**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE AMERICAN WATERWAYS OPERATORS,<br>801 North Quincy Street, Suite 200<br>Arlington, VA 22203,<br><br>    Plaintiff,<br><br>    v.<br><br>ANDREW WHEELER, Acting Administrator of the United States Environmental Protection Agency,<br><br>and<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br>1200 Pennsylvania Avenue, NW<br>Washington, DC 20460,<br><br>    Defendants. | Case No.: 18-2933 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The American Waterways Operators ("AWO") states as follows:

**INTRODUCTION**

1. For over four decades, under the Federal Water Pollution Control Act ("Clean Water Act" or "CWA") most vessels operating in waters of the United States, including Puget Sound, have been prohibited from discharging sewage without first properly treating it on board using approved marine sanitation devices ("MSDs") to ensure it met environmentally protective standards. Under the CWA, because of the interstate nature of vessel movement, these activities are regulated exclusively by the federal government, and states are completely preempted from

1

doing so. Federal law and regulations implemented by the U.S. Environmental Protection Agency ("EPA") and the U.S. Coast Guard provide uniform requirements that vessels must follow to properly treat any sewage prior to discharge of the sanitized water, and vessels have installed expensive equipment to meet this requirement.

2. In one narrow circumstance, under Section 312(f)(3) of the CWA, a state has the authority to petition EPA to allow it to create a "no discharge zone" ("NDZ"). No sewage, regardless of how well it is treated, may be discharged into an NDZ once the NDZ is created. Instead, all such sewage must be stored on the vessel, then transferred to an onshore facility to be treated elsewhere, and then the treated water would be discharged, in this case back into Puget Sound. If an NDZ is created, depending on its size, vessels may have to render inoperable the expensive MSDs that they installed in compliance with federal regulations, and must instead install larger tanks to store and discharge sewage to an appropriate onshore facility for it to be treated by onshore water treatment facilities.

3. Given the impact of such a determination on the industry that installed treatment systems and the impact on commerce if insufficient onshore facilities exist, before an NDZ is created, the state's petition must meet specific requirements regarding the need for the NDZ, and EPA must make an independent, substantive, affirmative determination that "adequate facilities" that can provide for the safe and sanitary removal and treatment of sewage from "all vessels" are "reasonably available" in the area of the proposed NDZ.

4. In this action, AWO challenges a determination by the Administrator of the EPA (the "Administrator") pursuant to Section 312(f)(3) that the entire Puget Sound can be declared a "no discharge zone" (the "Determination"). This Determination was made with respect to a petition filed by the State of Washington Department of Ecology ("Ecology") to create the

largest-ever all vessel NDZ in the United States pursuant to the CWA—2,300 square miles and 1,000 miles of coast line.

5. Specifically, this case involves a challenge to the Administrator's final Determination pursuant to Section 312(f)(3) that "adequate facilities" were "reasonably available" in Puget Sound to handle discharges from all vessels using Puget Sound, a copy of which is attached to this Complaint as Exhibit 1. The Administrator acted in an arbitrary, capricious, and illegal manner for several reasons, including but not limited to the following grounds: (a) he had no authority to make the Determination under Section 312(f)(3) because there was not a valid petition to do so submitted by a state; (b) the "numbers" used by the Administrator to conclude that there were adequate facilities reasonably available to safely and sanitarily remove and treat sewage from as many as 3,646 commercial vessels operating in the 2,300 square miles of Puget Sound simply do not add up, and EPA failed to respond adequately or at all to evidence presented to it that demonstrates this; and (c) the extraordinary costs associated with implementing this determination—as much as $720 million dollars—demonstrates that a determination that onshore facilities are reasonably accessible is arbitrary and capricious.

6. Accordingly, the Determination is arbitrary, capricious, and inconsistent with the law. AWO seeks a declaration invalidating and vacating the Determination.

## **JURISDICTION AND VENUE**

7. AWO seeks judicial review of agency action pursuant to 5 U.S.C. §§ 702-706, a declaratory judgment pursuant to 28 U.S.C. § 2201, and injunctive relief pursuant to 5 U.S.C. § 705.

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9. Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1).

**PARTIES**

10. Plaintiff AWO is the national trade association for the tugboat, towboat, and barge industry. AWO has approximately 350 member companies. Many AWO members operate towing vessels in Puget Sound. Plaintiff brings this action on behalf of itself and its members. As explained below, AWO submitted comments to EPA in connection with the Determination. The Determination adversely affects AWO's members because the NDZ would force them to incur substantial and unreasonable burdens and costs to retrofit and modify their vessels – as much as $161,500 for towing vessels or $300,000 for articulated tug barges to install storage tanks, rather than use perfectly good treatment equipment – and incur ongoing unreasonable burdens and expenses resulting from the prohibition on discharge in Puget Sound, which could well put some of them out of business. A court order vacating and setting aside the Determination would remedy this harm.

11. Defendant Andrew Wheeler is the Acting Administrator of the U.S. Environmental Protection Agency.

12. Defendant U.S. Environmental Protection Agency is the federal government agency responsible for implementing and enforcing a variety of federal environmental laws, including the CWA.

**OTHER RELEVANT ENTITIES**

13. The Puget Sound NDZ Marine Alliance ("Marine Alliance") is a coalition of maritime industry stakeholders, including vessel operators from the passenger, deep-draft, cruise, fishing, recreational, and towing vessel sectors; ports; shipyards; marine equipment manufacturers; and maritime labor. AWO is a member of the Marine Alliance. Many members

of the Marine Alliance are situated in Puget Sound. Members of the Marine Alliance, including AWO, submitted comments to EPA in connection with the Determination challenged in this lawsuit. The Marine Alliance and AWO also submitted a petition for reconsideration and reversal of the Determination.

## FACTUAL BACKGROUND

*Statutory and Regulatory Structure*

14. Section 312 of the CWA establishes a comprehensive federal program for the regulation of marine sewage discharges and MSDs, administered and enforced by the U.S. Coast Guard and EPA. 33 U.S.C. § 1322(b)-(e). Section 312(f) of the CWA expressly preempts states from adopting or enforcing any statute or regulation "with respect to the design, manufacture, or installation or use of any [MSD] on any vessel subject to the provisions of this section." 33 U.S.C. § 1322(f)(1)(A). This is a reflection of the inherently mobile nature of the commercial maritime industry, which necessarily crosses state and often international boundaries. Vessel transportation and commerce that rely on it would come to a standstill if every state could impose separate standards.

15. For four decades, MSDs have been used on many vessels to safely and efficiently treat or store water generated from sinks, bathrooms, and other locations on the vessels before the water was discharged (referred to generally as "sewage"). Millions of dollars have been spent developing, installing, and operating these devices. These devices treat or store the water so that when it is discharged, it meets appropriate standards for being free of sewage, as well as harmful bacteria and other substances. The requirement to use these devices is imposed by the CWA.

16. A type II MSD is a flow-through sewage treatment device certified by the U.S. Coast Guard to meet performance standards established by EPA. Those performance standards ensure that the treated water does not harm the receiving waters into which it is discharged. It is used on many commercial towing vessels that operate in Puget Sound. Because the type II MSDs treat the sewage, the vessels do not need to have sewage holding tanks on board (that would otherwise be needed to store sewage water until it can be treated and discharged at appropriate onshore facilities). Many of AWO's members have type II MSDs operating on their vessels. Other vessels, such as recreational offshore vessels, use type I MSDs that treat the water differently, or type III MSDs (used on most smaller recreational boats, as well as most large oceangoing ships) that are just holding tanks, such that the sewage is not treated at all but is instead held for discharge and treatment on shore.

17. Notwithstanding the preemption of state authority to regulate sewage treatment and discharge from vessels, Section 312(f)(3) authorizes EPA to allow states to establish NDZs in state waters, which means that even discharges for treated water from type I and type II MSDs, no matter how harmless, would be prohibited. Section 312(f)(3) states:

> After the effective date of the initial standards and regulations promulgated under this section, if any State determines that the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection, such State may completely prohibit the discharge from all vessels of any sewage, whether treated or not, into such waters, except that *no such prohibition shall apply until the Administrator determines that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply*. (emphasis added).

18. EPA has issued regulations and guidance to implement the process described in Section 312(f)(3). Specifically, a state seeking to establish an NDZ must "[make] a written application to the Administrator," which "shall include" the following, very specific information:

6

> (1) A certification that the protection and enhancement of the waters described in the petition requires greater environmental protection than the applicable Federal standard;
>
> (2) A map showing the location of commercial and recreational pump-out facilities;
>
> (3) A description of the location of pump-out facilities within waters designated for no discharge;
>
> (4) The general schedule of operating hours of the pump-out facilities;
>
> (5) The draught requirements on vessels that may be excluded because of insufficient water depth adjacent to the facility;
>
> (6) Information indicating that treatment of wastes from such pump-out facilities is in conformance with Federal law; and
>
> (7) Information on vessel population and vessel usage of the subject waters.

40 C.F.R. § 140.4(a). Absent such information, EPA may not grant the petition.

19. The EPA has also issued a 300-page guidance document that provides instructions and details on what states are expected to submit to meet the petition requirements. U.S. Environmental Protection Agency, *Protecting Coastal Waters from Vessel and Marina Discharges: A Guide for State and Local Officials, Volume I. Establishing No Discharge Areas Under §312 of the Clean Water Act* (August 1994).

20. EPA has granted approximately 68 state petitions filed under Section 312(f)(3), but none remotely approached the size of Puget Sound.

*Ecology's Petition to EPA*

21. Ecology's petition to EPA (the "Petition") was submitted in July 2016 and included no information that addressed the concerns and deficiencies raised by the vessel operating community.

7

22. By way of example, the state assumed there were 2.017 billion persons discharging raw sewage into Puget Sound every hour with no MSD being used. AWO and the Marine Alliance demonstrated the flaws in this and other assumptions, but all remained in the Petition as submitted to EPA.

23. The Petition also ignored extensive evidence regarding the costs associated with the proposed NDZ. It was pointed out to Ecology (and later to EPA) that with the institution of an NDZ and a prohibition on all discharges, towing vessel operators would not be able to use federally-approved type II MSDs in Puget Sound and would instead need to install type III MSD holding tanks where raw sewage could be stored until shore-side disposal or at-sea discharge. It was noted that (a) the cost to install a type III MSD is approximately $161,500 for each towing vessel and $300,000 for articulated tug barges; (b) these tanks require significant space, which is unavailable on many vessels; and (c) retrofitting is thus either impossible or economically infeasible for these vessels. As reported to EPA, Ecology cited estimates that the 20-year present value costs due to retrofits would be potentially $511 million and the 20-year present value costs associated with pumpouts are estimated to be up to $211 million.

24. The Petition was also defective because it failed to meet the requirements that EPA regulations impose, including sufficient information regarding the availability of pumpout facilities that might allow the agency to meaningfully fulfill its obligation to independently determine that facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available.

25. Rather than reject the Petition, EPA requested that Ecology submit additional information to EPA regarding commercial vessel pumpout availability. Ecology did so on October 14, 2016.

26. On November 7, 2016, EPA quickly published its preliminary affirmative determination approving the NDZ, allowing a 30-day comment period. 81 Fed. Reg. 78,141 (Nov. 7, 2016). This decision was made by the Regional Administrator of EPA Region 10 to whom the Administrator has claimed he delegated the authority to make NDZ determinations.

27. On November 16, 2016, AWO wrote to the then-EPA Region 10 Administrator seeking at least an additional 45 days to review the supplemental information Ecology provided on October 14, 2016. On November 18, 2016, EPA Region 10 denied the request to extend the comment period, but on December 7, 2016, reversed course and announced it would extend the comment period by 15 days, to December 23, 2016.

28. On January 19, 2017, EPA Region 10 released a document responding to the various comments received, titled "Puget Sound No-Discharge Zone Response to Comments." EPA also notified stakeholders that the then-EPA Region 10 Administrator planned to grant Ecology's petition.

29. The final "Regional Administrator's Determination" was issued by Acting Regional Administrator Michelle Pirzadeh on February 13, 2017. It was later published in the Federal Register. 82 Fed. Reg. 11,218 (Feb. 21, 2017). (Exhibit 1 hereto).

30. On November 15, 2017, AWO on behalf of the Marine Alliance sought reconsideration of the Regional Administrator's Determination from the Administrator. The Administrator never responded to that request and, due to subsequent events noted below, the request for reconsideration was withdrawn on April 20, 2018. It is the final decision of the Administrator, made on his behalf by the Acting Regional Administrator, that is the subject of the instant appeal.

31. On April 9, 2018, Ecology completed its rulemaking to implement the proposed NDZ. Ecology's rule establishing the NDZ became effective on May 10, 2018, though Ecology asserted that it would "phase in" enforcement of the rule.

*Comments to EPA*

32. EPA received 40,462 comments in response to the preliminary determination. The commenters included associations representing vessel owners, industry representatives, cruise boat operators, and other commercial vessel operators.

33. Plaintiff AWO provided comments to EPA on December 23, 2016. The comments identified specific and critical ways in which Ecology's Petition failed to comply with the requirements of 40 C.F.R. § 140.4 governing such petitions, why the record precluded EPA from making the requisite finding that adequate facilities for the safe and sanitary removal of sewage were reasonably available as to all vessels, and, therefore why the Petition had to be denied.

*Deficiencies in Ecology's Petition*

34. In its comments, AWO explained that the certification that Ecology included in its Petition needed to trigger the NDZ process at the federal level, attesting "that the protection and enhancement of the waters described in the petition require greater environmental protection than the applicable Federal standard," was not supported by facts. Specifically, Ecology had not demonstrated that (a) the use of type II MSDs caused or contributed in any way to water quality impairment in Puget Sound, (b) EPA standards for type II MSDs were not sufficiently protective of water quality in Puget Sound, or (c) the proposed NDZ would improve water quality in Puget Sound. AWO also provided EPA with the same analysis it provided to the state demonstrating that the potential discharges (over 2 billion people discharging sewage every hour) upon which

Ecology based its concerns were "absurd by any stretch of the imagination." EPA did not address these comments, stating that EPA had no authority to determine if the Petition met the requirements of Section 312(f) that "the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection" than what the current federal standards provide.

35. While Section 312 provides that the determination of reasonably available and adequate facilities is made exclusively by the Administrator, EPA's regulations do require the petitioning state to provide data relating to that decision. Ecology's Petition failed to include several pieces of information required by the applicable regulation, 40 C.F.R. § 140.4(a), when a petition to establish an NDZ is submitted. The Petition did not include "a general schedule of operating hours" for the mobile pump-out facilities, did not include an accurate map showing the location of such pump-out facilities, showed a facility in Seattle that does not exist, and failed to consider which of the supposedly available facilities were in water too shallow to accommodate the majority of commercial vessels operating in Puget Sound. The Petition also did not provide an attestation or information indicating that the identified pump-out facilities would actually treat the sewage in conformance with federal law.

36. In fact, the undisputed evidence was that many of the removal facilities cited in the Petition relied on treatment facilities that were under federal consent decrees based on their inability to serve then-existing customers, but such evidence was ignored.

37. AWO challenged the sufficiency of Ecology's certification of need for the NDZ to the Washington State Pollution Control Hearings Board ("PCHB"). That challenge is ongoing, thus rendering Ecology's certification non-final. The PCHB dismissed the appeal for lack of subject matter jurisdiction; the Thurston County Superior Court reversed the PCHB

dismissal and remanded the appeal to the PCHB; Ecology then appealed the Superior Court ruling, and the appeal is pending with briefing completed and oral argument occurred December 7, 2018. The remand proceeding in the PCHB has been stayed pending resolution of the appeal in the Court of Appeals. Without a final certification, Ecology's Petition was legally insufficient, and EPA could not have acted on it under the CWA or its own regulations.

*EPA's Defective Determination Regarding the Existence of Adequate Facilities for the Safe and Sanitary Removal and Treatment of Sewage from All Vessels Being Reasonably Available*

38. The Determination identified only two stationary commercial facilities as being reasonably available for as many as 3,646 commercial vessels operating 24/7 over 2,300 square miles and 1,000 miles of coastline within Puget Sound, or alternatively for handling the discharge of sewage from vessels by over 2 billion people every hour.

39. It was explained to EPA that these two facilities are not reasonably available to towing vessels operated by AWO members and similar commercial vessels because: (a) they were too far away from where the vessels operated, requiring vessels to spend a full day or more and tens of thousands of dollars in fuel and time out of service just to get to them; (b) their berthing areas are too small and too shallow to handle most of the commercial vessels; and (c) there were serious questions about whether they could properly treat the sewage once offloaded.

40. By way of example, it was explained to EPA that Bellingham—the only fixed pumpout facility in Puget Sound available for use by commercial towing vessels—is 70 miles from Seattle and 100 miles from Tacoma, the two busiest areas of commercial vessel traffic in Puget Sound; diverting AWO members' towing vessels to Bellingham for trips to these pumpout facilities would require *four to eight hours of travel tim*e each way, thousands of gallons of fuel, and thousands of dollars in out-of-service time. EPA did not dispute or meaningfully respond to these comments.

41. In addition, it was explained to EPA that both facilities at the Port of Bellingham location have significant length and draught restrictions that make them unavailable to many commercial vessels. It was explained that Bellingham's dock can only accommodate vessels up to 65 feet in length and has draught restrictions of 11-16 feet whereas ocean-going towing vessels operating in Puget Sound typically require a minimum of 110 feet for berth space and 20 feet of draught, and that articulated tug barges require a berthing space of 600 feet and 30 feet of draught. Numerous commercial vessel owners commented to EPA that most or all of their fleets would be unable to access the Bellingham facilities due to size and draught limitations. Indeed, the entire regulated community of vessels over 70 feet in length—many of which are operated by AWO members—would be unable to access either commercial shore-based pumpout facility. EPA did not adequately respond to these comments.

42. EPA also did not consider, as required by statute, whether the two facilities at Bellingham were "adequate facilities for the safe and sanitary removal and treatment of sewage" in terms of whether any expected increased capacity at these facilities would impact the ability to treat the sewage in a safe and sanitary manner. EPA noted that these facilities directly discharged into the Bellingham sewer line. There is nothing in the record to indicate whether Bellingham has the capacity to provide for safe and sanitary treatment of the additional sewage. EPA did not address these comments.

43. Rather than finding that these were "adequate facilities for the safe and sanitary removal and treatment of sewage" that "are reasonably available" as the law required, EPA brushed aside all of these comments, dismissively saying that these facilities might be "less useful."

44. EPA then claimed that there were five companies that had 52 "pumper" trucks and two mobile barges that offered pumpout services that were adequate and reasonably available to serve the commercial vessels operating in the 2,300 square miles of Puget Sound, with over 1,000 miles of coastline.

45. Comments explained that many of the mobile pump-out vessels and pumper truck companies are inaccessible to commercial vessels, noting that (a) many of the mobile pumpout companies identified by Ecology only work within marinas that cannot be accessed by typical commercial towing vessels; (b) others have tank capacity limitations (*e.g.* 300 gallons) far under that required for an ocean-going tugboat (as large as 3,000 gallons); and (c) there was no evidence that any of these vendors had the specialized clearance and credentials to allow them to serve vessels that often operate between secure facilities and terminals. EPA never substantively addressed these significant logistical issues or even examined these mobile pumpout facilities, relying instead on brief phone calls with sales personnel from some of these companies. There is nothing in the record of this Determination indicating that these significant issues and questions were addressed or that there was any independent verification of the conclusory answers that were provided. Nor is there any indication in the record that EPA addressed where and how these mobile pumpout operators treat pumped wastewater.

46. This information is fundamental to the determination that EPA is required to make in order to approve the NDZ—that there are "adequate facilities for the ***safe and sanitary*** removal and ***treatment*** of sewage." 33 U.S.C. § 1322(f)(3) (emphasis added). EPA never discussed or evaluated whether any of these mobile operators could actually and effectively treat the wastewater they collect, either directly or via delivery to a wastewater treatment facility that could handle the expected significant rise in demand that would result from institution of this

large new NDZ. Instead, EPA focused only on whether mobile units could collect the wastewater. Comments explaining this were submitted, but were ignored.

47. Mobile pumpout trucks also involve substantial costs. AWO commented that the estimated cost per vessel per year was $25,260 for a typical towing vessel, which would be in addition to the significant costs noted above to retrofit and install a type III MSD tank. EPA was also told that the annual cost for some passenger vessels could exceed over $350,000, a fact which it ignored when determining if onshore facilities were **reasonably** accessible.

48. EPA asserted that, apparently based on brief telephone calls to four mobile pumpout service providers and secondhand and unverified information provided by proponents of the NDZ, the mobile pumpout facilities would be available at any time, could cover all of Puget Sound, and could service any vessel. However, this assertion is directly contradicted by record evidence demonstrating commercial vessel operators' actual direct experiences. EPA made no effort to independently confirm the information it received beyond vague references to four telephone calls to companies offering mobile pumpout services. The record does not reveal any data or facts to support EPA's conclusions from this "outreach" or indicate with whom EPA spoke with at these companies (*i.e.*, salespersons versus technicians who actually perform the work and understand the logistical difficulties raised by the commenters, or existing customers of the same type that would be serviced as a result of the NDZ). With no explanation, EPA also discounted the direct experience from a cruise line operator that a pumper barge refused to provide it service due to the amount of time needed to fully pump out its tank.

49. Nothing in the record indicates that EPA visited even one of these mobile pumpout facilities or considered any of the logistics associated with which facilities could actually and reasonably service on a 24/7 basis vessels in an area with 1,000 miles of coastline.

50. To the extent that the Determination is based on what the agency believes may occur in the future as to the accessibility of mobile pumpout providers and installation of dockside sewage holding tanks, its conclusion is inappropriate. The plain language of the statute requires that EPA determine that adequate facilities "are" reasonably available, not that they "will be" or "might be" available in the future. The record evidence demonstrates that given the actual vessel activity, there are not presently sufficient pumper trucks and barges that, in fact, can access, accommodate, and be available to meet the real-world needs of these vessels when the demand actually exists.

51. The foregoing represents some but by no means all of the ways in which the Determination by EPA was arbitrary, capricious, and inconsistent with law.

## COUNT I
### (Violation of Section 706 of the Administrative Procedures Act)

52. Paragraphs 1 through 51 are incorporated by reference as if fully set forth herein.

53. The Determination is an order under 5 U.S.C. § 551 that constitutes final agency action under 5 U.S.C. § 704.

54. Under section 706 of the Administrative Procedures Act, a reviewing court may set aside final agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The Determination is arbitrary, capricious, and not in accordance with law.

55. By way of example, the Determination is arbitrary and capricious because EPA approved Ecology's Petition despite the fact that it clearly was insufficient under EPA's own regulations. Among other things, Ecology's Petition is nonfinal; omits critical required elements, such as "a general schedule of operating hours" for the mobile pump-out facilities; lacks an accurate map showing the location of pump-out facilities; lacks information on draught

requirements; and lacks an attestation or information indicating that treatment of wastes from the identified pump-out facilities is in conformance with federal law.

56. By way of further example, the Determination is arbitrary and capricious because EPA did not adequately respond to or address the comments provided, failed to consider critical information, and chose not to evaluate factors required under the law. Specifically, EPA excluded thousands of commercial vessels from its considerations, chose not to consider any costs in evaluating whether adequate facilities were reasonably available, and did not adequately address information presented to the agency that contradicted the agency's conclusions.

57. By way of further example, the Determination is inconsistent with law because it is not supported by substantial evidence in the record and is inconsistent with the CWA.

## COUNT II
### (Declaratory Judgment – Violation of the CWA)

58. Paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

59. This complaint presents an actual controversy regarding the interpretation of the CWA as it relates to the scope of EPA's authority to make an affirmative determination that adequate facilities are reasonably available as to all vessels, sufficient to approve a state's petition for an NDZ under 33 U.S.C. § 1322(f)(3).

60. Pursuant to 28 U.S.C. § 2201(a), to resolve the actual controversies regarding the interpretation and application of this provision of the CWA and EPA's authority with respect thereto, AWO seeks a declaratory judgment, as set forth below, with respect to the duties and obligations of EPA under the CWA.

61. The CWA does not authorize EPA to issue an affirmative determination under 33 U.S.C. § 1322(f)(3) unless the state's petition for an NDZ meets the necessary requirements and EPA "determines that adequate facilities for the safe and sanitary removal and treatment of

sewage from all vessels are reasonably available for such water to which such prohibition would apply."

62. The Determination is inadequate under the statute because the evidence before EPA does not support that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply.

WHEREFORE, AWO respectfully requests that this Court:

a. Hold unlawful and set aside the Administrator's Determination;

b. Declare that the Determination violated Section 312(f)(3) of the CWA, 33 U.S.C. § 1322(f)(3), and the regulations implemented at 40 C.F.R. § 140.4(a);

c. Grant preliminary and permanent injunctive relief against implementation of the Determination;

d. Award attorney's fees and costs; and

e. Award such other relief as is just.

Dated: December 13, 2018

Respectfully submitted,

K&L GATES LLP

/s/ Barry M. Hartman
Barry M. Hartman (D.C. Bar No. 291617)
Theodore L. Kornobis (D.C. Bar No. 997236)
1601 K Street, N.W.
Washington, D.C. 20006-1600
T:  202.778.9000
F:  202.778.9100
barry.hartman@klgates.com
ted.kornobis@klgates.com

*Attorneys for Plaintiff*