UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WATERWAYS OPERATORS, ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> ANDREW WHEELER, Administrator of the United States Environmental Protection Agency, and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ) <br><br> Defendants, ) <br><br> and ) <br><br> WASHINGTON ENVIRONMENTAL COUNCIL, PUGET SOUNDKEEPER, FRIENDS OF THE EARTH, AND WASHINGTON STATE DEPARTMENT OF ECOLOGY, ) <br><br> Intervenor-Defendants. ) | Case No. 18-cv-02933 (APM) |

MEMORANDUM OPINION AND ORDER

I.      INTRODUCTION

On January 19, 2017, the Environmental Protection Agency ("EPA"), acting pursuant to Section 312(f)(3) of the Clean Water Act, authorized the State of Washington to declare the Puget Sound a "No Discharge Zone" ("NDZ").  That designation cleared the way for the State of Washington to prohibit recreational and commercial vessels from discharging sewage into the Puget Sound.  As a precondition to a state establishing an NDZ, Section 312(f)(3) requires EPA to

"determine[] that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available" for the waters at issue.  33 U.S.C. § 1322(f)(3).  EPA made such a "reasonable availability" finding for the waters of the Puget Sound.

American Waterways now seeks to overturn the agency's decision.  Moving for summary judgment, it argues that EPA's "reasonable availability" determination was arbitrary and capricious and violated Section 312(f)(3) of the Clean Water Act for multiple reasons.  EPA does not seek to defend its determination.  Instead, EPA now confesses legal error on one challenged ground, conceding that it erred by authorizing the Puget Sound NDZ without considering the financial costs of the action.  Instead of opposing summary judgment, EPA asks the court to reconsider its earlier denial of the agency's motion for voluntary remand.  Intervenor-Defendants Washington Environmental Council, Puget Soundkeeper, Friends of the Earth, and Washington State Department of Ecology (collectively, "Intervenors") have stepped in for the agency.  They deny that EPA committed any error, defend EPA's authorization of the Puget Sound NDZ, and cross-move for summary judgment.

For the reasons that follow, the court grants in part and denies in part American Waterways' motion for summary judgment, grants in part and denies in part Intervenors' motion for summary judgment, and denies as moot EPA's motion for reconsideration.

## II.    BACKGROUND

### A.    Legal Background

This case concerns the State of Washington's effort to prohibit recreational and commercial vessels from discharging sewage into the Puget Sound, an inlet of the Pacific Ocean along Washington's northwestern coast.  Under the Clean Water Act, EPA is required to set national "standards of performance for marine sanitation devices" that are "designed to prevent the

discharge of untreated or inadequately treated sewage into or upon the navigable waters." 33 U.S.C. § 1322(b)(1).  Once EPA promulgates national standards, the standards serve as a floor, and no state is permitted to "adopt or enforce any statute or regulation" regarding marine sanitation devices that is less stringent than the national standards.  *See id.* § 1322(f)(1).

In certain circumstances, however, a state may impose greater restrictions on vessel sewage discharge in the form of a No Discharge Zone, or NDZ.  Under Section 312(f)(3), "if any State determines that the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection, such State may completely prohibit the discharge from all vessels of any sewage, whether treated or not, into such waters." *Id.* § 1322(f)(3).  There is, of course, a catch.  Before a state can create an NDZ, it must obtain approval from EPA, which must "determine[] that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply."  *Id.*  After a state applies for permission to designate an NDZ, EPA has 90 days to make its determination on the reasonable availability of adequate facilities.  *Id.*

To facilitate EPA's decision, agency regulations require that a state's application to create an NDZ include the following:

    (1)    A certification that the protection and enhancement of the waters described in the petition require greater environmental protection than the applicable Federal standard;

    (2)    A map showing the location of commercial and recreational pump-out facilities;

    (3)    A description of the location of pump-out facilities within waters designated for no discharge;

    (4)    The general schedule of operating hours of the pump-out facilities;

    (5)    The draught requirements on vessels that may be excluded because of insufficient water depth adjacent to the facility;

(6)    Information indicating that treatment of wastes from such pump-out facilities is in conformance with Federal law; and

(7)    Information on vessel population and vessel usage of the subject waters.

40 C.F.R. § 140.4(a).  Additionally, EPA has published extensive guidance for state and local officials that are interested in establishing NDZs under Section 312(f)(3).  *See* A.R. at 2326–623.[1]

## B.    Factual Background

### 1.    Application for a Puget Sound NDZ

Prior to petitioning EPA for an NDZ, the State of Washington, acting through its Department of Ecology ("Ecology"), and its partner organizations studied water quality in the Puget Sound for four years.  *See* A.R. at 57.  These studies led Ecology to conclude that federal marine discharge requirements were insufficient to protect the Puget Sound's water quality, primarily because vessels were discharging treated sewage near shellfish beds and swimming beaches.  *See id.* at 66.  The Puget Sound was already facing serious degradation from pollution: some of the waters of the Puget Sound were "designated as impaired waters under the Clean Water Act" because of poor water quality indicators, including "high concentrations of fecal indicator bacteria."  *Id.* at 67.  The Washington Department of Health ultimately closed some public swimming beaches and shut down 36,000 acres of commercial shellfish harvest beds in the Sound due to poor water quality.  *Id.*  Ecology hoped that securing an NDZ would "complement[] other, more substantive investments in sewage treatment, onsite systems, stormwater management, industrial treatment, and agricultural runoff control" that would revitalize the Puget Sound.  *Id.* at 66.

---

[1] Citations to the Administrative Record ("A.R.") can be found in the four-volume Joint Appendix, *see* ECF Nos. 61, 61-1, 61-2, 61-3.

In July 2016, Ecology requested EPA's permission to designate the Puget Sound as an NDZ, submitting a petition that reflected water quality studies, outreach to vessel operators, and an analysis of the costs and benefits of creating an NDZ. *Id*. at 57, 68. Ecology also submitted a supplement to its petition in October 2016, after EPA asked for more information on the availability of "pumpout" facilities. *See id.* at 127; *id.* at 128–45 (Ecology's October 2016 supplement titled "Commercial Vessel Pumpout Availability in Puget Sound"). As the name implies, a pumpout facility removes, or "pumps out," sewage from a vessel.

On November 7, 2016, EPA published notice of its preliminary determination that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels were reasonably available in the Puget Sound. 81 Fed. Reg. 78,141-02. The notice sought public comment, with the original deadline for comments set for December 7, 2016. *Id.* at 78,141. On December 7, after receiving stakeholder requests for additional time, EPA announced that it would extend the deadline for comments to December 23, 2016. A.R. at 55541.

### 2.    *EPA's Determination*

On January 19, 2017, after receiving more than 40,000 comments on Ecology's application, *id.* at 33, EPA published notice of its final determination. It found that "adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available" in the Puget Sound, *id.* at 1–31.

In its determination, EPA considered separately the availability of sewage pumpout facilities for recreational and commercial vessels. As to recreational vessels, EPA found that there were at most 171 recreational vessels per pumpout facility in the Puget Sound. *Id.* at 5–6. EPA concluded that this ratio was well below the minimum ratio of 600 recreational vessels per pumpout facility that the Fish and Wildlife Service recommended was reasonable under the Clean

Vessel Act, *id.* at 727, and therefore determined that adequate pumpout facilities were reasonably available in the Puget Sound for recreational vessels. *Id.* at 6.

As for commercial vessels, EPA estimated that there were 709 such vessels operating in the Puget Sound based on a study conducted by the Puget Sound Maritime Air Forum and information provided by commenters. *Id.* at 7. In reaching this total, EPA excluded "large, oceangoing transient commercial vessels that are only in Puget Sound for a short period of time." *Id.* The agency did so after finding that such vessels "have large enough holding tanks to hold their waste during the time they are in Puget Sound, with some exceptions[,] . . . [and therefore] do not have a need to pumpout." *Id.* EPA then subtracted additional commercial vessels, including the fleets of the Washington State Ferries, the U.S. military, and the Victoria Clipper, because they have "dedicated pumpout facilities" and would not use other facilities. *Id.* at 7, 9. EPA ultimately determined that there were 631 commercial vessels operating in the Puget Sound that would require pumpout facilities. *Id.* at 9.

EPA then found that there were "at least 56 pumpouts available for commercial vessels" in the Puget Sound, including both stationary and mobile pumpout facilities. *Id.* Based on the estimated 631 vessels, this created a ratio of 11 commercial vessels per pumpout facility. *Id.* In addition to this 11:1 ratio, EPA "considered the fact that . . . mobile pumpouts provide service throughout Puget Sound, provide sufficient capacity for commercial vessels, and generally do not experience dock access issues." *Id.* EPA also noted that such mobile pumpout services could be scheduled by appointment and that service providers had reported that they did not "experience seasonal fluctuations" in demand. *Id.* "Given the widespread availability and flexibility of these services and the overall ratio of 11:1, EPA determine[d] that adequate pumpout facilities for the safe and sanitary removal and treatment of sewage for commercial vessels are reasonably available

6

for the waters of Puget Sound."  *Id.* at 9–10.  EPA's final decision was published in the Federal

Register on February 13, 2017.  *Id.* at 45–48.

With EPA's sign off in hand, Ecology established an NDZ in the Puget Sound.  *See* Wash.

Admin. Code § 173-228-030.  Ecology established two effective dates for the NDZ.  The default

effective date for "all vessels" was May 10, 2018.  *See id.* § 173-228-050.  However, for "[t]ug

boats, commercial fishing vessels, small commercial passenger vessels, and National Oceanic and

Atmospheric Administration (NOAA) research and survey vessels," Ecology "delayed

implementation . . . [for] five years," meaning an effective date for such vessels of May 10, 2023.

*Id.*  The members of Plaintiff American Waterways, "a national trade association for the tugboat,

towboat, and barge industry," are subject to the five-year delayed implementation.  *See* Pl.'s Mot.

for Summ. J., ECF No. 46 [hereinafter Pl.'s Mot.], at 4, 12.

### C.    Procedural Background

In December 2018, American Waterways brought this suit, alleging that EPA's

determination was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C.

§ 706, and that EPA was not authorized to issue a determination on Ecology's purportedly

defective petition under Section 312(f)(3) of the Clean Water Act, 33 U.S.C. § 1322(f)(3).  Compl.,

ECF No. 1, ¶¶ 54–57, 61–62.

Before any substantive motions were filed, EPA moved to remand without vacatur so that

the agency could consider compliance costs, a factor it had eschewed in its "reasonable

availability" determination.  Mot. to Remand to EPA, ECF No. 25 [hereinafter First Remand Mot.].

EPA had taken the position that "neither the Clean Water Act nor EPA's implementing regulations

contemplate or require that EPA consider the cost of retrofitting vessels, the practical

considerations related to retrofitting vessels to achieve compliance, or the cost of using pump-out

facilities." A.R. at 15.  But following American Waterways' Complaint, EPA explained that it "now believes," based on the Supreme Court's decision in *Michigan v. EPA*, 576 U.S. 743 (2015), "that it should have considered compliance costs in making the challenged determination."  First Remand Mot. at 4.

The court denied EPA's motion.  The court observed that EPA had "admit[ted] no error," and instead had argued that, although the Clean Water Act did not necessarily require it to weigh costs, the Act could not "'be read to prohibit EPA from doing so.'"  Memo. Op. & Order, ECF No. 41 [hereinafter Remand Op.], at 5 (quoting Reply in Supp. of EPA's Remand Mot., ECF No. 32, at 3).  The court exercised its discretion to deny remand in part because no new developments rendered EPA's determination infirm; rather, *Michigan v. EPA*, on which EPA based its change of heart, "was decided two years before EPA issued its decision," and commenters had raised the issue of costs during the Section 312(f)(3) process.  *Id.* at 5–6.  The court also concluded that granting EPA's remand request would unduly prejudice Intervenors' environmental interests and create uncertainty for regulated parties.  *Id.* at 7–8.

EPA then tried to shore up its case for remand.  On March 26, 2020, EPA issued a formal memorandum declaring that it had taken "the legally erroneous position that it was not required to, and did not, consider costs" in issuing its "reasonable availability" determination as to the Puget Sound NDZ.  Cross-Mot. for Recons., ECF No. 49 [hereinafter Mot. for Recons.], Ex. 1, ECF No. 49-1 [hereinafter EPA Costs Memo], at 1.  Upon further review, the agency concluded, "the Supreme Court's decision in *Michigan v. EPA* . . . *compels* EPA to consider costs in determining whether such facilities are 'reasonably available.'"  *Id*. (emphasis added).  EPA also promised that "the Office of Water is developing a tool to calculate the costs on the vessel community associated with the reasonable availability of facilities within a proposed no-discharge zone."  *Id.* at 3.

8

Meanwhile, this litigation continued to move forward.  On January 17, 2020, the court issued a scheduling order for briefing on cross-motions for summary judgment.  Minute Order, Jan. 17, 2020.  American Waterways filed its motion for summary judgment, as directed, on February 26, 2020.  *See* Pl.'s Mot.  That motion challenged the Puget Sound NDZ determination on four grounds, all under the APA:  (1) EPA failed to determine that there were "adequate" facilities for the "treatment" of sewage, as required by Section 312(f)(3); (2) the agency failed to consider costs in determining the "reasonable availability" of facilities in the Puget Sound, as required under *Michigan v. EPA*; (3) EPA's finding that pumpout facilities are "reasonably available" was flawed; and (4) the agency improperly disregarded deficiencies in Ecology's Section 312(f)(3) petition.  *See* Pl.'s Mot.

EPA did not fully respond to American Waterways' motion; nor did it cross move for summary judgment.  Instead, the agency filed a consolidated opposition and a "Cross-Motion for Reconsideration," in which the agency conceded error only on the *Michigan v. EPA* cost issue and again asked the court to remand the case in its entirety.  *See* Mot. for Recons.  The agency mounted no defense to the other three challenges but urged the court not to reach those issues, so that the agency "on remand . . . [could] reevaluate the rest of the determination."  *Id.* at 1.  Taking up the agency's mantle, Intervenors defended the Puget Sound NDZ determination in full and asked the court to reject EPA's renewed request for remand and enter summary judgment in their favor.  Def.-Intervenors' Cross-Mot. for Summ. J., ECF No. 52 [hereinafter Intervenors' Br.].  The court heard oral argument on the parties' motions on November 13, 2020.

## IV.    DISCUSSION

The court turns first to EPA's motion for reconsideration and then takes up the cross-motions for summary judgment.

### A.    Motion for Reconsideration of Motion to Remand

Under Rule 54(b), the court may "reconsider an interlocutory order as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (internal quotation marks omitted).  "[A]sking 'what justice requires' amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004).  The court likewise "has broad discretion to decide whether and when to grant an agency's request for a voluntary remand." *Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 381 (D.C. Cir. 2017).  Here, EPA does not claim that the typical triggers for remand—the occurrence of events outside the agency's control or new evidence, *Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 132 (D.D.C. 2010)—support its request for reconsideration.  Rather, EPA's request turns on its memo formalizing its new position on the impact of the Supreme Court's 2015 decision in *Michigan v. EPA*.  The memo states that EPA's prior "position that it was not required to . . . consider costs in issuing its determination in 2017" was "legally erroneous" under *Michigan v. EPA*.  EPA Costs Memo at 1.

While EPA has now admitted error, the court is not convinced that justice requires granting EPA's motion for reconsideration, which would have the effect of preempting resolution of the pending motions for summary judgment.  One of the driving purposes of remanding a matter to an agency is to conserve "the courts' and the parties' resources."  *See Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993); *see also id.* at 524 n.3 (collecting cases where remand was granted prior to significant events in the development of the case); *Carpenters Indus. Council*, 734 F. Supp.

10

2d at 132 (noting voluntary remand "preserves scarce judicial resources by allowing agencies to cure their own mistakes" (internal quotation marks omitted)).  That objective would not be served were the court to remand this case in its present posture.  The court has before it hundreds of pages of briefing on cross-motions for summary judgment.  Those motions squarely present issues that go beyond EPA's failure to consider costs.  If the court were to remand to EPA for a determination of costs, EPA would lack guidance on the validity of American Waterways' other challenges, and the parties potentially could be mired in piecemeal litigation over EPA's determination for years to come.  No one benefits from such an approach.  The court therefore concludes that it is in the parties' best interests, and that of the public, for the court to resolve the ripe cross-motions for summary judgment.  As the court reaches the merits of the parties' dispute, and will remand the matter as a remedy, EPA's motion for reconsideration will be denied as moot.

### B.     Cross-Motions for Summary Judgment

#### 1.     *Legal Standard*

"[S]ummary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016).  In reviewing an agency action under the APA, "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted).  The court's analysis must be confined to the administrative record and should involve "neither more nor less information than" was before "the agency when it made its decision."  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted).  The district court's "review is 'narrow' and [it] will 'not substitute [its] judgment for that of the agency.'"  *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016)

(alterations omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.* (*State Farm*), 463 U.S. 29, 43 (1983)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "Although the arbitrary and capricious standard of review is deferential, the court will 'intervene to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action.'"  *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221–22 (D.C. Cir. 1999) (alterations omitted) (quoting *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994)).  An agency's decision is arbitrary and capricious if the agency relies "on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

### 2. *Failure to Consider Costs*

The court first turns to the parties' dispute regarding whether EPA was required to consider compliance costs under Section 312(f)(3) of the Clean Water Act.  American Waterways and EPA both argue that *Michigan v. EPA* required the agency to consider the costs of compliance as part of the "reasonable availability" determination required under Section 312(f)(3).  *See* Pl.'s Mot. at 20–22; Mot. for Recons. at 5–7.  Intervenors dispute this, arguing that (1) the logic of *Michigan* does not apply to the statutory scheme at issue here, (2) the text of Section 312(f)(3) is silent as to costs, and (3) the statute prioritizes environmental protection over economic considerations. Intervenors' Br. at 19–25.

Although the parties largely devote their time to parsing *Michigan*, the Supreme Court's earlier decision in *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001), is the better place to begin.  In *Whitman*, the Court considered whether a provision of the Clean Air Act instructing EPA to set ambient air quality standards that were "requisite to protect the public health with an adequate margin of safety" required the agency to consider "the economic cost of implementing" the proposed standards.  531 U.S. at 465–66 (internal quotation marks omitted). The Court concluded that Congress's instruction for EPA to issue "requisite" standards with an "adequate margin of safety" did not constitute a "textual commitment of authority to the EPA to consider costs" in setting air quality standards.  *Id.* at 468.  It was "implausible," the Court found, that by using the "modest words" "requisite" and "adequate," Congress bestowed on EPA "the power to determine whether implementation costs should moderate national air quality standards." *Id.*  Rather, the text of the provision at issue, "interpreted in its statutory and historical context and with appreciation for its importance to the [Clean Air Act] as a whole, unambiguously bar[red] cost considerations from the" standard-setting process.  *Id.* at 471; *see also Murray Energy Corp. v. EPA*, 936 F.3d 597, 621 (D.C. Cir. 2019) (rejecting "the same argument rejected in *Whitman*" that costs should be considered in setting air quality standards).

More than a decade later, in *Michigan*, the Supreme Court considered a different provision of the Clean Air Act, this time evaluating a provision that directed EPA to regulate emissions from power plants if it concluded that "regulation [wa]s appropriate and necessary."  576 U.S. at 748. There, EPA found that it was "'appropriate and necessary'" to regulate power-plant emissions, but the agency concluded that it was not required "to consider whether the costs of its decision outweighed the benefits."  *Id.* at 749–50.  The *Michigan* Court disagreed, finding that the term "'[a]ppropriate and necessary'" was "a far more comprehensive criterion than 'requisite to protect

13

the public health,'" the phrase at issue in *Whitman*.  *Id.* at 756 (internal quotation marks omitted).

The word "'appropriate,'" the Court reasoned, was "the classic broad and all-encompassing term

that naturally and traditionally includes consideration of all the relevant factors."  *Id.* at 752

(internal quotation marks omitted).  Cost was one such relevant factor:  "Read naturally in the

present context, the phrase 'appropriate and necessary' requires at least some attention to cost."  *Id.*

Read together, *Whitman* and *Michigan* stand for the proposition that whether an agency is

required to consider costs depends on the breadth of the statutory text and the degree to which it

compels the agency to balance costs and benefits.  Since the Supreme Court decided *Michigan*,

courts in this Circuit have helpfully fleshed out the *Whitman–Michigan* dichotomy.  For example,

in *Utility Solid Waste Activities Group v. EPA*, the D.C. Circuit concluded that EPA was not

required to consider costs when determining whether a waste site should be classified as an "open

dump."  901 F.3d 414, 448–49 (D.C. Cir. 2018).  The statute there directed EPA to determine "if

there is no reasonable probability of adverse effects on health or the environment from disposal of

solid waste at such facility."  *Id.* at 449 (emphasis omitted) (internal quotation marks omitted).

The Circuit held that the statute did not contain an "explicit mention of costs," nor was "there any

flexible language such as 'appropriate and necessary' that might allow the EPA to consider costs

in rulemaking."  *Id.*; *see also Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 401 (D.D.C. 2017)

(holding statute that said the FDA "shall" regulate products that the Secretary deemed to be

tobacco products did not permit consideration of costs because "[t]he statute does not limit the

Secretary's authority to deem to when he finds it 'appropriate and necessary' to do so").  In

contrast, in *Metlife, Inc. v. Financial Stability Oversight Council*, the district court determined that

the Council was required to consider costs when designating Metlife for supervision by the Board

of Governors of the Federal Reserve System under the Dodd–Frank Act.  177 F. Supp. 3d 219,

14

224–25, 230 (D.D.C. 2016).  The Dodd–Frank Act instructed the Council to consider ten statutory criteria in deciding whether to designate a financial institution, as well as "any other risk-related factors that [it] deems appropriate."  *Id.* at 225 (quoting 12 U.S.C. § 5323(a)(2)(K)).  The statute's use of the word "appropriate," the court held, required the Council to consider costs in making any designation.  *Id.* at 241.  As in *Michigan v. EPA*, "'[a]ppropriate' is . . . the touchstone of the catch-all factor in Dodd–Frank Section 113," and that "textual hook," the court held, required the Council "to consider the cost of designating a company for enhanced supervision."  *Id.* at 240–41.

Turning then to the present case, the court begins, as required, with the statutory text. Section 312(f)(3) provides, in relevant part, that

> if any State determines that the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection, such State may completely prohibit the discharge from all vessels of any sewage, whether treated or not, into such waters, except that no such prohibition shall apply until the Administrator determines that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are *reasonably available* for such water to which such prohibition would apply.

33 U.S.C. § 1322(f)(3) (emphasis added).  The question before the court is whether EPA's mandate to determine whether adequate facilities are "reasonably available" is a textual direction from Congress to EPA to consider costs.  It is.

Section 312(f)(3) of the Clean Water Act more closely resembles the statutes at issue in *Michigan* and *Metlife* than those at issue in *Whitman* and *Utility Solid Waste*.  The term "reasonably available" is precisely the type of language that the *Michigan* Court held "naturally and traditionally includes consideration of all the relevant factors."  576 U.S. at 752 (internal quotation marks omitted); *see also id.* at 755 (considering parenthetically the boundaries of "the expansive word 'reasonable'").  Indeed, the Court said as much in explaining its decision: "*reasonable*

regulation ordinarily requires" an agency to consider the "advantages *and* the disadvantages of agency decisions." *Id.* at 753 (first emphasis added) (internal quotation marks omitted); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. OSHA*, 938 F.2d 1310, 1319 (D.C. Cir. 1991) ("'Reasonableness' has long been associated with the balancing of costs and benefits."). "Reasonable availability" therefore provides the "textual hook," *Metlife*, 177 F. Supp. 3d at 241, that requires EPA to consider costs when approving an NDZ.

Logic likewise dictates that the agency was required to consider costs. Say, hypothetically, that the only pumpout facilities available to commercial vessels were all located in a remote portion of the Puget Sound. Even if those pumpout facilities were sufficient in number, no one would seriously contend that such facilities were "reasonably available" if they imposed significant costs on vessels to reach them. *Cf. Michigan*, 576 U.S. at 752 ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."). There can be little doubt that Congress intended for EPA to consider the costs of accessing adequate facilities in determining whether such facilities were "reasonably available."

Intervenors launch three primary attacks against the application of *Michigan* to this case. First, Intervenors argue that Section 312(f)(3) requires the states that seek to create an NDZ—not EPA—to consider the costs of compliance, and Ecology did so here. Intervenors' Br. at 20–21. Second, Intervenors argue that the relevant statutory scheme fundamentally differs from the provision in *Michigan* because it does not contain an explicit congressional directive to consider costs. *Id.* at 22–23. Third, Intervenors claim that Congress "prioritized environmental protection under § 312(f)(3)" to the exclusion of cost considerations. *Id*. at 23–25. None of these arguments is persuasive.

16

a.      The statutory scheme

Intervenors first assert that, because Section 312(f)(3) calls for states, as opposed to EPA, to regulate and limits EPA's role to approving a state's decision to regulate, the state, rather than EPA, should balance the costs and benefits of creating an NDZ. *Id*. at 21–23.  But that contention cannot be squared with the plain statutory text.  Section 312(f)(3) places an independent obligation on EPA to consider costs.  It requires "the Administrator" of EPA to "determine[] that adequate facilities . . . are reasonably available." 33 U.S.C. § 1322(f)(3).  Thus, the textual hook that requires consideration of all relevant factors—the "reasonable availability" of adequate facilities—is delegated directly to EPA, not to states petitioning EPA.  The Administrator, having been charged with determining whether adequate facilities are reasonably available, must consider "the advantages *and* the disadvantages" of his decision, *see Michigan*, 576 U.S. at 753, regardless of whether the petitioning state also does so.

b.      Explicit directive

Intervenors next attempt to distinguish *Michigan* by arguing that, while the statutory scheme in *Michigan* explicitly called for the considerations of costs, the same is not true here.  Intervenors' Br. at 22–23.  They also contend that Congress did not intend for EPA to consider costs in Section 312(f)(3) because Congress explicitly required EPA to consider costs in making different determinations under other subsections of the same section of the Clean Water Act but did not specifically do so in Section 312(f)(3).  *Id.* at 22 (citing 33 U.S.C. § 1322(b)(1) (requiring EPA to promulgate regulations for marine sanitation devices "after giving appropriate consideration to the economic costs involved"); *id.* § 1322(n)(b)(B)(vii) (requiring consideration of "the economic costs of the installation and use of the marine pollution control device" for armed service vessels); *id*. § 1322(o)(B)(vii) (requiring consideration of "the economic costs of the use

17

of the management practice" in determining such practices for recreational vessels); *id.* § 1322(p)(6)(C)(ii)(III) (allowing exclusion of installed ballast water management systems if "with respect to the use of which[,] the environmental, health, and economic benefits would exceed the costs")).  Neither argument meaningfully distinguishes this case from *Michigan*.

The provision at issue in *Michigan* no more *expressly* required consideration of costs than does the statutory text at issue here. Neither statutory provision explicitly mentions costs.  Rather, both statutes use broad language—"appropriate and necessary" in *Michigan*, and "reasonably available" here—to convey consideration of cost as a factor.  To read *Michigan* as applicable only in situations in which the statute explicitly calls for the consideration of costs would ignore the Court's primary reason for requiring the agency to consider costs:  that "it is unreasonable to read an instruction to an administrative agency to determine whether 'regulation is appropriate and necessary' as an invitation to ignore cost."  576 U.S. at 753.  The difference in statutory text is not a basis on which to distinguish *Michigan*.

Moreover, the *Michigan* Court rejected a challenge similar to Intervenors' assertion here that the express reference to costs in nearby statutory provisions meant that Congress did not intend for EPA to consider costs under Section 312(f)(3).  In *Michigan*, EPA "point[ed] out that other parts of the Clean Air Act expressly mention cost," but that the provision at issue did not.  *Id.* at 754.  The Court responded that "this observation shows only that [the statute's] broad reference to appropriateness encompasses *multiple* relevant factors (which include but are not limited  to cost); other provisions' specific references to cost encompass just cost."  *Id.* at 755.  The Court held that it was "unreasonable to infer that, by expressly making cost relevant to other decisions, the Act implicitly makes cost *irrelevant* to" other decisions committed to the agency.  *Id.*; *see also Metlife, Inc.*, 177 F. Supp. 3d at 241 ("[The Council] points to adjacent terms in Dodd–Frank that

18

expressly mention cost.  But the *Michigan* Court considered and rejected the same argument."
(citation omitted)).  Similarly here, the fact that other provisions of Section 312 explicitly require
the consideration of costs does not mean cost is irrelevant to Section 312(f)(3).  If anything, the
emphasis on cost in these other sections, as in *Michigan*, "reinforces the relevance of cost" as a
factor to be considered under Section 312(f)(3).  576 U.S. at 753.

c.   Priority of environmental protection

Finally, Intervenors urge that Congress intended Section 312(f)(3) to prioritize
environmental protection over all else and thus EPA was not permitted to consider costs.
Intervenors' Br. at 23–25.  But the cases that Intervenors marshal in support of this argument are
inapposite.  For example, in *Union Electric Co. v. EPA*, the disputed provision of the Clean Air
Act enumerated eight criteria that a state program implementing EPA's standards needed to satisfy,
and if the program satisfied the eight criteria, the statute provided that the Administrator "shall"
approve the state plan.  427 U.S. 246, 257 (1976).  The Court concluded that "[t]he mandatory
'shall' makes it quite clear that the Administrator is not to be concerned with factors other than
those specified."  *Id*.  Likewise, the statute at issue in *Whitman* instructed EPA to determine the
maximum concentration of certain airborne pollutants that "public health can tolerate" and to
decrease that concentration to "provide an 'adequate' margin of safety."  531 U.S. at 465.  The
Court found EPA should not consider costs because Congress used "modest words" that limited
the scope of the agency's inquiry.  *See id.* at 468; *see also Citizens to Preserve Overton Park, Inc.
v. Volpe*, 401 U.S. 402, 411 (1971) (forbidding Secretary from approving project to use public
parkland unless there was "no feasible and prudent alternative," which the Court concluded meant
that "only the most unusual situations are exempted" (internal quotation marks omitted)).  In these

19

cases, Congress expressed a "priority" for environmental protection by severely restricting the factors the agency could consider and narrowly defining the scope of its review.

In contrast, Section 312(f)(3)'s requirement that the Administrator determine whether adequate facilities are "reasonably available" uses language that traditionally requires "consideration of all the relevant factors," including a balancing of costs and benefits.  *See Michigan*, 576 U.S. at 772–73; *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 938 F.2d at 1319; *Mingo Loan Coal Co. v. EPA*, 829 F.3d 710, 735 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("In order to act reasonably, EPA must consider costs before exercising its Section 404(c) authority to veto or revoke a permit.").  Given Section 312(f)(3)'s capacious language, no overriding environmental-protection priority is evident in the provision.[2]

*       *       *

The court holds that EPA was required to consider the costs of compliance in determining whether adequate facilities were "reasonably available."   EPA specifically disavowed any consideration of costs, erroneously concluding that "neither the Clean Water Act nor EPA's implementing regulations contemplate or require that EPA consider the cost" of an NDZ.  A.R. at 15; *see* Mot. for Recons. at 1 ("EPA refused to consider costs when determining whether certain sewage facilities in Puget Sound are 'reasonably available.'").  EPA therefore acted arbitrarily and capriciously in violation of the APA.  The agency will have to consider costs on remand.

---

[2] Intervenors also argue that requiring EPA to consider costs permits the agency "to unilaterally consider costs to industry, without considering the harm to states."  Intervenors' Br. at 24–25.  The court disagrees.  Because the touchstone of EPA's analysis is the "*reasonable* availability" of facilities, costs are just one factor EPA must consider in determining whether adequate facilities are reasonably available.  The reasonableness of the costs of a proposed NDZ may vary depending on environmental concerns, among other factors.

3.      *Availability of Adequate Treatment Facilities*

American Waterways next argues that EPA acted arbitrarily and capriciously by not determining whether adequate facilities for the treatment (as opposed to the removal) of wastewater are reasonably available in the Puget Sound.  Pl.'s Mot. at 14–20.  Intervenors counter that EPA satisfied its obligations to verify the existence of adequate treatment facilities by requiring Ecology to certify how pumpout companies treat the waste they remove and that, by dint of a separate EPA regulatory scheme, the public treatment facilities that accept marine sewage meet federal requirements.  Intervenors' Br. at 14–15.

Section 312(f)(3) requires EPA to determine whether adequate facilities are reasonably available for both the "removal *and* treatment of sewage."  33 U.S.C. § 1322(f)(3) (emphasis added).[3]  EPA therefore must inquire into the reasonable availability of adequate treatment facilities and "articulate[] a rational connection" between its factual conclusions and its determination that adequate treatment facilities are reasonably available in the Puget Sound.  *See, e.g.*, *Clean Wis. v. EPA*, 964 F.3d 1145, 1161 (D.C. Cir. 2020) (internal quotation marks omitted).  That is, EPA must "make[] an 'attempt at explanation or justification'" for its decision that there were adequate, reasonably available treatment facilities for marine sewage and provide this court "with a 'way to know [its] methodology.'"  *Nat'l Wildlife Fed. v. EPA*, 286 F.3d 554, 564 (D.C. Cir. 2002) (quoting *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994)); *see also Chamber of Argentine-Paraguayan Producers of Quebracho Extract v. Holder*, 332 F. Supp. 2d 43, 49 (D.D.C. 2004) (noting agency's "decisionmaking path" must be "reasonably" discernable from the record (internal quotation marks omitted)).

---

[3] EPA's guidance on Section 312(f)(3) applications reflects this construction.  It requires applicants to "describe the waste disposal process for each pumpout facility and dump station" and "indicate that these practices comply with current Federal, state, and local regulations and, in some cases, explain how they comply."  A.R. at 2376.

EPA failed to meet its obligation.  The record is devoid of any explanation for EPA's finding that adequate sewage treatment facilities are reasonably available in the Puget Sound. Intervenors suggest that "EPA based [its] determination [as to treatment facilities] on the fact that the majority of pumped sewage is sent to wastewater treatment plants, and some is treated at onsite septic tanks 'that meet federal requirements.'"   Def.-Intervenors' Reply Br., ECF No. 60 [hereinafter Intervenors' Reply], at 2.  But the portion of the record that Intervenors cite relates to only facilities that treat sewage from *recreational* vessels—it says nothing about treatment of sewage from *all* vessels, or importantly here, treatment of sewage from commercial vessels.  *See* A.R. at 43 (discussing pumpout and treatment facilities for "the recreational vessel population" and noting "[t]he majority of pumped sewage is sent to wastewater treatment plants; however, some is sent to onsite septic tanks that meet federal requirements"); *see also* Intervenors' Reply at 2 (noting EPA made separate determinations for recreational and commercial vessels in this section).  Intervenors cannot point to, and the court cannot find, any similar determination by EPA with respect to facilities that deal with commercial marine sewage.

If anything, the record appears to suggest that the agency deliberately avoided making a determination regarding the reasonable availability of adequate treatment facilities.  In response to a comment expressing concern about "sewage facilities accepting septage," EPA said that its "authority under . . . Section 312(f)(3) is limited to evaluating the reasonable availability of pumpout facilities" and "[a]ny considerations as to whether an individual wastewater treatment facility has the capacity to accept vessel sewage would appropriately lie within the jurisdiction of that municipality or utility."  A.R. at 31.  That position cannot be squared with the clear statutory text.  Congress directed EPA to consider the reasonable availability of adequate facilities to remove "and" treat sewage.  33 U.S.C. § 1322(f)(3).  While Intervenors suggested at oral argument that

EPA did not mean that it had eschewed all consideration of treatment facilities, the record contains no explanation or further context for this statement or, most importantly, any countervailing evidence that EPA *did* consider the reasonable availability of treatment facilities. On this record, the court must conclude that EPA did not make a reasoned determination as to the availability of sewage treatment facilities. *See Nat'l Mar. Safety Ass'n v. OSHA*, 649 F.3d 743, 753 (D.C. Cir. 2011) (remanding where record was "almost devoid" of analysis beyond the agency's "bare conclusion").

Intervenors' attempts to fill the gaps in the agency's reasoning are both impermissible and unconvincing. "[C]ourts may not accept . . . counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*; *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."); *Clean Wis.*, 964 F.3d at 1162–63 (rejecting argument because court could not "accept counsel's *post hoc* rationalizations for agency action" (alteration omitted) (internal quotation marks omitted)). Having already discerned that EPA did not conduct any inquiry into the availability of treatment facilities in the Puget Sound, Intervenors' *post hoc* explanation cannot stand in as surrogate for the agency's own explanation.[4]

---

[4] In their reply brief, Intervenors also suggest that the issue of the reasonable availability of adequate wastewater treatment facilities was not raised before EPA. Intervenors' Reply at 2, 5. "[A] party will normally forfeit an opportunity to challenge an agency [decision] on a ground that was not first presented to the agency for its initial consideration." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005). Intervenors, however, first raised this argument in their reply brief, so they have forfeited their forfeiture argument. *See Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 n.7 (D.C. Cir. 2009) (refusing to consider argument that issue that was not raised "with the agency at the appropriate time" was waived because the parties did not raise the purported waiver "with th[e] court at the appropriate time").

But even if this court were to accept Intervenors' explanation as EPA's, the record still would be insufficient.  Intervenors argue that EPA did verify the availability of treatment facilities because Ecology's petition showed that most sewage "would be treated at publicly owned treatment works," which are "regulated under the Clean Water Act" and must "obtain National Pollutant Discharge Elimination System permits."  Intervenors' Br. at 14.  Therefore, Intervenors suggest, EPA was certain that "publicly owned treatment works treat sewage in a safe and sanitary manner."  *Id.*  But the only evidence of such a consideration in the record consists of Ecology's own tables that simply list the name of the "Discharge Location" for pumpout facilities.  *See* A.R. at 137–39 tbls. 5&6.  Nowhere does the record state that *EPA* determined, based on Ecology's list of discharge locations, that all sewage facilities were federally regulated and therefore there were adequate treatment facilities reasonably available in the Puget Sound.  Moreover, even crediting Intervenors' argument that the sewage would be properly treated, the record contains no evidence and reveals no consideration by EPA of whether existing treatment plants could accommodate the extra sewage that likely would need to be processed if the Puget Sound became an NDZ.

Intervenors' statement that "EPA verified that four commercial marine work companies can discharge vessel sewage to any publicly owned treatment facility located throughout Puget Sound" is likewise without basis.  Intervenors' Br. at 14.  To substantiate their assertion, Intervenors identify four conversations that EPA held with commercial marine work companies. *Id.* at 14–15 (citing notes from conversations at A.R. 655, 657, 659, and 678).  But these conversations could hardly have supported EPA's finding regarding adequate treatment facilities. EPA's notes from three of the conversations contain *no* discussion of sewage treatment.  *See* A.R. at 655, 657, 659.  And EPA's notes from the fourth conversation include a single bullet point stating, "The same companies that come to take oil/waste streams can also take sewage waste.

24

And then take it to a municipality for disposal." *Id.* at 678.  This lone bullet point—in the four-volume Joint Appendix the parties submitted—reveals nothing about the capacity of the municipality to accept more marine sewage, nor does it establish that all commercial marine work companies can take marine sewage to a municipality, or that this is a routine practice.  It therefore cannot save EPA's determination.

To receive this court's deference, EPA must show its work.  *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 269–70 (D.D.C. 2018).  EPA did not show that it considered the reasonable availability of adequate sewage treatment facilities, and its determination that such facilities exist was therefore arbitrary and capricious.  On remand, EPA must explain its reasoning for its determination as to the existence of adequate, reasonably available treatment facilities in the Puget Sound, which may include additional fact finding as necessary.[5]

4.     *EPA's Methodology for Determining the Availability of Pumpout Facilities*

American Waterways next takes issue with EPA's methodology for determining that adequate pumpout facilities are reasonably available.  Pl.'s Mot. at 28–39.  It argues that EPA's determination was arbitrary and capricious because the agency (1) excluded large oceangoing vessels from its estimate when calculating a ratio of commercial vessels to pumpout facilities, *id.* at 28–31; (2) did not appropriately respond to a comment stating that two companies' fleets were excluded from its estimate of vessels, *id.* at 31–32; and (3) did not consider characteristics of certain vessels that are relevant to determining whether such vessels can access pumpout facilities, *id.* at 32–39.  Intervenors disagree.  They respond that (1) EPA's estimate of vessels properly excluded any vessels that would not require the use of pumpout facilities in the Puget Sound and

---

[5] Because the court concludes that EPA did not explain its basis for determining that adequate treatment facilities are reasonably available in the Puget Sound, it does not reach American Waterways' remaining argument on the adequacy of sewage treatment at municipalities near the Puget Sound, *see* Pl.'s Mot. at 18–20.

(2) even if more vessels should have been included in EPA's estimate, additional vessels would have had little impact on the vessels-to-facilities ratio.  Intervenors' Br. at 25–30.  Intervenors also argue that (3) EPA directly addressed comments regarding how the characteristics of certain vessels might limit access to pumpout facilities and no more was required of the agency.  *Id.* at 30–39.  The court takes each purported flaw in EPA's methodology in turn.

a.   <u>Vessels estimate</u>

American Waterways' objections to EPA's vessels estimate wade into waters where the agency is typically afforded the utmost deference.  "[W]hen agency decisions involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise, they receive an extreme degree of deference."  *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (internal quotation marks omitted).  "Although the plaintiff[] may disagree with the science or the methodology the [agency] elects to use, absent a statutory mandate that requires a particular methodology, the agency's choice of methodology need only be 'reasonable' to be upheld."  *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 209 (D.D.C. 2012) (citing *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998–99 (D.C. Cir. 2008)). Even if EPA's vessel count was ultimately "less than perfect, imperfection alone does not amount to arbitrary decision-making."  *Dist. Hosp.*, 786 F.3d at 61.

EPA offered a reasonable explanation for why it excluded large oceangoing vessels from its vessels estimate and thus its vessels-to-pumpout-facilities ratio.  EPA stated in its Final Determination:

> The large, oceangoing transient commercial vessels that are only in Puget Sound for a short period of time . . . have large enough holding tanks to hold their waste during the time they are in Puget Sound, with some exceptions. . . . [T]hese vessels do not have a need to

26

pumpout and were not included when assessing the adequacy of
pumpout facilities.

A.R. at 7. In support of this conclusion, EPA pointed to information supplied by Ecology,

including a 2013 survey titled *Phase 2 Commercial Vessel Sewage Management and Pumpout:*

*Puget Sound No Discharge Zone for Vessel Sewage. Id.* at 22–23.[6] American Waterways

nonetheless presses that EPA must count *all* vessels—regardless of their need to use pumpout

facilities—and that some large oceangoing vessels, even those with holding tanks, may ultimately

need pumpout facilities. Pl.'s Mot. at 28–30. These arguments fall flat.

EPA's obligation under Section 312(f)(3) is to determine if removal and treatment facilities

are "reasonably available" in the Puget Sound. 33 U.S.C. § 1322(f)(3). It would make no sense

for EPA to develop a commercial vessels-to-facilities ratio, or otherwise tailor its methodology, to

account for boats that do not require any pumpout or treatment services. Padding the vessels count

with such empty numbers would not yield any additional information about the number of facilities

that are required to adequately remove and treat marine sewage. EPA thoroughly explained its

logic for reducing its estimate of vessels, and this court finds no fault in EPA's conclusion.

The statutory text does not compel a different result. American Waterways emphasizes

Section 312(f)(3)'s reference to "all vessels," but, read in context, that reference is to only those

vessels that actually require disposal and treatment services in the Puget Sound. Before a state can

completely prohibit vessels from discharging sewage in specific waters, EPA is directed to

"determine[] that adequate facilities for the safe and sanitary removal and treatment of sewage

---

[6] American Waterways argues that it was improper for EPA to rely on this survey, rather than a global survey, in
reaching its determination. Pl.'s Reply at 18. EPA, however, offered a reasonable explanation for relying on
Ecology's 2013 study rather than American Waterways' proposed global study: There was "no information to suggest
that the results of the world survey are representative of vessels in Puget Sound." A.R. at 23. Because EPA has
offered a reasonable explanation for its choice, that choice is entitled to this court's deference. *See Coal. of Battery
Recyclers Ass'n v. EPA*, 604 F.3d 613, 619–21 (D.C. Cir. 2010) (concluding that EPA "adequately justified" its choice
of studies and deferring to that decision).

27

from all vessels are reasonably available for such water." 33 U.S.C. § 1322(f)(3). The statutory focus is thus on the reasonable availability of adequate facilities for vessels that actually require "safe and sanitary removal and treatment" services. It would make little sense for "all vessels" to include vessels that do not need the very facilities whose reasonable availability EPA is required to assess. Section 312(f)(3) therefore did not compel the inclusion of oceangoing vessels in EPA's count.[7]

Nor does the court find any basis to require EPA to develop a model that accommodates every contingent circumstance in which vessels that rarely need pumpout services in the Puget Sound require emergency service. EPA exercised its discretion in excluding such vessels and specifically explained that it had "confirmed that no large cruise ships" had requested authorization to directly discharge in the Puget Sound since 2012. A.R. at 27. The court cannot conclude that it was unreasonable for EPA to exclude ships that generally do not need to discharge in the Puget Sound and in practice had not had an emergency need to do so in the five years preceding the NDZ.

b.  EPA's response to comments regarding excluded fleets

American Waterways next asserts that EPA's response to a comment stating that EPA had failed "to consider at least two companies' entire fleets" was inadequate. Pl.'s Mot. at 31. The law of this Circuit is settled that an agency must "respond to 'relevant' and 'significant' public comments," but it need not respond to comments that "do not disclose the factual or policy basis on which they rest." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (first quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977); then quoting *id.* at 35 n.58); *see also Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)

---

[7] Notably, EPA also excluded other types of vessels in its count—including Washington State Ferries and U.S. military vessels—that have their own dedicated pumpout facilities, *see* A.R. 7, 9, but American Waterways registers no complaint as to these exclusions.

("[C]omments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response." (internal quotation marks omitted)).  As EPA explained in its response to the disputed comment, the commenter did not identify the "number of additional existing vessels [that] may have been excluded."  A.R. at 22.  The commenter claimed two fleets were missing but provided the number of vessels (six) for only one of the missing fleets. *Id.* at 21–22; *see id.* at 54962.  EPA's response demonstrated that small discrepancies in the commercial vessel count, which already included more than 600 vessels, were not substantial enough to alter its analysis.  *Id.* at 22.  And without information regarding the size of the other missing fleet or information substantiating the commenter's claim that the "numbers should be higher," *id.*, EPA could not reasonably assess how its model might have fallen short and the degree to which its estimates needed to be reconsidered.  In such a circumstance, no additional response was required.

Moreover, minor deficiencies in an agency's data do not provide this court with a basis to conclude that the agency acted arbitrarily and capriciously.  *See Dist. Hosp.*, 786 F.3d at 61 (holding that an agency's reliance on an imperfect dataset "alone does not amount to arbitrary decision-making"); *Catawba County v. EPA*, 571 F.3d 20, 45 (D.C. Cir. 2009) ("EPA used the best information available in making its designations, and that is all our precedent requires.").  Thus, any shortcomings in EPA's response are not grounds for remand.  *See Nat'l Shooting Sports Found., Inc.*, 716 F.3d at 215 ("[O]nly comments which, . . . if adopted, would require a change in an agency's proposed rule cast doubt on the reasonableness of a position taken by the agency." (internal quotation marks omitted)).

c.    EPA's use of a vessels-to-facilities ratio

Finally, American Waterways offers a broadside attack on EPA's determination that adequate pumpout facilities exist, particularly contesting EPA's use of a ratio to determine whether there were reasonably available facilities for all vessels.   American Waterways first identifies multiple logistical issues that it claims EPA failed to address properly.  *See* Pl.'s Mot. at 32–38.  It then argues that EPA failed to explain why a simple ratio was helpful to its determination and why a ratio of 11 vessels to 1 pumpout facility meant that pumpout facilities were reasonably available. *Id.* at 38–39.

*First*, American Waterways argues that EPA failed to consider the logistical challenges commercial vessels would face when attempting to use pumpout facilities, including concerns about large boats accessing facilities, mobile facilities gaining security access to certain docks, and the time and cost of using pumpout services.  *Id.* at 32–36.  American Waterways also argues that EPA ignored concerns about seasonal demand for services.  *See id*. at 38.  These arguments boil down to discontent with EPA's conclusion that mobile pumpout facilities, which EPA concluded resolve many of American Waterways' complaints, can service commercial vessels that are unable to use stationary pumpout facilities.  EPA acknowledged the very same logistical challenges that American Waterways now raises and concluded that they were not prohibitive:

> EPA has determined that there are numerous mobile pumpout facilities with the capacity to serve large commercial vessels and that service all of Puget Sound.  Among the five pumpout companies identified in Ecology's petition, approximately 52 pumpout trucks and two mobile commercial pumpout vessels are available to service all of Puget Sound.  As such, the geographic location or vessel access restrictions at the two stationary pumpout facilities in Bellingham are not determinative.

A.R. at 24.  The agency went on to explain precisely how mobile pumpout facilities could solve some of the challenges that vessels faced and delineated separate responses regarding the number

30

of mobile pumpout companies, services provided, capacity of mobile pumpouts, dock access and security concerns, and seasonal demand.  *Id.* at 25–26.  American Waterways may disagree with the conclusions EPA reached during notice and comment, but that does not convert EPA's reasoned response to the type of non-response that "demonstrates that the agency's decision was not 'based on a consideration of the relevant factors.'"  *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (quoting *Overton Park*, 401 U.S. at 416).  This court will not substitute its judgment for EPA's.

*Second*, American Waterways claims that EPA was "dismissive" of a comment from American Cruise Lines relaying concerns about pumping sewage from the *American Spirit*, a small cruise ship.  Pl.'s Mot. at 37–38; A.R. at 54928–40.  But American Waterways' argument is based on a selective excerpt of EPA's thorough response to American Cruise Lines.  EPA's response explained, for example, why American Cruise Lines' concerns about pumpout times were unfounded based on its research and further explained that, while the *American Spirit* might need to adjust its itinerary or operations to accommodate the time needed to pump out, this did not render pumpout facilities unavailable.  *See* A.R. at 27.  There is thus no truth to American Waterways' claim that EPA "dismiss[ed] rather than address[ed]" the issues American Cruise Lines raised.  Pl.'s Mot. at 38.  EPA's response satisfies the court that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *State Farm*, 463 U.S. at 43.

*Third*, American Waterways argues that, particularly considering the aforementioned logistical challenges, EPA acted arbitrarily and capriciously (1) by basing its determination that facilities were reasonably available on a ratio of commercial vessels to pumpout facilities and (2) by failing to explain the relevance of that ratio.  Pl.'s Mot. at 34–38.  Intervenors counter that

EPA properly responded to these logistical concerns and that EPA considered a ratio of commercial vessels to pumpout facilities as but one factor of several in determining that adequate pumpout facilities are reasonably available in the Puget Sound. Intervenors' Br. at 30–32, 37–39.

In reviewing an agency's use of a given model, "judicial deference . . . cannot be utterly boundless." *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994). This court will find EPA's model "arbitrary and capricious if there is simply no rational relationship between the model and . . . [the situation] to which it is applied." *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 198 (D.D.C. 2008) (internal quotation marks omitted). "Generally, the court defers the determination of fit between the facts and the model to the EPA, so that the agency rather than the court may balance marginal losses in accuracy against marginal gains in administrative efficiency and timeliness of decision making." *Chemical Mfrs. Ass'n*, 28 F.3d at 1265.

The record before the court reveals that EPA did not simply compute a ratio and call it quits. Rather, EPA reached out to multiple pumpout providers to ascertain any restrictions on vessel size, capacity, time to pump out, dock access, and seasonality. A.R. at 24–27; *id.* at 655–60, 668–70, 672–74, 676–79 (records of conversations with pumpout facilities). EPA explicitly stated that its determination was based, in part, on information gleaned from these conversations, which satisfied the agency that (1) "mobile pumpouts provide service throughout Puget Sound, provide sufficient capacity for commercial vessels, and generally do not experience dock access issues"; and (2) "services can be scheduled by appointment to accommodate vessel needs and itineraries, and are sufficiently diversified such that they do not experience seasonal fluctuations." *Id.* at 8–9. Thus, without deciding whether a ratio by itself is a permissible methodology for determining whether facilities are reasonably available, EPA's decision here was more nuanced than the simple

32

calculation of a ratio that American Waterways suggests.  *See Pub. Emps. for Env't Resp. v. U.S. Dep't of Interior*, 832 F. Supp. 2d 5, 24, 26 (D.D.C. 2011) (rejecting argument that agency did not show that its "observations [we]re systematic, comprehensive, or scientific" because the court was required to "defer to the agency's chosen methodology so long as it bears a rational relationship between the method and that to which it applied" (alterations omitted) (internal quotation marks omitted)).

American Waterways' second attack on EPA's reliance on a ratio—that EPA failed to adequately explain the relative significance of its ratio—has more teeth.  *See* Pl.'s Mot. at 38–39. "[T]he process by which an agency reaches its decreed result must be logical and rational." *Natural Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 86 (D.D.C. 2017) (alterations omitted) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).  To demonstrate that its process was logical and rational, EPA must, "at a minimum, provide[] an explanation for adopting" a given metric.  *See U.S. Sugar Corp.*, 830 F.3d at 652.  EPA, however, did not provide any explanation for how an 11:1 ratio of commercial vessels to pumpout facilities supported the conclusion that pumpout facilities were reasonably available.  *See* A.R. at 7–10. EPA did not, for example, explain whether there was a maximum permissible ratio for approving an NDZ or even if the 11:1 ratio fell into a given range of permissible ratios for commercial vessels. By contrast, with respect to recreational vessels, EPA explained that its ratio of 171 recreational vessels to one pumpout facility was appropriate by referring to the Clean Vessel Act's guidance that there should be "one pumpout station for every 300-600 boats."  *Id*. at 4–6.  EPA's lack of explanation with respect to commercial vessels stands out in comparison.

Intervenors attempt to make up for this shortcoming by noting that "[p]ast affirmative determinations shed some light" on why EPA found the 11:1 ratio reasonable, but Intervenors fail

33

to identify a single page in the record in which EPA itself looked to past determinations.  *See* Intervenors' Br. at 38.  Without an explanation for why a ratio of 11 commercial vessels to one pumpout facility is reasonable, EPA has not shown that its reliance on this ratio was rational and logical.  On remand, EPA will have the opportunity to explain why the 11:1 ratio supports a "reasonable availability" determination.

### 5.   *Scrutiny of Ecology's Petition*

#### a.   Exclusion of key data

American Waterways also argues that this court should vacate and remand EPA's determination because Ecology's petition for an NDZ did not include a map, operating hours, or draught restrictions for all facilities.  American Waterways suggests that these omissions required EPA to reject Ecology's petition.[8]  Pl.'s Mot. at 39–44.  Intervenors, naturally, have a different view.  They argue that an appendix to Ecology's petition provided most of the information American Waterways claims is missing and that EPA properly did not require a map of mobile pumpout facilities because they are, by definition, not fixed to a location.   Intervenors' Br. at 39–40.

As a "general principle," "it is always within the discretion of . . . an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it."  *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (internal quotation marks omitted).  For a court to undo an agency's action due to the agency's deviation from its procedures, the complaining party must make a

---

[8] American Waterways also argues that EPA should have rejected Ecology's petition because it did not include a statement that the treatment facilities in the petition complied with federal standards. *See* Pl.'s Mot. at 43–44.  Because this court has already concluded that EPA's analysis of wastewater treatment was insufficient and requires remand, it need not determine whether Ecology's failure to include a certification of compliance with respect to treatment facilities renders EPA's decision arbitrary and capricious.

"showing of substantial prejudice." *Associated Press v. FCC*, 448 F.2d 1095, 1104 (D.C. Cir. 1971) (internal quotation marks omitted).

American Waterways contends that the *American Farm Lines* rule does not apply here because EPA's procedures "confer important procedural benefits upon individuals," *id.* (internal quotation marks omitted), and "affect individuals' rights," *see Chiron Corp. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 944 (D.C. Cir. 1999). Pl.'s Mot. at 40–42. In such situations, American Waterways argues, courts have limited an agency's ability to deviate from its procedures. *Id.* But this comparison is inapt, and the court need look no further than American Waterways' own case law to demonstrate why. American Waterways relies on *Morton v. Ruiz*, where the Supreme Court found that an agency distributing a federal assistance program for impoverished Native Americans needed to adhere to strict internal procedures to determine whether an applicant was entitled to benefits. 415 U.S. 199, 231–32, 235 (1974). There, the "rights of individuals"—that is, individuals' rights to federal benefits—were being adjudicated. *Id.* at 235. In such a situation, the Supreme Court concluded that it was "incumbent upon" the agency "to follow [its] own procedures." *Id.*; *see also Mass. Fair Share v. Law Enf't Assistance Admin.*, 758 F.2d 708, 711–12 (D.C. Cir. 1985) (reaching a similar conclusion with respect to procedural requirements for finalizing grants to successful applicants). Here, by contrast, EPA did not adjudicate the individual rights of American Waterways' members when it approved the Puget Sound NDZ—it merely determined that Washington may create an NDZ for those waters. *Chiron Corp.*, 198 F.3d at 944 ("Because an NTSB investigation does not itself determine the rights of the parties . . . the Guidance cannot be viewed as a binding rule on these terms."). The *American Farm Lines* rule, and not a stricter one, therefore applies.

35

Following that rule, American Waterways fails to make a "showing of substantial prejudice," even if EPA did deviate from its own procedure. *Associated Press*, 448 F.2d at 1104 (internal quotation marks omitted). Although American Waterways vaguely claims that the lack of information made it difficult for the regulated community to access "the information necessary to meaningfully participate," Pl.'s Mot. at 42–43, it offers no credible reason to believe that any person's right to participate was impaired. First, American Waterways overstates the amount of information missing from Ecology's petition. The petition contained a map of stationary pumpout facilities and identified where mobile pumpout facilities were based, although it did not depict the range of the mobile pumpout companies. A.R. at 111. An appendix to the petition titled "Pumpout Facility Information" further provided the hours of operation for the vast majority of pumpout facilities. *See id*. at 119–24. The same appendix provided the "Min Depth at Low Tide" for each of the stationary facilities, although it did not do so for mobile pumpout facilities. *Id.* As Ecology explained, such draught requirements would vary for mobile pumpout companies, depending on where they were providing services. *See id.* at 145.

Second, with respect to the information that Ecology did omit from its petition, the record reveals that EPA received and responded to comments about each of the omitted issues—including the range of mobile pumpout facilities, access to such facilities, and their hours of operation. *Id.* at 25–26 (concluding marine work companies "will travel to the customer so that the distribution of services covers all of Puget Sound"; providing information on hours of operation in section titled "service provided"; explaining why "access to docks has not been an issue" for mobile pumpout facilities); *id.* at 23 (noting additional comment on lack of access to mobile facilities). American Waterways fails to identify what further comments it would have liked to offer or to

36

meaningfully address how EPA's responses to the existing comments were insufficient to protect its interests.

Moreover, EPA explained why the omissions in Ecology's petition did not hamper its reasoned decisionmaking.  It would not yield useful information, EPA explained, to require Ecology's petition to comply with certain requirements for mobile pumpout facilities and pumper trucks because of the variable places and docks these facilities use.  *Id.* at 18–19; *see also id.* at 145 (Ecology noting that "[d]ue to the nature of pumper trucks['] geographic mobility, and ability to operate in many different locations, mapping the companies or providing size of draught limits is not practical").  EPA also concluded that, given mobile pumpout companies' ability to travel throughout the entire Puget Sound region, "mapping the specific locations of these companies would not add to EPA's analysis or provide any further information for the regulated community." *Id.* at 19.  EPA therefore concluded that, in this instance, strict adherence to the petition requirements would not be helpful in reaching its determination and therefore was unnecessary. On this record, the court concludes that it was not arbitrary or capricious for EPA to relax its requirements for Ecology's Petition.

### b.   Certificate of Need

Finally, American Waterways challenges EPA's NDZ determination on the basis that EPA accepted without scrutiny Ecology's Certificate of Need, which stated that the Puget Sound required protection from marine discharges that exceeded federal standards.  Pl.'s. Mot. at 44.  Not so, Intervenors contend.  They argue that Congress gave the states, not EPA, the authority to determine whether certain waters require greater environmental protection and that second-guessing the Certificate of Need would have exceeded EPA's authority.  Intervenors' Br. at 40–42. Intervenors also argue that American Waterways waived this argument by previously arguing to

the Washington Pollution Control Hearings Board that EPA lacked authority to review Ecology's Certificate of Need. *See id.* at 40, 42.

Turning first to Intervenors' argument that American Waterways adopted a contrary position prior to this litigation, "[i]t is settled law that a party that presents a winning opinion before the agency cannot reverse its position before this court." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006); *see also Del. Dep't of Nat. Res. & Env't Ctrl. v. EPA*, 895 F.3d 90, 96 (D.C. Cir. 2018) ("A petitioner may not take a position in this court opposite from that which it took below, particularly when its position has prevailed before the agency." (internal quotation marks omitted)). In order to advance an argument on a petition for review, the party must have given "adequate notification of the general substance of the complaint" to the agency. *S. Coast Air Quality Mgmt. Dist.*, 472 F.3d at 891.

The record reveals that American Waterways' position on EPA's authority to review Ecology's Certificate of Need has been inconsistent, but not fatally so. Before the Washington Pollution Control Hearings Board, American Waterways argued that the Board should stay Ecology's Certificate until the Board could review it precisely because "EPA is only authorized to determine if adequate pump out facilities exist and will provide no substantive review of the Certificate of Need." A.R. at 2806; *see also id.* at 2818 (arguing that concerns regarding the Certificate of Need "are not subject to EPA review"). During the notice-and-comment period, however, American Waterways nudged EPA to at least *review* Ecology's Certificate of Need. American Waterways outlined its concerns regarding the Certificate of Need and argued, "EPA must play a role in evaluating the integrity of that certification, and should not render a final determination on adequacy of pump-out capacity since Ecology's 'certification' is not based in fact." *Id.* at 55273. While stopping short of asserting that EPA had an obligation to independently

38

verify the Certificate of Need, American Waterways suggested that its concerns about the Certificate "should inform EPA's review of Ecology's petition." *Id.* at 55275. In the same paragraph, American Waterways nonetheless implied that EPA's review was limited to determining "Ecology's assertion that 'the current number and location of pump-outs are sufficient'" to support an NDZ. *Id.*

American Waterways' position on this issue has certainly morphed depending on the audience, but its comments to EPA are not irreconcilably at odds with its position here. The court thus cannot conclude that American Waterways is precluded from challenging the Certificate of Need. *See Del. Dep't of Natural Resources & Env't Ctrl.*, 895 F.3d at 96 (requiring a "clear contradiction" with a party's position before the agency in order to foreclose judicial review). Accordingly, this court will consider whether EPA was obligated to review Ecology's Certificate of Need.

Starting, as it must, with the text of the statute, *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004), the court concludes that Congress was clear that the petitioning state—not EPA—is entrusted with determining whether enhanced protection against marine sewage discharge is necessary. Section 312(f)(3) delineates separate roles for the petitioning state and EPA. The state is entrusted with determining whether "the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection." 33 U.S.C. § 1322(f)(3). Following that determination, EPA's Administrator is tasked with determining whether "adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available." *Id.* By design, the state and EPA work in separate spheres: the state identifies a need for greater protection from marine discharge, and EPA determines whether prohibition of marine

discharge will be feasible.  The text of the statute therefore suggests EPA does not enjoy plenary review of the state's Certificate of Need.

This interpretation is consistent with the regulatory scheme Section 312(f) creates.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)).  In contrast to Section 312(f)(3), which creates a path for a *state* to regulate an NDZ with EPA's approval, Section 312(f)(4) calls for the *Administrator* to determine whether greater regulation of marine sewage is necessary.  Under Section 312(f)(4), "[i]f the *Administrator* determines upon application by a State that the protection and enhancement of the quality of specified waters within such State requires such a prohibition," EPA must then regulate to prohibit discharge in such waters.  33 U.S.C. § 1322(f)(4)(A) (emphasis added).  Section 312(f)(4) therefore provides a useful comparison to Section 312(f)(3):  Section 312(f)(4) explicitly directs the Administrator to assess the need for the protection and enhancement of water quality, and the Administrator is thereafter responsible for regulating to "prohibit the discharge from a vessel of any sewage (whether treated or not) into such waters."  *Id.*  In contrast, under Section 312(f)(3), where the state takes primary responsibility for regulating, the Administrator's role is limited to ensuring that "adequate facilities for the safe and sanitary removal and treatment of sewage" are available.  *Id.* § 1322(f)(3).

Based on the text of Section 312(f)(3) and its statutory context, the court concludes that EPA did not have a duty to independently verify Ecology's Certificate of Need under Section 312(f)(3) and did not arbitrarily or capriciously accept the Certificate.

40

### C.      Remedy

The only remaining question before the court is whether to remand with vacatur, which would have the effect of undoing the Puget Sound NDZ, or remand without vacatur, which would allow the NDZ to continue while EPA acts on remand.  American Waterways requests vacatur of EPA's determination in its entirety or "partial vacatur as to certain affected vessel classes."  *See* Pl.'s Suppl. Mem. of Law, ECF No. 65 [hereinafter Pl.'s Suppl. Br.], at 3.  EPA and Intervenors, meanwhile, principally argue that any remand should be without vacatur.  *See* Mot. for Recons. at 9–10; Intervenors' Reply at 15–17.  Following supplemental briefing, Intervenors restated their position that this court, if it must remand, should remand without vacatur, but requested that if the court does vacate EPA's determination, it vacate the determination solely with respect to American Waterways' members.  Def.-Intervenors' Suppl. Br. Opposing Vacatur, ECF No. 64, at 3–4.

"While unsupported agency action normally warrants vacatur," whether to remand a rule with or without vacatur is committed to the district court's discretion.  *See Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (noting "this court is not without discretion" in determining whether to vacate an agency decision); *see also Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("[T]he terms 'invalid' and 'vacated' are not synonyms.").  "The decision whether to vacate depends on [1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed." *Allied-Signal v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (internal quotation marks omitted).

41

1.      *Seriousness of the Determination's Deficiencies*

Here, the court has identified at least two sizeable flaws in EPA's decisionmaking—its failure to consider the costs of compliance and its failure to determine whether adequate facilities for the treatment of marine sewage are reasonably available.  In determining whether such flaws counsel in favor of vacating, the court considers whether "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand."  *See Allied-Signal, Inc.*, 988 F.2d at 151; *see also Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008) (remanding without vacatur after finding there was "a significant possibility that the [agency] may find an adequate explanation for its actions").

The court finds that there is a serious possibility that EPA will be able to substantiate its determination on remand.  As to the likelihood that correcting EPA's first flaw will alter the agency's decision, there is no dispute that Ecology considered costs to the industry and presented EPA with an estimate of those costs in its petition.  *See* Intervenors' Br. at 20–21; Pl.'s Mot. at 22 n.14.  Thus, at least one regulatory body, Ecology, has already concluded that the costs of the regulation do not outweigh its benefits.  *See* A.R. at 68 (explaining Ecology's "multifaceted effort" to determine whether an NDZ was appropriate included "evaluating impact costs and benefits," among numerous other considerations); *id.* at 71 (noting one consequence of considering costs was five-year implementation delay).  EPA therefore is not starting from scratch.  And although the agency ultimately disregarded costs, its responses to comments reveal some awareness of the issue. *See id.* at 15 (noting Ecology had created a five-year delayed implementation for some vessels to ease costs and providing examples of helpful cost information for commenters to gather).  There is therefore a serious possibility that EPA will reissue the same determination after fully considering costs.

42

Likewise, there is a possibility that, after EPA considers the reasonable availability of adequate treatment facilities for marine sewage, it will again green light the NDZ.  Nearly all the treatment facilities that Ecology has thus far identified are public treatment facilities.  *See id.* at 137–39.  And while American Waterways makes much of the fact that two public treatment facilities operate under consent decrees, Pl.'s Mot. at 17, EPA's guidance on this issue suggests that "[d]ischarge to a public wastewater collection system and treatment facility" is one of two "preferable" disposal methods, A.R. at 2376.  EPA's guidance and the predominance of public treatment facilities in the record suggest there is at least a "non-trivial likelihood that" EPA will again permit Ecology to designate the Puget Sound as an NDZ, supporting remand without vacatur. *See WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002).

### 2.    Disruptive Consequences of an Interim Change

Regarding the second *Allied-Signal* factor, the potential disruptiveness of vacatur, the court is concerned that vacating EPA's determination at this juncture would have a negative impact on environmental conditions in the Puget Sound.  As the D.C. Circuit has held, even where a court finds "more than several fatal flaws" in an agency action, it is nonetheless "appropriate to remand without vacatur in particular occasions where vacatur 'would at least temporarily defeat . . . the enhanced protection of the environmental values covered by [the agency action at issue].'"  *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam) (quoting *Env't Def. Fund, Inc. v. Adm'r of the U.S. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990)); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 189 (D.C. Cir. 2017) (per curiam) (remanding without vacatur because "vacating would at least temporarily defeat . . . the enhanced protection of the environmental values covered by [the action at issue].").  As this court stated in denying EPA's motion for remand, the Puget Sound NDZ is a significant piece of a years-long initiative in the

43

State of Washington to improve the quality of the waters of the Puget Sound.  Remand Op. at 7–8.

Establishing the NDZ prompted the state's Department of Health to reopen nearly 700 acres of

commercial shellfish beds, which could close again if the NDZ is vacated.  *Id.*; Intervenors' Reply

at 16–17.  Additionally, vacating the NDZ would permit new recreational boaters to discharge

partially treated sewage into the Puget Sound.  Intervenors' Reply at 15–16.  The court therefore

concludes that enhanced protection of the environmental integrity of the Puget Sound favors

remand without vacatur.

The court also finds that environmental-protection concerns outweigh the potential costs

to commercial vessels of keeping the determination in place during remand.  Washington's NDZ

regulations mitigate such costs.  Ecology has delayed implementation of the new discharge

requirements for "tug boats, commercial fishing vessels, small commercial passenger vessels, and

National Oceanic and Atmospheric Administration (NOAA) research and survey vessels" until

May 10, 2023.  A.R. at 70–71 (footnote omitted).  Accordingly, such vessels have another two-

and-a-half years to take whatever steps are required to prepare to comply with the NDZ.  *See* Dep't

of Ecology, State of Wash., Puget Sound Is Now a No-Discharge Zone for Vessel Sewage,

https://ecology.wa.gov/Water-Shorelines/Puget-Sound/No-discharge-zone  (last  visited  Nov.

29, 2020).  This  implementation  delay  provides  regulated  parties  with  a  buffer  while  EPA

reconsiders its determination.

American Waterways nonetheless urges the court to vacate the NDZ on the ground that its

continuation even while on remand will require its members "to expend significant resources" to

retrofit their vessels by May 2023.  *See* Pl.'s Reply Mem. of Law, ECF No. 56, at 24–27.  American

Waterways relies on the July 30, 2019 Declaration of Timothy Stewart, a Senior Director of Fleet

Engineering and Shipyards at Foss Maritime Company ("Foss"), to substantiate its position.  Pl.'s

Reply in Further Supp. of Cross-Mot. for Remand with Vacatur, ECF No. 39, Decl. of Timothy Stewart, ECF No. 39-1 [hereinafter Stewart Decl.], ¶ 1.  Stewart avers that the vessels at Foss typically undergo maintenance twice every five years—once in the third year since the last full maintenance and once in the fifth year—and that off-schedule maintenance and work is "extremely costly."  *Id.* ¶ 16.  According to Stewart, two ships in Foss's fleet were scheduled to be dry docked in March and April 2020 and not again until after the effective date of the NDZ.  *See id.* ¶ 22. Stewart's Declaration suggests that these vessels were scheduled for retrofitting of new tanks during those months.  *See id.*  Foss will continue to incur the expense of retrofitting other vessels in its fleet, at an average cost of $140,000.  *See id.*

Though the court recognizes that companies like Foss may continue to incur costs during the remand period, Stewart's Declaration alone does little to establish what the overall cost is likely to be.  Stewart represents only one company, and the court has before it no evidence that other companies are likely to incur retrofitting costs in the near term or how much those costs might be. Even as to Foss, because the declaration is now over a year old, it remains unclear how much additional cost Foss is likely to incur in the coming months.  In short, though American Waterways' members may face some costs of compliance during the remand period, those costs do not outweigh the potential environmental harm that would befall the Puget Sound were the court to vacate the NDZ.

### 3.  *Partial Vacatur*

American Waterways argues that, even if full vacatur is inappropriate, the court should at least grant partial vacatur of the determination "as to certain affected vessel classes."  Pl.'s Suppl. Br. at 3.  In other words, American Waterways wants its members to be exempt from the NDZ until a final determination is made on remand.  The court declines that invitation.

"Severance and affirmance of a portion of an administrative regulation is improper if there is 'substantial doubt' that the agency would have adopted the severed portion on its own." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (internal quotation marks omitted). Section 312(f)(3) of the Clean Water Act requires EPA to make a single determination as to "*all* vessels." 33 U.S.C. § 1322(f)(3) (emphasis added). The statute therefore gives EPA no authority to make piecemeal determinations that would affect some vessels but not others, and the court cannot conclude that EPA's determination is segregable.

The cases on which American Waterways primarily relies in requesting partial vacatur do not compel a different result. The courts in those cases ordered partial vacatur of regulations that were plainly divisible. For instance, in *American Iron & Steel Institute v. OSHA*, OSHA was required to investigate the feasibility of lead-exposure standards as to each specific industry to which the standard applied, and when the court found the standard was not feasible in certain industries, vacatur as to only those industries was the proper course. *See* 939 F.2d 975, 979–80, 1010 (D.C. Cir. 1991). Likewise, in *Petroleum Communications, Inc. v. FCC*, the court vacated FCC's cellular service regulation only as to licensees that provide coverage in the Gulf of Mexico. 22 F.3d at 1173. The FCC regulatory scheme at issue already divided licensees into geographic regions. *Id.* at 1166. And *Petroleum Communications* involved a special situation in which FCC had previously exempted Gulf of Mexico licensees from regulations because of the unique fact that they, unlike licensees anywhere else in the country, used towers that were attached to mobile oil and gas platforms floating in the ocean. *Id.* at 1167–68. Here, by contrast, Congress did not instruct EPA to make specific determinations with respect to classes of vessels. Rather, Congress commanded EPA to make a single determination taking account of "all" vessels. 33 U.S.C. § 1322(f)(3). Partial vacatur therefore would not be appropriate.

46

*      *      *

There remains the open question of how long EPA will be given to address deficiencies on remand.  By statute, EPA must make its "determination within 90 days of the date of" a state's application.  33 U.S.C. § 1322(f)(3).  EPA's review should therefore be prompt.  On the other hand, EPA has yet to finalize its guidance on how the agency should consider costs in making a determination under Section 321(f)(3).  Mot. for Recons. at 4 (noting that "[t]he agency is now developing cost-consideration guidance"); EPA Costs Memo at 3 (noting additional guidance is forthcoming).  But the lack of formal guidance should not prohibit EPA from proceeding expeditiously on remand.  Congress wanted EPA to act quickly, and so does this court. Accordingly, the court will order this matter remanded without vacatur for a period of 90 days. Any request for more time must be made by motion and based on a showing of good cause for an extension.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, the court (1) grants in part and denies in part Plaintiff's Motion for Summary Judgment, ECF No. 46; (2) grants in part and denies in part Intervenors' Cross-Motion for Summary Judgment, ECF No. 52; and (3) denies as moot EPA's Motion for Reconsideration of Remand, ECF No. 49.

The court remands the record to EPA for a period of 90 days for further consideration of the following issues, including any additional fact-gathering the agency deems necessary: (1) the costs of creating an NDZ in the Puget Sound; (2) the reasonable availability of adequate sewage treatment facilities in the Puget Sound; and (3) an explanation of EPA's use of a ratio of commercial vessels to pumpout facilities to determine whether adequate treatment and removal

facilities are reasonably available in the Puget Sound.  EPA's determination is not vacated pending

remand.

Dated:  November 30, 2020
                                                 _____
                                                        Amit P. Mehta
                                                 United States District Court Judge

48