**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE AMERICAN WATERWAYS OPERATORS,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL S. REGAN, in his official capacity as Administrator, U.S. Environmental Protection Agency, and U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>Defendants. | Case No.: 18-2933-APM |

**PLAINTIFF'S MOTION TO ENFORCE AND
RENEWED MOTION FOR SUMMARY JUDGMENT**

Pursuant to this Court's November 30, 2020 Order (the "Summary Judgment Order"), Federal Rule of Civil Procedure 56, and LCvR 7(h), Plaintiff The American Waterways Operators ("AWO") respectfully moves the Court for an order enforcing its Summary Judgment Order and for an order entering summary judgment against Defendants Environmental Protection Agency ("EPA") and Michael S. Regan, in his official capacity as Administrator of EPA, on all claims.

For the reasons stated in the accompanying Memorandum of Law, Plaintiff AWO's motion should be granted because Defendants' actions on remand violated the Summary Judgment Order. Additionally, Defendants' issuance of the determination (the "Determination") and the reaffirmed determination (the "Reaffirmed Determination") challenged in this case violated the Administrative Procedures Act, 5 U.S.C. § 706, and the Federal Water Pollution Control Act, 33 U.S.C. § 1322(f)(3). In granting summary judgment, the Court should declare unlawful and vacate the Determination and Reaffirmed Determination.

Plaintiff respectfully requests an oral hearing on this motion, pursuant to LCvR 7(f).


Date: April 19, 2021                      Respectfully submitted,

                                          K&L GATES LLP

                                          */s/ Barry M. Hartman*
                                          Barry M. Hartman (D.C. Bar No. 291617)
                                          Theodore L. Kornobis (D.C. Bar No. 997236)
                                          1601 K Street, N.W.
                                          Washington, D.C. 20006-1600
                                          T:  202.778.9000
                                          F:  202.778.9100
                                          barry.hartman@klgates.com
                                          ted.kornobis@klgates.com

                                          Laura A. Musselman (D.C. Bar No. 1029446)
                                          134 Meeting Street, Suite 500
                                          Charleston, SC 29401
                                          T:  843.579.5600
                                          F:  843.579.5601
                                          laura.musselman@klgates.com

                                          *Attorneys for Plaintiff*
                                          *The American Waterways Operators*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE AMERICAN WATERWAYS
OPERATORS,

               Plaintiff,

      v.

MICHAEL S. REGAN, in his official capacity
as Administrator, U.S. Environmental Protection
Agency, and U.S. ENVIRONMENTAL
PROTECTION AGENCY,

               Defendants.

Case No.: 18-2933-APM

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION TO ENFORCE AND
RENEWED MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

    I.      Plaintiff ...........................................................................................4

    II.     Legal and Regulatory Background ...................................................4

    III.    Ecology's Petition for the Puget Sound NDZ and EPA's Determination ..............5

          A.     EPA's Receipt of and Preliminary Determination on Ecology's Petition ...............................................................................5

          B.     EPA Received Substantial Data Regarding the Significant Costs Vessels Would Incur to Comply with the NDZ, Including Capital Expenditures ...............................................................................5

          C.     EPA's Determination ...........................................................7

    IV.    AWO's Challenge to the Determination and the Court's Summary Judgment Order..........................................................................7

          A.     AWO's Complaint ...............................................................7

          B.     EPA's Initial Motion to Remand to Consider Costs....................................7

          C.     Motions for Summary Judgment and EPA's Confession of Error .............8

          D.     The Court's Order on Summary Judgment...................................9

    V.     EPA's Actions on Remand ..............................................................9

          A.     EPA's Limited Request for Input from the Parties.....................................9

          B.     Information Submitted by AWO Regarding the Substantial Costs Vessel Operators Will Incur in Order to Comply with the NDZ...............10

          C.     EPA's Remand Decision.......................................................12

              1.     EPA's Decision to Ignore All Upfront Costs...............................13

              2.     EPA's Assessment of Ongoing Vessel Costs ..............................13

              3.     EPA's Assessment of Treatment Facilities...................................14

    VI.    AWO's Supplemental Complaint .........................................................15

STANDARD OF REVIEW .................................................................................................15

ARGUMENT ...................................................................................................................16

    I.     EPA Violated the Court's Order by Not Considering and Entirely Ignoring All of the Significant Upfront and Capital Costs Imposed by the NDZ ...............17

        A.    EPA's Decision on Remand Is Directly Contrary to the Court's Order ...............................................................................................17

        B.    EPA's Remand Action Violates the Law-of-the-Case Doctrine and the Rule of Mandate ...........................................................................20

        C.    The Doctrines of Waiver and Judicial Estoppel Prevent EPA from Now Arguing that It Can Ignore Capital and Other Upfront Compliance Costs .....................................................................................21

            1.    EPA Waived the Argument That It Can Ignore Capital and Other Upfront Costs of Compliance ................................21

            2.    EPA is Judicially Estopped from Now Arguing that It Can Ignore Upfront Costs ............................................................22

    II.    EPA's Decision to Ignore All Upfront Costs from Its Analysis Is Outside the Bounds of Reasonable Interpretation of the CWA and Violates the APA ...................................................................................................................23

        A.    The CWA Text Requires that EPA Consider the Significant Upfront Costs that Vessels Face to Comply with the NDZ .....................23

            1.    The Statutory Text Is Clear that the Upfront Costs Needed in Order for Vessels to Access Facilities and Comply with the NDZ Must Be Considered When Evaluating Reasonable Availability .................................................................25

            2.    When an Agency Is Broadly Required to Consider Costs of Compliance Under a Statute, It Must Consider All Significant Costs .................................................................................26

            3.    EPA's Explanations for Ignoring All Upfront Costs Are Inconsistent with the Statute, Arbitrary, and Capricious ..............28

        B.    Upfront and Capital Costs Are a Regular Component of Agency Analysis When Considering Costs .............................................................29

    III.    EPA's Analysis of Cost Data Is Arbitrary and Capricious ....................................32

A.    EPA's Cost Analysis Did Not Consider and Failed to Address Key Evidence Regarding the Actual Impact that Increased Costs Would Have on Vessels ...................................................................................32

B.    EPA's Cost Calculations and Conclusions Rest on Flawed Data..............34

IV.   EPA's Response on "Safe and Sanitary" Treatment Lacked Reasoned Decisionmaking ..........................................................................................36

V.    The Court Should Vacate the Determination and Reaffirmed Determination ...............................................................................................38

CONCLUSION......................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*,
470 F.3d 375 (D.C. Cir. 2006) ................................................................36

*Am. Waterways Operators v. Wheeler*,
No. 18-cv-2933 (APM), 2020 WL 7024195 (D.D.C. Nov. 30, 2020)....................................2

*\*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984).................................................................15

*Cigar Ass'n of Am. v. FDA*,
436 F. Supp. 3d 70 (D.D.C. 2020) ........................................................16

*City & Cty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
408 F. Supp. 3d 1057 (N.D. Cal. 2019), *aff'd* 981 F.3d 742 (9th Cir. 2020) ........................28

*\*City of Cleveland, Ohio v. Fed. Power Comm'n*,
561 F.2d 344 (D.C. Cir. 1977).............................................................20

*Convertino v. U.S. Dep't of Just.*,
674 F. Supp. 2d 97 (D.D.C. 2009) ..........................................................23

*\*Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
365 F. Supp. 3d 28 (D.D.C. 2019), *appeal dismissed*, No. 19-5137, 2019 WL
4565514 (D.C. Cir. Sept. 18, 2019) ........................................................24, 27, 28

*D.C. v. U.S. Dep't of Agric.*,
No. 20-cv-00119 (BAH), 2020 WL 6123104 (D.D.C. Oct. 18, 2020)............................27, 34

*\*Day v. D.C. Dep't of Consumer & Regul. Affs.*,
191 F. Supp. 2d 154 (D.D.C. 2002) .......................................................22

*Defenders of Wildlife v. Kempthorne*,
No. 04-1230, 2006 WL 2844232 (D.D.C. Sept. 29, 2006)......................................19

*Delgado v. U.S. Dep't of Just.*,
979 F.3d 550 (7th Cir. 2020) .............................................................20

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015)..............................................................35

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)....................................................................16

iv

*Encyc. Britannica, Inc. v. Dickstein Shapiro, LLP*,
   905 F. Supp. 2d 150 (D.D.C. 2012) ................................................................22

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012) ........................................................................36

*\*Glob. Tel\*Link v. FCC*,
   866 F.3d 397 (D.C. Cir. 2017) ......................................................................27

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   235 F.3d 588 (D.C. Cir. 2001) ......................................................................20

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*,
   448 U.S. 607 (1980) (Powell, J., concurring) ...............................................34

*\*Kimberlin v. Quinlan*,
   199 F.3d 496 (D.C. Cir. 1999) ......................................................................20

*LaShawn A. v. Barry*,
   87 F.3d 1389 (D.C. Cir. 1996) ......................................................................22

*Medicines Co. v. Kappos*,
   731 F. Supp. 2d 470 (E.D. Va. 2010) ...........................................................21

*Metlife, Inc. v. Fin. Stability Oversight Council*,
   177 F. Supp. 3d 219 (D.D.C. 2016) ..............................................................28

*Miami Tribe of Okla. v. United States*,
   656 F.3d 1129 (10th Cir. 2011) ....................................................................20

*\*Michigan v. EPA*,
   576 U.S. 743 (2015) ............................................................................. *passim*

*Moses v. Howard Univ. Hosp.*,
   606 F.3d 789 (D.C. Cir. 2010) ......................................................................22

*\*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................16, 26

*Nat. Res. Def. Council v. EPA*,
   808 F.3d 556 (2d Cir. 2015) .........................................................................30

*Nat'l Wildlife Fed'n v. EPA*,
   286 F.3d 554 (D.C. Cir. 2002) ......................................................................31

*\*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .....................................................................................22

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
    753 F. Supp. 2d 103 (D.D.C. 2010) ...................................................................17

*New Orleans v. SEC*,
    969 F.2d 1163 (D.C. Cir. 1992) ........................................................................35

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
    No. 19-cv-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020), *appeal
    dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021) ....................27

*Riverkeeper, Inc. v. EPA*,
    358 F.3d 174 (2d Cir. 2004) .............................................................................30

*Saqr v. Holder*,
    580 F.3d 414 (6th Cir. 2009) ...........................................................................21

*Sierra Club v. McCarthy*,
    61 F. Supp. 3d 35 (D.D.C. 2014) .....................................................................15

*Sierra Club v. Van Antwerp*,
    719 F. Supp. 2d 77 (D.D.C. 2010) ...................................................................38

*Singh v. George Washington Univ.*,
    383 F. Supp. 2d 99 (D.D.C. 2005) ...................................................................20

*Sullivan v. Hudson*,
    490 U.S. 877 (1989) ........................................................................................19

*Tex Tin Corp. v. EPA*,
    992 F.2d 353 (D.C. Cir. 1993) .........................................................................19

*The Fund for Animals v. Norton*,
    390 F. Supp. 2d 12 (D.D.C. 2005) ...................................................................17

*United States v. Locke*,
    529 U.S. 89 (2000) ..........................................................................................5

*Wannall v. Honeywell, Inc.*,
    775 F.3d 425 (D.C. Cir. 2014) .........................................................................22

*In re Wella A.G.*,
    858 F.2d 725 (Fed. Cir. 1988) .........................................................................21

**Statutes**

Administrative Procedures Act, 5 U.S.C. § 706 ................................................... *passim*

Federal Water Pollution Control Act, 33 U.S.C. § 1322(f)(3) ("CWA") ............... *passim*

**Other Authorities**

33 C.F.R. § 159.3 ...................................................................................................................4

40 C.F.R. § 140.4(a)(5) ........................................................................................................26

77 Fed. Reg. 9,303 (Feb. 16, 2012) ......................................................................................24

81 Fed. Reg. 24,419 (Apr. 25, 2016) ...............................................................................25, 31

84 Fed. Reg. 2,670 (Feb. 7, 2019) ........................................................................................32

85 Fed. Reg. 31,286 (May 22, 2020) ...............................................................................25, 31

85 Fed. Reg. 67,818 (Oct. 26, 2020) .....................................................................................31

The American Waterways Operators ("AWO") respectfully moves the Court to enforce its prior Order partially granting Plaintiff's motion for summary judgment, and to grant summary judgment on Plaintiff's claims that Defendant Environmental Protection Agency ("EPA") violated the Administrative Procedures Act, 5 U.S.C. § 706 ("APA") and the Federal Water Pollution Control Act, 33 U.S.C. § 1322(f)(3) ("CWA") when it issued its determination and renewed determination on remand that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available in the Puget Sound.

## PRELIMINARY STATEMENT

This matter is again before the Court to review whether EPA violated its statutory obligations when it approved Washington State's petition to impose a no discharge zone ("NDZ") in the entire 2,300 square mile area of Puget Sound.  Consistent with the federal government's predominant role in admiralty and maritime matters, the CWA prohibits states from regulating the discharge of treated sewage from vessels.  One narrow exception to that prohibition allows a state to petition EPA for the ability to create a NDZ.  The CWA imposes a specific obligation on EPA before a NDZ can be created: the Administrator must "determine[] that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply."  33 U.S.C. § 1322(f)(3).

In partially granting summary judgment to Plaintiff, this Court held that EPA's original decision approving the Puget Sound NDZ (the "Determination") violated the express terms of the CWA and was arbitrary and capricious by entirely failing to consider the costs of compliance in determining whether adequate facilities were "reasonably available" and failed to show that EPA

1

considered the onshore treatment of vessel sewage.[1]  The Court remanded to EPA with specific instructions to consider these issues.  *Id.* at 47.

On remand, EPA again failed to adequately consider the relevant issues.  In fact, EPA ignored this Court's order and sought to reopen issues that the Court already decided and EPA conceded.  EPA's one-page memorandum reaffirming its earlier decision (the "Reaffirmed Determination") and its supporting analysis (the "Remand Findings") reveal that the agency continued to blatantly and entirely ignore relevant factors and that its action was plainly not based on reasoned decisionmaking.  Plaintiff therefore moves the Court to enforce its previous order and to grant summary judgment because the Reaffirmed Determination is arbitrary, capricious, and inconsistent with law.

EPA's Reaffirmed Determination entirely failed (in fact, it expressly declined) to consider whether the extraordinary upfront costs that vessels would need to incur in order to comply with the NDZ impacted whether "adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available."  33 U.S.C. § 1322(f)(3) (emphasis added).  This is directly contrary to the Court's order and, for the reasons the Court has already found, it is not in accordance with the CWA and constitutes an arbitrary and capricious decision.  Plaintiff has consistently raised its concerns with and challenged EPA's failure to consider upfront (capital) costs *and* ongoing costs, both of which vessel owners and operators must incur in order to comply with the NDZ.  In response, EPA initially elected not to defend its prior position on the role of costs under the statute.  After Plaintiff filed its substantive brief, EPA expressly confessed error for its failure to consider costs and agreed with AWO that its prior Determination was legally

---

[1] *See* Mem. Op. & Order, ECF No. 66 (the "SJ Order"), also available at *Am. Waterways Operators v. Wheeler*, No. 18-cv-2933 (APM), 2020 WL 7024195 (D.D.C. Nov. 30, 2020).

flawed.  The Court also agreed, concluding that the statute's use of the term "reasonably available" means that, under *Michigan v. EPA*, 576 U.S. 743 (2015), EPA must consider "all the relevant factors," which necessarily includes the costs associated with compliance with the agency action. SJ Order at 15.  The Court therefore ordered EPA to consider the costs of compliance on remand. *Id.* at 20.  However, EPA ignored that directive, reversed itself, and concluded (contrary to the Court's order and *Michigan*) that it can ignore all of the substantial upfront compliance costs, which are absolutely necessary to incur in order for a vessel to be able to operate and access onshore disposal and treatment facilities.  The Reaffirmed Determination should therefore be vacated.

In addition, EPA's analysis as to the ongoing costs that vessel operators will face is fundamentally flawed and fails to actually analyze *how* the increased operating costs associated with NDZ compliance will impact the operational viability of vessels in Puget Sound.  In particular, EPA based its "reasonable availability" conclusion solely on a superficial calculation of the increased costs as a percentage of annual revenue.  However, that approach, and EPA's conclusory assertion of the costs as "small," ignores how those added costs will actually impact vessels and whether the vessels can absorb them.  EPA ignored direct record evidence that vessels are already operating on thin or nonexistent margins, and EPA offered nothing but *ipse dixit* to explain why a nearly seven percent increase in costs is "reasonable."  Further, the data underlying EPA's analysis was facially inaccurate.

EPA's decision as to whether there are safe and sanitary facilities for onshore treatment of sewage also reflects a lack of reasoned decisionmaking.  Specifically, EPA made no decision on its own related to combined sewer overflows ("CSOs") and their impact on treatment.  Instead, EPA blindly accepted Ecology's logically unsound and unsupported conclusions regarding the

undisputed occurrences of *raw* sewage discharges into Puget Sound from municipal sewer systems—the exact places to receive vessel sewage under the NDZ.

Accordingly, the Reaffirmed Determination violates the Court's order, does not comport with EPA's statutory requirement under the CWA, and constitutes an arbitrary and capricious decision. AWO seeks a declaration invalidating it, along with the Determination.

**STATEMENT OF FACTS[2]**

## I.      Plaintiff

AWO is the national trade association for the tugboat, towboat, and barge industry and has approximately 350 member companies, many of whom operate towing vessels in Puget Sound that are the only means by which barges carrying goods to and from the Northwest United States can operate. The Determination and Reaffirmed Determination adversely affect AWO's members because they would force AWO's members to incur substantial and unreasonable burdens to comply with the NDZ, including from retrofit of their vessels.

## II.     Legal and Regulatory Background

Federal law prohibits the discharge of raw, untreated sewage from all vessels within three miles of shore. AR-0000012; 33 U.S.C. § 1322(b)–(c). Under the CWA, vessels must comply with long-standing federal regulations that require the use of approved marine sanitation devices ("MSDs") to handle sewage generated on a vessel. *Id.* A type-II MSD (found on many commercial vessels, such as tugboats) is a flow-through sewage treatment device certified by the U.S. Coast Guard to meet performance standards set by EPA that are designed to ensure that the treated effluent does not harm the receiving waters. 33 C.F.R. § 159.3. Because type II-MSDs

---

[2] Plaintiff only sets forth herein those facts relevant to the current motion. Additional facts are recited in Plaintiff's original motion for summary judgment (ECF No. 46).

treat the sewage on a continuous, "flow through" basis, a vessel equipped with a type-II MSD does not need a large holding tank.  A type-III MSD is a tank that holds sewage until it can be discharged on shore.  *Id.*

States and political subdivisions are, with limited exceptions, broadly preempted from adopting or enforcing any statute or regulation with respect to the design, manufacture, installation, or use of any MSD.  33 U.S.C. § 1322(f)(1).[3]  One exception is to petition EPA to allow the state to prohibit all discharges (including of fully treated effluent) in certain waters within the state.  33 U.S.C. § 1322(f)(3).  Before the state may prohibit all discharges, EPA must determine that "adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which [the NDZ] would apply."  33 U.S.C. § 1322(f)(3).

## III.    Ecology's Petition for the Puget Sound NDZ and EPA's Determination

### A.    EPA's Receipt of and Preliminary Determination on Ecology's Petition

In July 2016, Ecology petitioned EPA to designate the entirety of Puget Sound as a NDZ— the largest single designation ever made.  AR-0000059–125; AR-0055005; AR-0055298.  On November 7, 2016, EPA published a preliminary determination by its Regional Administrator of EPA Region 10 approving the NDZ and allowing a 30-day comment period.  AR-0000042–44.

### B.    EPA Received Substantial Data Regarding the Significant Costs Vessels Would Incur to Comply with the NDZ, Including Capital Expenditures

During the brief public comment period, EPA received over 40,000 comments, including from AWO (AR-0055272–416) and many other affected members of the vessel industry in Puget

---

[3]    Vessels necessarily operate in interstate commerce and constantly cross state borders. Accordingly jurisdiction over admiralty and maritime matters is ordinarily within the exclusive province of the federal government.  *United States v. Locke*, 529 U.S. 89, 108 (2000).

Sound.  These commenters urged EPA to deny the Petition for, among other reasons, the problems with retrofitting vessels to install type-III MSD holding tanks.[4]

Data presented to EPA showed that estimated costs to retrofit a vessel to install a tank that could store sewage until the vessel could reasonably access and pump out at an onshore facility was $161,500 for a typical tugboat, up to $150,000 (or $350,000) for fishing boats, up to $300,000 for articulated tug barges, and up to $650,000–$750,000 for small cruise vessels.[5]  Ecology's Petition and its commissioned study confirmed these costs.  AR-0000076–77; AR-0000278–80. In addition to parts and labor, retrofits also mean taking the vessel out of revenue-generating service for dry dock.  *See* AR-0055300–03; AR-0003029–30.  Overall, the record (based on Ecology's own consultant's estimates) indicates that the initial (non-operating) cost of the NDZ to the towing industry alone would be $15.3 million.  AR-0055398; AR-0055438.  *See also* AR-0055301 (over $10 million for the towing industry).

EPA was also told that in some instances it will not be possible to retrofit a vessel (and will thus require scrapping the vessel or exiting the business).  This could be due to the prohibitive retrofitting costs (AR-0003981; AR-0055013) or because a storage tank physically cannot be added to a vessel due to a lack of space or concerns regarding vessel stability and compliance with U.S. Coast Guard and other standards.  *See* AR-0054936–37; AR-0055275–77; AR-0055293; AR-0055007; AR-0055362; AR-0000283–84.  For vessels that cannot be retrofitted, the replacement costs could run into the tens of millions of dollars.  AR-0055007; AR-0000279. Further, the record shows that even if it is physically possible to add a tank to some vessels, it would reduce the available space that can be used for revenue-generating activities.  For example,

---

[4]    *See* ECF No. 46 at 10 (citing comments).

[5] *See* AR-0055274–75; AR-0055301–03; AR-0055308–16; AR-0003029–30; AR-0054936–37; AR-0055007; AR-0000665; AR-0055438.

installing a sufficiently-sized type-III MSD tank on small passenger cruise vessels would take up passenger space (thus reducing revenue), which may make it economically infeasible to continue operations.  AR-0055010; AR-0055013; AR-0054937; AR-0000284.  Commercial fishing boats may also need to give up revenue-generating space (i.e., areas used to hold fish).  AR-0000280; AR-0000282.

### C.      EPA's Determination

On January 19, 2017, EPA notified stakeholders that it intended to grant Ecology's Petition and issued a document purporting to describe and respond to comments.  AR-0000011–31.  EPA recited the various comments it received regarding the costs of compliance with the NDZ, including both upfront and ongoing costs, but explained that EPA was not considering such information because the agency concluded that it was not required to consider any costs under the CWA.  *Id.*  EPA signed the Determination on January 19, 2017, and reissued it approximately a month later on February 13, 2017.  AR-0000032–41; AR-0000001–10; AR-0000045–48.

## IV.      AWO's Challenge to the Determination and the Court's Summary Judgment Order

### A.      AWO's Complaint

AWO filed the instant lawsuit challenging the Determination on December 13, 2018. Among other things, AWO asserted the Determination was arbitrary, capricious, and inconsistent with law because it failed entirely to consider the adequacy of safe and sanitary treatment options and failed entirely to consider the significant costs associated with compliance with the NDZ.

### B.      EPA's Initial Motion to Remand to Consider Costs

On May 31, 2019, EPA moved for a voluntary remand of the Determination so that it could reconsider the action to include consideration of costs.  EPA explained that it "now believes that it should have considered compliance costs in making the challenged determination."  EPA Vol. Remand Mot. at 4, ECF No. 25; *see also* EPA Vol. Remand Reply at 1, ECF No. 32 (describing

agency's "straightforward" request that, "because EPA should have considered costs in making the challenged determination but did not do so, it would like to address that issue now"). EPA further discussed the "centrality" of considering costs and elaborated: "After all, something cannot be reasonably available as a practical matter if it 'impose[s] billions of dollars in economic costs in return for a few dollars in health or environmental benefits.'" EPA Vol. Remand Reply at 4, ECF No. 32 (quoting *Michigan*, 576 U.S. at 752). The Court denied EPA's motion, noting that EPA did not confess error and was seeking to consider new information on the same cost concerns it had before it previously, which included "'the cost to retrofit vessels in order to comply with the no-discharge zone' and 'the financial burden of ongoing costs.'" Order Denying Remand at 8–9, ECF No. 41 (citation omitted).

### C.    Motions for Summary Judgment and EPA's Confession of Error

This case then proceeded into the merits, Plaintiff moved for summary judgment, and EPA and Intervenors cross-moved. Plaintiff argued, among other things, that EPA failed entirely to consider the significant costs associated with compliance with the NDZ—including both substantial upfront (capital and retrofitting) costs and ongoing costs.

In response, EPA confessed error as to its failure to consider costs when issuing the Determination, did not respond to any of AWO's other arguments, and requested remand. EPA Resp. & Cross-Mot., ECF No. 48. EPA attached a memorandum from its Office of General Counsel (the "OGC Memo") to "provide guidance on the proper interpretation of section 312(f)(3)" and that further explained that "the Agency took the legally erroneous position that it was not required to, and did not, consider costs in issuing its determination in 2017 (notwithstanding the reasoning of *Michigan*)." AR-0055832. Neither the OGC Memo nor EPA's filing stated that EPA confessed error only as to *ongoing* costs. To the contrary, EPA spoke broadly regarding its failure to consider "costs" or "compliance costs" generally in determining

8

reasonable availability, and EPA explicitly "admit[ted] that it erred—*just as The American Waterways Operators alleged*—by failing to heed the Supreme Court's admonishment [in *Michigan*]."  EPA Resp. at 1, ECF No. 48 (emphasis added); AR-0055833.

D.    **The Court's Order on Summary Judgment**

The Court held oral argument on the parties' summary judgment motions on November 13, 2020, and issued a decision on November 30, 2020.  Among other things, the Court held that "EPA was required to consider the costs of compliance in determining whether adequate facilities were 'reasonably available'" and "EPA did not show that it considered the reasonable availability of adequate sewage treatment facilities, and its determination that such facilities exist was therefore arbitrary and capricious."  SJ Order at 20, 25.

V.    **EPA's Actions on Remand**

A.    **EPA's Limited Request for Input from the Parties**

On December 10, 2020, EPA invited the parties to the litigation to submit "updated data and information relevant to the remanded issues."  AR-0055731–32.  EPA specifically sought information in three areas: (1) "the average annual operating costs for [AWO] member vessels in Puget Sound;" (2) "the locations where pumped out vessel sewage is treated;" and (3) "sewage treatment facilities' capacity to accommodate the incremental increases in vessel sewage that could reasonably be attributed to the establishment of the Puget Sound NDZ."  AR-0055731–32.  EPA set a January 8, 2021, deadline for submissions—giving the parties 29 days, over the course of the end-of-year holidays and during a global pandemic.  AR-0055731.

AWO informed EPA that "many non-AWO and non-party vessel operators are impacted by this remand order and are interested in sharing cost concerns with EPA," and that although AWO would pass EPA's request on to those it could, "it is incumbent on the agency to directly contact entities with a direct interest in this, especially given the time constraints."  AR-0055729–

30.  AWO also sought clarification regarding what EPA meant by "average annual operating costs" and noted that EPA's request "does not appear to cover all of the information that would be needed for EPA to evaluate costs in connection with the NDZ under the remand order."  AR-0055730.  In response, EPA only stated that AWO could submit data from non-AWO members, and ignored the other questions.  AR-0055728–29.  AWO reiterated that EPA should consider costs from other affected entities and again asked for clarification on EPA's definition of operational costs.  AR-0055728.  EPA's reply again failed to respond, other than to clarify that EPA did not intend to seek confidential business information.  AR-0055727.

### B.    Information Submitted by AWO Regarding the Substantial Costs Vessel Operators Will Incur in Order to Comply with the NDZ

In response to EPA's request, AWO submitted information including that gathered from some of its members regarding vessels' baseline operating costs and the ongoing costs expected to be incurred by vessels after the NDZ takes effect.[6]

AWO explained that, due to the varied nature of the towing industry, vessel types, and operations, figures on vessels' general operating costs are "highly variable dependent on many factors."  AR-0055760.  During this limited time period, AWO was able to survey six members, operating at least 37 vessels in Puget Sound, and provided a series of estimates regarding annual operating costs, including a low range of $1 million to $1.5 million; a high range of $8 million to $10 million; and a range for most vessels between $3 million and $7 million, with the average coming in at approximately $4 million.  AR-0055760; AR-0055766–84.  As AWO explained, this would mean that the ongoing operating costs from the NDZ (not counting costs to retrofit, modify,

---

[6] Ecology and NGO Intervenors also submitted responses, as explained in relevant part below.

or replace vessels) would be a 5–10 percent increase to average annual operating costs.  AR-0055760.

AWO also included information submitted by its members as to the various costs, challenges, and disadvantages that vessel operators face in order to comply with the NDZ.  The retrofitting costs submitted were consistent with the average data that AWO and other operators previously provided to Ecology and EPA.  For example, one member estimated that the costs per vessel for all necessary retrofits would range from $204,000 to $234,000; another estimated costs of approximately $350,000 per vessel.  AR-0055772; AR-0055781.  These costs are significant to the operators' financial conditions and viability such that many are trying to wait as long as feasible for this Court to rule.  *See* Costanzo Decl. ¶ 5, appended hereto.  However, in an attempt to comply on time with the NDZ, at least 18 vessels are expected to undergo retrofitting over the next approximately 12 to 18 months, incurring irreversible costs.  *Id.* ¶ 6.

AWO members also explained the substantial logistical challenges and timing considerations associated with retrofitting a vessel to install a sewage holding tank.  The process begins with engineering analysis and drawing up designs.  AR-0055768, AR-0055771, AR-0055775, AR-0055779, AR-0055781.  The retrofits could require structural, piping, electrical, and alarm modifications, and a stability analysis to ensure the vessel remains safe to operate with the new tank.  AR-0055771, AR-0055781, AR-0055783.  Vessel owners estimated these planning steps could take anywhere from four weeks to 10 months, depending on the vessel configuration, and cost approximately $30,000 per vessel class.  AR-0055768, AR-0055771, AR-0055775.  The design would then need to be reviewed and approved by certification authorities and/or the U.S. Coast Guard, which could take another one to four months.  AR-0055771, AR-0055775, AR-0055779.  Each vessel configuration within an operator's fleet would need a separate engineering

11

analysis, design, and regulatory approval.  *See* AR-0055768 (each vessel in fleet has unique configuration), AR-0055771 (fleet with 13 different configurations that would need separate analyses and approvals).  The time needed for the actual retrofitting work would vary based on the type of work needed and the extent of the retrofit, but operators estimate it can range from three weeks to 12 months.  AR-0055768, AR-0055772, AR-0055781.

AWO's members also commented on the importance of aligning the retrofitting work with normal vessel maintenance schedules in order to minimize time out of revenue-generating service, avoid disruptions to customers, and ensure availability of shipyard dry-docking.  AR-0055772, AR-0055775.  Forcing a retrofit outside of the normal maintenance cycle could cause a five-fold increase in the costs, not counting the loss of revenue during the retrofit.  AR-0055776.

Operators also provided data regarding vessels that would need to be put out of service due to an inability to retrofit the vessel, either because of physical limitations (e.g. engineering, stability, or liquid loading concerns) or because the substantial retrofitting costs will exceed the vessel's income-producing capability.  AR-0055776.  For example, one member explained that three tugboats would be put out of business by the NDZ, and that the cost to build and obtain new ones would be approximately $11 to $15 million per vessel.  AR-0055772.  Another operator explained that it cannot entertain the prospect of retrofitting vessels without knowledge that the vessel will be able to recover the investment in future operating income.  AR-0055775.

### C.    EPA's Remand Decision

On March 1, 2021, EPA filed with the Court a one-page memorandum indicating that EPA had completed its review on remand and decided to reaffirm the Determination.  AR-0055835.  It referenced a 50-page document summarizing EPA's findings.  AR-0055836.  As relevant here, EPA determined that the expected costs to access and use pumpout facilities do not materially alter

EPA's determination that adequate facilities are reasonably available, and that adequate treatment facilities are reasonably available.  AR-0055836.

### 1.    EPA's Decision to Ignore All Upfront Costs

EPA's analysis on remand intentionally ignored all upfront costs that vessels will incur in order to hold all sewage on board and only discharge on shore as required by the NDZ.  In justifying this decision, EPA explained that "[t]he term 'reasonably available' applies to the determination of 'adequate pumpout facilities'" and that any "need for retrofit would be attributable to the *per se* existence of the NDZ and would not be attributable to inadequacy or unavailability of pumpout facilities."  AR-0055840.  As explained further below, this decision to ignore all upfront costs contradicts EPA's prior confession of error, the Court's earlier order, and (consistent with the Court's analysis) the statutory requirement under the CWA.

### 2.    EPA's Assessment of Ongoing Vessel Costs

To evaluate those costs that EPA did not choose to ignore, EPA developed a cost analysis tool (the "Tool"), an Excel file that considers various inputs and "calculates the percentage increase in baseline operating costs that affected vessels in Puget Sound may incur using pumpout facilities."  AR-0055839.  EPA assumed a "uniform demand" scenario, i.e. that an equal number of vessels within a class will pump out every day.  AR-0055841.

As to tugboats, EPA noted that it received a wide range of baseline operating costs, in part due to the various types of vessels and classes that fit within this category.  The figures included $853,260 per year based on a 16-year old Army Corps of Engineers memorandum; a report from Ecology that provided a range of $510,000 to $1.9 million; and the estimates AWO provided.  AR-0055850–51.  Based on the outputs from the Tool, EPA concluded each tugboat would experience an annual operating cost increase of $58,038 associated with the NDZ (including facility use costs, travel costs, and pumpout time costs), amounting to a 6.8 percent cost increase when using the

baseline operating cost figure of $853,260.  AR-0055855.  EPA then recited figures regarding vessel revenue contained in a report provided by Ecology's consultant, Herrera, and calculated that the increased cost associated with NDZ compliance equated to between 0.67% and 2.2% of annual revenue.  AR-0055855.

Based on these calculations, EPA concluded that the increase in costs represented "a small fraction of the vessel's annual revenue" and "would not result in an unreasonable financial burden nor affect the reasonable availability of such [pumpout] facilities."  AR-0055858.  EPA's analysis did not consider how this increase would actually impact the viability of the vessel or otherwise explain why the increased cost was reasonable.  AR-0055858.

### 3.    EPA's Assessment of Treatment Facilities

As to EPA's determination on remand that adequate facilities for the treatment of sewage were reasonably available, EPA relied significantly on information provided by Ecology.  As relevant to this challenge, Ecology and EPA considered the existence of CSO events in the Puget Sound area, when sewer systems discharge *untreated* sewage that is mixed with stormwater during wet weather events.  AR-0055741, AR-0055861–62.  EPA recited and concurred with Ecology's assessment that "it is unlikely that pumped vessel sewage will be sent to a [wastewater treatment plant ("WWTP")] during a CSO event" due to the fact that peak capacity from *recreational* boats occurs in the summer dry season.  AR-0055862.  The Remand Findings does not address the fact that commercial vessels operate year-round.  EPA also repeated and concurred with Ecology's conclusion that untreated CSO discharges are more desirable than vessels using MSDs to treat effluent because CSO discharges occur at controlled locations, "some" sewer systems provide disinfection of CSO discharges, and (according to Ecology) CSO discharges are "relatively rare."  AR-0055862; AR-0055743.

VI.     **AWO's Supplemental Complaint**

EPA's failure to consider costs violates this Court's previous order.  However, EPA's Reaffirmed Determination is also arbitrary, capricious, and inconsistent with law.  As a result, AWO moved for leave to file a supplemental complaint on March 19, 2021, which the Court granted the same day.  In the Supplemental Complaint, AWO alleges that EPA's action on remand was arbitrary, capricious, and inconsistent with law because (1) it failed entirely to consider an entire category of costs that no party disputes vessel owners will need to incur in order to comply with the NDZ; (2) it arbitrarily concluded that the increase in ongoing costs associated with NDZ compliance does not alter the agency's finding of "reasonable availability;" (3) the agency's analysis regarding the reasonable availability of treatment facilities lacks reasoned decisionmaking; and (4) it failed to consider and seek out necessary information and comment.

STANDARD OF REVIEW

A court should grant a motion to enforce its previous order when a "prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it."  *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014) (citation omitted).  This is not the same standard that applies to APA review cases and under no circumstances is an agency entitled to deference when deciding whether to comply with a court order

Under the APA, agency action must be set aside if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As to questions of an agency's interpretation of its statutory obligations, the two-step process of *Chevron* provides that, "[i]f the intent of Congress is clear, that is the end of the matter" and the court as well as the agency "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  If, however, the statute is silent or ambiguous, then the court inquires as to whether the agency action "is based on

15

a permissible construction of the statute," *id.* at 843, but even under that standard "agencies must operate within the bounds of reasonable interpretation." *Michigan*, 576 U.S. at 751.

Further, to survive "arbitrary and capricious" review, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  The agency's explanation must be "clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted).  Although courts give some deference to an agency's expertise, "[t]he court's review . . . is not toothless." *Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 81 (D.D.C. 2020).  Additionally, agency action is properly set aside if the agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion," where the agency "fail[ed] to consider an important aspect of the problem," or "failed to address significant comments raised during the rulemaking." *Id.* (citations omitted).

## ARGUMENT

Under the CWA, no NDZ petition may be approved and no NDZ made effective unless and until the EPA Administrator "determines that adequate facilities for the safe and sanitary removal and treatment of sewage from <u>all</u> vessels <u>are</u> <u>reasonably available</u> for such water."  33 U.S.C. § 1322(f)(3) (emphasis added).

Although the Court's prior summary judgment order decided several key issues that govern EPA's exercise of this statutory responsibility, EPA's Reaffirmed Determination utterly fails to meet its APA obligations or follow this Court's order.  First, choosing to ignore all upfront costs directly violated the Court's holding that EPA must consider the costs of compliance with the NDZ as part of the agency's obligation to consider "all relevant factors" under *Michigan*.  Second,

EPA's decision to exclude all upfront costs from its analysis contravenes the CWA text and the APA because a decision as to whether facilities are *reasonably* available requires consideration of all associated costs.  Third, the agency's analysis of ongoing costs is arbitrary and capricious and not based on reasoned decisionmaking because it superficially and inadequately compares the increased costs to revenue without actually analyzing the impact on vessel operations and relies on flawed data.  Fourth, EPA's decision regarding the adequacy of treatment facilities is irrational because it relies on a patently illogical conclusion as to the discharge of raw sewage from onshore treatment facilities and otherwise ignores key contrary evidence in the record.

For these reasons—individually and collectively—the Reaffirmed Determination is invalid and should be vacated.[7]

## I. EPA Violated the Court's Order by Not Considering and Entirely Ignoring All of the Significant Upfront and Capital Costs Imposed by the NDZ

### A. EPA's Decision on Remand Is Directly Contrary to the Court's Order

In failing to consider on remand the capital and other upfront costs of compliance with the NDZ, EPA violated the Court's summary judgment order.  This is a blatant affront to the judicial process and the Court's review of agency action.  "[A]n agency's review on remand must be responsive to the court's mandate."  *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 114 (D.D.C. 2010) (citation omitted).  Plaintiff therefore moves the Court to enforce that prior order by requiring EPA to consider *all* costs of compliance, including capital and other upfront costs, and to hold that the agency's disregard of the Court's order renders the Reaffirmed Determination arbitrary and capricious.  *See The Fund for Animals v. Norton*, 390 F. Supp. 2d 12,

---

[7] AWO challenged in its initial summary judgment motion other flaws in EPA's Determination that are repeated in the Remand Findings.  For example, EPA continues to exclude all oceangoing vessels from its analysis.  AR-0055839.  By not repeating those challenges here, AWO does not concede these arguments and reserves its rights with respect to further appeal.

15 (D.D.C. 2005) ("district courts clearly have the authority to enforce the terms of their mandates") (citing *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984))).

In the summary judgment order, the Court held that "EPA was required to consider the costs of compliance in determining whether adequate facilities were 'reasonably available'" and that EPA acted arbitrarily and capriciously in violation of the APA by failing to consider such costs.  SJ Order at 20.  The Court therefore ordered EPA on remand to consider the costs of creating a NDZ in Puget Sound.  *Id.* at 47.  The Court's order was not limited to any specific type of costs. To the contrary, the Court's reasoning clearly shows that EPA must consider all costs that a vessel would incur to comply with the NDZ.  The Court concluded that the term "reasonably available" as used in the CWA "is precisely the type of language that the *Michigan* Court held 'naturally and traditionally includes consideration of all the relevant factors.'"  *Id.* at 15 (quoting *Michigan*, 576 U.S. at 752) (emphasis added).  The *Michigan* decision also reasoned that "'cost' includes more than the expense of complying with regulations; any disadvantage could be termed a cost."  576 U.S. at 752 (emphasis added).  Additionally, the Court's discussion of the "costs of compliance" encompassed retrofitting and upfront compliance costs.  SJ Order at 45 (discussing retrofitting and off-schedule maintenance costs that Plaintiff's "members may face [as] some costs of compliance [with the NDZ] during the remand period").

There is no reasonable argument for ambiguity in the Court's decision.  *None* of the briefing leading up to the decision distinguished between upfront (including capital) costs and ongoing costs.  AWO's Complaint and its motion for summary judgment faulted EPA for failing to consider both types of costs.  *See* AWO Mot. Summ. J. at 23–26, ECF No. 46.  In response, EPA confessed legal error, stated that it would need to consider costs on remand, and at no point in any court filing or during oral argument did EPA ever argue that it was *only* required to consider ongoing costs.

*See* EPA Resp. at 7, ECF No. 48 ("Here, as in *Michigan*, EPA ignored an important aspect of the problem—compliance costs."); AR-0055833 (OGC Memo).  To the contrary, EPA cited and relied heavily on the reasoning in *Michigan*, referred broadly to its failure to consider "costs" or "compliance costs" in determining reasonable availability, and explicitly "admit[ted] that it erred—*just as The American Waterways Operators alleged*—by failing to heed the Supreme Court's admonishment [in *Michigan*]."  EPA Resp. at 1, ECF No. 48 (emphasis added); *id.* at 8 (admitting that "Operators are right that the agency should have considered costs"); AR-0055833.[8] The Court likewise described that, in confessing error, EPA "conced[ed] that it erred by authorizing the Puget Sound NDZ without considering the financial costs of the action."  SJ Order at 2.

Accordingly, by ignoring all of the significant upfront and capital costs that vessels will need to undertake in order to be able to comply with the NDZ, EPA's action on remand contravened the Court's prior order and the APA.  *See Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) ("Deviation from [a] court's remand order in . . . subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review."); *see also Tex Tin Corp. v. EPA*, 992 F.2d 353, 356 (D.C. Cir. 1993) (granting plaintiff's petition for review where the agency "failed to comply with [the court's] remand order" and again "c[a]me up with insufficient support for its conclusion"); *Defenders of Wildlife v. Kempthorne*, No. 04-1230, 2006 WL 2844232, at *13 (D.D.C. Sept. 29, 2006) (agency "utterly failed to abide by the terms of a remand order").

An agency whose action is under review by a court under the APA cannot choose to simply disregard orders from the court on remand.  Particularly given the history of this case, this spurious

---

[8] Nor did Intervenors ever distinguish between upfront and ongoing costs when arguing about the scope of EPA's responsibilities.  Indeed, both Ecology and the NGO Intervenors provided data about retrofitting costs to EPA during the remand period.  AR-0055733-34; AR-0055738.

position seems designed to further lengthen these proceedings as the NDZ compliance date
continues to draw closer and forces Plaintiff's members to incur significant costs—or go out of
business—regardless of the law.  Agencies cannot be allowed to render judicial review of agency
actions so meaningless.

    **B.**    **EPA's Remand Action Violates the Law-of-the-Case Doctrine and the Rule of Mandate**

Additionally, by unilaterally deciding that it can ignore all upfront and capital costs—after
this Court has already ruled on the issue—EPA violates the law-of-the-case doctrine and the rule
of mandate.  "The law-of-the-case doctrine rests on a simple premise: 'the *same* issue presented a
second time in the *same case* in the *same court* should lead to the *same result*.'"  *Kimberlin v.
Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (citation omitted).  As to interlocutory orders, it
counsels that, "'where litigants have once battled for the court's decision, they should neither be
required, nor without good reason permitted, to battle for it again.'"  *Singh v. George Washington
Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005).  The rule of mandate is a "'more powerful version'
of the law-of-the-case doctrine," *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597
(D.C. Cir. 2001), and requires that, after a higher court establishes the law binding further action
in the litigation, a lower decision-maker "'is without power to do anything which is contrary to
either the letter or spirit of the mandate construed in the light of the opinion of (the) court deciding
the case.'"  *City of Cleveland, Ohio v. Fed. Power Comm'n*, 561 F.2d 344, 348 (D.C. Cir. 1977)
(citation omitted) (granting motion to direct agency to comply with remand order).  In the context
of a court's review of agency action, these doctrines "require the administrative agency, on remand
from a court, to conform its further proceedings in the case to the principles set forth in the judicial
decision, unless there is a compelling reason to depart."  *Miami Tribe of Okla. v. United States*,
656 F.3d 1129, 1138 (10th Cir. 2011) (citation omitted); *Delgado v. U.S. Dep't of Just.*, 979 F.3d

550, 557 (7th Cir. 2020) (finding administrative judge's refusal to follow law of the case on remand was arbitrary, capricious, and contrary to law).[9]

EPA, by choosing to ignore all capital and other upfront compliance costs, acted in direct contradiction to the law of the case and the rule of mandate.  *See also Medicines Co. v. Kappos*, 731 F. Supp. 2d 470, 477 (E.D. Va. 2010) ("If an agency is dissatisfied with any part of a district court's order, the remedy is to appeal the case and not, under the guise of a hearing, to relitigate a question already finally decided by the district court.").

### C.   The Doctrines of Waiver and Judicial Estoppel Prevent EPA from Now Arguing that It Can Ignore Capital and Other Upfront Compliance Costs

#### 1.   EPA Waived the Argument That It Can Ignore Capital and Other Upfront Costs of Compliance

As noted above, in response to Plaintiff's argument that EPA was required to consider all upfront and ongoing costs associated with NDZ compliance, EPA admitted that it was "error to ignore costs" and it "should have considered compliance costs in making the Puget Sound determination."  EPA Resp. at 1, 3, ECF No. 48.  EPA did not only confess error for failing to consider ongoing costs; indeed EPA never in any litigation filing or at oral argument drew any distinction between upfront and ongoing costs.[10]

Because EPA admitted it failed to consider compliance costs and failed to respond to AWO's arguments regarding consideration of *all* costs of compliance with the NDZ, EPA has

---

[9] *See also Saqr v. Holder*, 580 F.3d 414, 420 (6th Cir. 2009) ("[W]here a court has considered the merits and remanded on certain issues, an agency or lower court is not permitted to review anew those issues already addressed by the reviewing court if they are not part of the remand because issues addressed on the merits and not within the scope of remand become the law of the case."); *In re Wella A.G.*, 858 F.2d 725, 728 (Fed. Cir. 1988) (the rule that an "inferior court has no power or authority to deviate from the mandate issued by an appellate court" is equally applicable "to the duty of an administrative agency . . . to comply with the mandate issued by a reviewing court" (citation omitted)).

[10] EPA also did not distinguish among compliance costs in its first remand motion (ECF No. 25).

conceded that it must consider such costs.  *See Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); *cf. Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.  Such a concession 'acts as waiver,' such that a 'party cannot raise [a] conceded argument on appeal.'" (citations omitted)).[11]

### 2.    EPA is Judicially Estopped from Now Arguing that It Can Ignore Upfront Costs

The doctrine of judicial estoppel also prevents EPA from arguing that it can ignore capital and other upfront costs of compliance with the NDZ.  "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted); *see also Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010) (judicial estoppel asks whether the party's later position is inconsistent with the earlier successful position, and whether that party will "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped") (citing *New Hampshire*, 532 U.S. at 750–51).  "Application of the doctrine of judicial estoppel should be guided by a sense of fairness, with the facts of the particular dispute in mind."  *Encyc. Britannica, Inc. v. Dickstein Shapiro, LLP*, 905 F. Supp. 2d 150, 154 (D.D.C. 2012) (quoting 18 Moore's Fed. Practice § 134.31 (3d ed. 2012)).

---

[11] Additionally, the "waiver variant" of the law-of-the-case doctrine precludes EPA from now seeking to overturn or change the Court's prior order.  *See LaShawn A. v. Barry*, 87 F.3d 1389, 1396 n.7 (D.C. Cir. 1996) ("If a party fails to raise a point he could have raised in the first appeal, the 'waiver variant' of the law-of-the-case doctrine generally precludes the court from considering the point in the next appeal of the same case.").

EPA's current stance is clearly inconsistent with its earlier position and with the conclusion reached by this Court.  Allowing EPA to adopt this inconsistent position would impose an "unfair detriment" on AWO.  As AWO has made clear throughout this litigation, allowing the Determination, and now the Reaffirmed Determination, to remain in effect during the course of the litigation imposes burdens on its members who need to undertake significant expenditures (including retrofits) in order to prepare their vessels to be able to comply with the NDZ, if they can even afford to do so.  *See* AWO Reply at 24, 26–27, ECF No. 56; *see also* AR-0055768–83 (citing costs and challenges associated with retrofitting and need for substantial lead time). Allowing EPA to now change its position and requiring the parties to relitigate this issue that EPA had ample opportunity to argue previously, prejudices Plaintiff by keeping the Determination and Reaffirmed Determination in effect longer and requiring Plaintiff to incur the additional expenses of renewed briefing.  *See, e.g.*, *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97, 107 (D.D.C. 2009) (finding that defendant who "would be forced to defend itself on more discovery requests for a claim that had already been dismissed" would be subject to an unfair detriment).

EPA is thus judicially estopped from changing its position to argue now that it may ignore all upfront costs in deciding whether facilities are reasonably available.  Stated simply, EPA's position is a flagrant attempt to evade the Court's mandate and render the Court's judgment meaningless.  The agency must be called to task for this "threat to judicial integrity."  *Id.* at 106.

## II.    EPA's Decision to Ignore All Upfront Costs from Its Analysis Is Outside the Bounds of Reasonable Interpretation of the CWA and Violates the APA

### A.    The CWA Text Requires that EPA Consider the Significant Upfront Costs that Vessels Face to Comply with the NDZ

The Court has already held that *Michigan* requires that EPA consider "all the relevant factors," which, in the context of the NDZ statutory provision, includes costs.  SJ Order at 14. Moreover, as *Michigan* explained, the "costs" that an agency is required to consider in such

circumstances "includes more than the expense of complying with regulations; ***any disadvantage could be termed a cost***."  576 U.S. at 752 (emphasis added).  The significant upfront costs that all parties agree will be necessary in order for vessels to comply with the NDZ clearly comprises a "relevant factor" and a "disadvantage" imposed by the NDZ.[12]  EPA's failure to consider any upfront costs therefore cannot be sustained.

As *Michigan* explained, even under the *Chevron* standard "agencies must operate within the bounds of reasonable interpretation." *Michigan*, 576 U.S. at 751.  Here, as *Michigan* and this Court's prior order make clear, "EPA strayed far beyond those bounds" of reasonable interpretation, *id.*, by interpreting Section 312 of the CWA to allow it to ignore all upfront costs. *See id.* (rejecting EPA's interpretation of "appropriate and necessary" as allowing it to exclude consideration of costs); *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 54 (D.D.C. 2019) (although courts are deferential when reviewing the agency's balancing of costs and benefits, an agency's failure to entirely account for two relevant types of costs was arbitrary and capricious and not subject to deference), *appeal dismissed*, No. 19-5137, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019).  Indeed, the *Michigan* case itself involved (and rejected) EPA's ignoring of costs that included both the amortized costs of required capital investments and the ongoing costs associated with compliance.[13]

---

[12] No party disputes that these costs will be significant.  EPA acknowledged them, both in its initial Determination and on remand.  *See* AR-0000014; AR-0055857.  As noted in the Statement of Facts, *supra*, the retrofitting costs presented to EPA ranged from $161,500 to $750,000 per tug vessel (not including lost revenue) and the 20-year present value for retrofit costs totals over $510 million.  The information before EPA also showed the other substantial challenges associated with retrofitting, including that retrofits would be physically or economically impossible as to some vessels.  For example, one member noted that 15 percent of the vessels in its fleet could not be retrofitted "without so drastically reducing the fuel and water capacity and modifying the tank arrangement as to render the boat uneconomical to modify or operate."  AR-0055771.

[13] *See* Nat'l Emission Standards for Hazardous Air Pollutants, 77 Fed. Reg. 9,303, 9,425 (Feb. 16, 2012) (the "2012 HAP Rule") ("The annualized incremental cost is the projected additional cost

1.    **The Statutory Text Is Clear that the Upfront Costs Needed in Order for Vessels to Access Facilities and Comply with the NDZ Must Be Considered When Evaluating Reasonable Availability**

Capital expenditures and other upfront costs are plainly relevant factors under the language of the CWA.  Whether a facility for the removal or treatment of sewage is "reasonably available" to a vessel depends (in part) on whether the vessel has the physical ability to actually travel to, access, and use the facility.  If vessels do not have the appropriate equipment needed to use a facility (i.e., a system with a tank that can be physically pumped out by the facility and that can store the sewage in the interim and while the vessel travels to a pumpout), then the facility cannot be described as "reasonably available" to the vessels, at least not without assessing what steps the vessels need to take to make necessary changes.

A hypothetical that the Court posed in the earlier summary judgment order helps to illustrate the illogic of EPA's position:

> Say, hypothetically, that the only pumpout facilities available to commercial vessels were all located in a remote portion of the Puget Sound. Even if those pumpout facilities were sufficient in number, no one would seriously contend that such facilities were "reasonably available" if they imposed significant costs on vessels to reach them.

SJ Order at 16.  The issue here is that many commercial vessels in Puget Sound do not have tanks on board that can store sewage until they can reach the supposedly available pumpout facilities— instead they have flow-through MSDs on board that continuously treat and discharge the sewage. They therefore need to retrofit to remove the existing equipment and instead install a tank(s) with

---

of complying with the rule in the year analyzed, and includes the amortized cost of capital investment and the ongoing costs of operating . . . ."); Supp. Finding That It Is Appropriate & Necessary to Regulate Hazardous Air Pollutants, 81 Fed. Reg. 24,419, 24,426 (Apr. 25, 2016) (the "Supp. HAP Finding") (comparing costs including capital expenditures); Nat'l Emission Standards for Hazardous Air Pollutants, 85 Fed. Reg. 31,286, 31,299 (May 22, 2020) (the "2020 HAP Rule") (comparing the total cost of compliance, including "the increased expenditures in capital, fuel, and other inputs by the entire power sector to comply").

pumpout capability that can hold the sewage until the pumpout.  As the Court explained, "no one would seriously contend that such facilities were 'reasonably available'" if vessels could not reach the facility without undertaking these significant costs.

It is therefore unsurprising that other aspects of EPA's analysis focus on whether a vessel can physically access a facility.  For example, EPA requires states to provide information on "the draught requirements on vessels that may be excluded because of insufficient water depth adjacent to the facility."  40 C.F.R. § 140.4(a)(5).[14]  This is why the facilities at the Port of Bellingham are considered to not be reasonably available to many vessels.  AR-0000024 (acknowledging the "vessel access restrictions at the two stationary pumpout facilities in Bellingham").  However, by EPA's logic on remand, the agency could have concluded that these facilities are reasonably available because, regardless of costs, larger vessels could be compelled to undertake potentially impossible, major retrofits to reduce their size or their owners could retire vessels and purchase new, smaller ones.

### 2. When an Agency Is Broadly Required to Consider Costs of Compliance Under a Statute, It Must Consider All Significant Costs

Courts have routinely held that, when a statute directs an agency to consider compliance costs using broad language (like Section 312(f)(3) of the CWA, at issue here), the agency's decision to entirely ignore a significant type of cost from its analysis does not constitute the "reasoned decisionmaking" that is required by the APA.  *See State Farm*, 463 U.S. at 43.  For example, when the Federal Communications Commission, in deciding to set certain rate caps for telephone services that were required by statute to be "just and reasonable," excluded from its

---

[14] EPA's guidance document similarly includes instructions to states regarding what to include in a petition.  AR-0002372 ("The application reviewer will need to know the physical accessibility of each pumpout facility in the proposed No Discharge Area for the general boating population.").

analysis all site commissions that service providers paid and passed along to end-users, the D.C. Circuit held that such decision "defies reasoned decisionmaking because site commissions obviously are costs of doing business incurred by [] providers." *Glob. Tel\*Link v. FCC*, 866 F.3d 397, 413 (D.C. Cir. 2017) (vacating agency decision). The agency attempted to argue that these costs were unrelated to the provision of the services at issue, but the court explained that, "[i]f agreeing to pay site commissions is a condition precedent" to providers offering their services, then those commissions are related to the provision of the services and must be considered. *Id.* The D.C. Circuit explained that the agency's reasoning "cannot be easily squared with the requirements of [the statute]" and was not entitled to any deference.

Likewise, here, the cost of retrofitting to remove the existing onboard treatment equipment, redesign the vessel, obtain necessary approvals, and install a tank(s) capable of storing sewage to be pumped out by onshore facilities is a "condition precedent" for any pumpout facilities to be "reasonably available" to a vessel and for the vessel to be able to comply with the NDZ. EPA therefore must consider it in order to engage in reasoned decisionmaking. *Id.* ("Ignoring costs that the [agency] acknowledges to be legitimate is implausible."); *see also DeVos*, 365 F. Supp. 3d at 53–54 (holding that regulation was "arbitrary and capricious because the government failed to consider all the relevant factors when considering the cost of the regulation," including two types of costs that the agency ignored).[15]

---

[15] *See also D.C. v. U.S. Dep't of Agric.*, No. 20-cv-00119 (BAH), 2020 WL 6123104, at \*28 (D.D.C. Oct. 18, 2020) ("The agency's choice to 'brush[] aside critical facts' about States' costs presented to the agency by commenters and the agency's subsequent failure to give those facts any meaningful consideration is appropriately reviewed under the APA.") (vacating rule); *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, No. 19-cv-3283 (RDM), 2020 WL 5995206, at \*28 (D.D.C. Oct. 8, 2020) (plaintiff was likely to prevail on claims that action was arbitrary and capricious where agency acknowledged some types of costs that would result from its action "but it failed to consider that burden in weighing the costs and benefits of the Rule and failed to consider the impact the Rule would have on those unable to borrow the necessary funds"),

3.    **EPA's Explanations for Ignoring All Upfront Costs Are Inconsistent with the Statute, Arbitrary, and Capricious**

EPA incorrectly interpreted its role as only needing to determine whether pumpout facilities are reasonably available for those vessels that already have sewage storage tanks.  AR-0055840 (only considering "the 'availability' or 'adequacy' of the pumpout facilities that serve vessels equipped with such tanks").  This approach ignores the plain text of the statute, which requires EPA to make a determination as to whether "adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available." 33 U.S.C. § 1322(f)(3) (emphasis added).  By using the present tense and referring to "all" vessels, the statute makes clear that EPA cannot make its decision based on some hypothetical future situation in which all vessels have already undergone expensive retrofits.  *Cf. DeVos*, 365 F. Supp. 3d at 54 (agency's decision to ignore all reliance costs from its analysis because these were "sunk investments" that would be incurred regardless of agency action was arbitrary and capricious).

EPA also erroneously equated its responsibility to consider costs with a reevaluation of the state's decision to petition for creation of the NDZ.  EPA properly exercising its role to determine if adequate facilities are (currently) reasonably available to all vessels does not intrude on the state's domain and, even if there is some overlap, EPA cannot abdicate its statutory responsibility.  *See* SJ Order at 17 (noting that the statutory text requires EPA to consider the advantages and disadvantages of its determination, "regardless of whether the petitioning state also does so").

---

appeal dismissed, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021); *City & Cty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1106, 1109 (N.D. Cal. 2019) (holding that agency action that "wholly failed to engage with [an] entire category of comments" relating to costs on local governments contravened requirement for reasoned decisionmaking and was arbitrary and capricious under *Michigan*), *aff'd* 981 F.3d 742 (9th Cir. 2020).  *Accord Metlife, Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d 219, 223 (D.D.C. 2016) ("[F]ocus[ing] exclusively on the presumed benefits ... and ignor[ing] the attendant costs ... is itself unreasonable under the teachings of [*Michigan*].").

Indeed, EPA acknowledged that Congress, in giving EPA the role in determining reasonable availability of removal and treatment facilities, specifically wanted to ensure that the federal government, consistent with its preeminent role in maritime matters, would consider potential "disruptions to interstate commerce when a state establishes a NDZ," AR-0055841, and would not "merely rubber-stamp state determinations in such waters." EPA Resp. at 7, ECF No. 48; AR-0055833.[16] If upfront costs were outside the scope of EPA's permissible review, and instead EPA were permitted (or required) to ignore the costs that vessels would need to undertake in to comply with a state's NDZ petition, then that would substantially hinder if not preclude EPA from fulfilling its Congressionally-designated role.[17]

### B.   Upfront and Capital Costs Are a Regular Component of Agency Analysis When Considering Costs

EPA's explanation that upfront costs are not the type that it needs to consider is also belied by the abundance of examples where agencies (including EPA) do consider capital costs in analyzing the economic burden imposed by regulatory activity when the governing statute requires consideration of costs.

Courts have acknowledged the importance of upfront and capital costs in an agency's consideration of costs in the context of regulatory actions. For example, in ruling that EPA acted in an arbitrary and capricious manner when it failed entirely to consider onshore treatment facilities as a potentially "available" option for the treatment of ballast water discharged by vessels, the

---

[16] *See also* Envt. Policy Div. of the Cong. Rsch. Serv., S. Doc. No. 93-1, 93d Cong., S. Comm. on Public Works, Pub. L. No. 92-500, Legislative History of the Water Pollution Control Act Amendments of 1972, at 236 (1973) ("[A]ny restriction or prohibition of any defined area as a disposal site must be made with circumspection in view of the importance of navigation and waterborne commerce to the economic well-being of the United States." (emphasis added)).

[17] Further, although the state creates a NDZ, failure to comply with one becomes a violation of federal law. *See* 33 U.S.C. § 1322(j).

Second Circuit noted that "onshore treatment has many costs, including the cost of retrofitting vessels for onshore facilities" and that EPA failed to perform the required economic analysis of these costs. *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 575 (2d Cir. 2015); *see also Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 195 (2d Cir. 2004) (in connection with a statute that required EPA to "take into consideration the cost of achieving such effluent reduction" when setting "best available technology" under the CWA, "the Administrator must inquire into the initial and annual costs of applying the technology and make an affirmative determination that those costs can be reasonably borne by the industry").

EPA's own guidance dating back to 2010 on conducting economic analyses recognizes the importance of considering capital costs.  EPA published a document titled "Guidelines for Preparing Economic Analysis," which the agency describes was designed to a "establish a sound scientific framework for performing economic analyses of environmental regulations and policies" and was created, among other reasons, to "ensure that important subjects such as uncertainty, timing, and valuation of costs and benefits, are treated consistently in all economic analyses at EPA."[18]  In that document, EPA acknowledges the importance of considering capital costs, which are one of two main components of "compliance costs."[19]

Consistent with that approach, EPA has considered capital expenditures when taking regulatory action, including in the context of vessel discharge regulations.  For example, in recently proposed regulations regarding the Vessel Incidental Discharge Act (which creates a separate no-

---

[18] *See* EPA, Guidelines for Preparing Economic Analyses, https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses (the "EPA Economic Guidelines").

[19] *See* EPA Economic Guidelines at ¶ 8.2.2.3, https://www.epa.gov/sites/production/files/2017-09/documents/ee-0568-08.pdf; *id.* at ¶ 9.3.1 (defining "direct compliance costs" as annual costs as well as "capital costs"), https://www.epa.gov/sites/production/files/2017-09/documents/ee-0568-09.pdf.  *See also* Exec. Order No. 12866 (Sept. 30, 1993) (explaining that agencies should consider "all costs").

discharge zone process for ballast water discharges), EPA would require a state's application to include "a detailed analysis of how the vessels subject to the prohibition may be impacted with regards to collection capability, storage capability, need for retrofitting, travel time to facility, and safety concerns."  Vessel Incidental Discharge Nat'l Standards of Performance, 85 Fed. Reg. 67,818, 67,874 (Oct. 26, 2020).  EPA also noted that it specifically declined to propose certain requirements because the associated "retrofitting could cost an additional $3–5 million per vessel beyond the capital expenditures that vessel owners have already incurred" in connection with anticipated limitations.  *Id.* at 67,863; *see also id.* at 67,850 (noting that retrofitting a vessel "is a significantly costly endeavor" in concluding that certain equipment does not meet the "economically achievable" portion of the best available technology requirement).[20]

Similarly, after the *Michigan* decision, EPA twice reevaluated the rule at issue in that case and two different administrations (from different political parties) both considered capital costs as well as ongoing costs as part of the rule's "compliance costs" in determining whether the regulation was "appropriate and necessary."  *See note 13, supra*.  EPA first decided to reaffirm the regulation, after comparing the rule's compliance costs (including capital expenditures) to historical annual revenues, capital expenditures, and anticipated benefits.  *See* Supp. HAP Finding, 81 Fed. Reg. at 24,420–21.  Later, EPA decided to modify its approach and withdraw the regulation, but still considered capital expenditures in the analysis and specifically noted various retrofitting costs associated with the regulation.  2020 HAP Rule, 85 Fed. Reg. at 31,299, 31,306–07.  In addition, in proposing to modify the regulation, EPA specifically solicited comment "on the cost of

---

[20] *See also Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 563 (D.C. Cir. 2002) (EPA's economic analysis of "best available technology" for regulating wastewater discharge "explain[ed] that compliance costs included both capital costs and annual operating costs").

retrofitting . . . applicable control technologies." *See* Nat'l Emission Standards for Hazardous Air Pollutants, 84 Fed. Reg. 2,670, 2,702 (Feb. 7, 2019).

## III.     EPA's Analysis of Cost Data Is Arbitrary and Capricious

Even among the costs that EPA *did* consider on remand, the analysis reveals a lack of reasoned decisionmaking.  In particular, EPA's determination regarding the ongoing costs to be borne by the vessel community from use of pumpout facilities simply recites various costs and then concludes that they are reasonable, without actually analyzing the data presented.  Further, the conclusions themselves are contradicted by the evidence before the agency.

### A.     EPA's Cost Analysis Did Not Consider and Failed to Address Key Evidence Regarding the Actual Impact that Increased Costs Would Have on Vessels

The data before EPA showed that many vessels would not be able to handle the increased annual operating costs associated with the NDZ (which EPA estimates is over $58,000 per tugboat).  Yet, EPA did not address this.  Instead, EPA focused only on calculating the percentages of the new ongoing costs imposed by the NDZ relative to vessels' baseline operating costs and revenues, and offered the conclusory assertions that because the percentages were "small," the costs are reasonable.  This superficial approach ignores *how* the increased costs would actually impact the profitability and viability of vessels in Puget Sound.

EPA compared the estimated annual ongoing costs associated with the NDZ ($58,038) with certain figures within the ranges of baseline operating costs and revenue to conclude that the NDZ would impose an increase of up to 6.8 percent in baseline operating costs (not considering any upfront or capital costs), equating to up to 2.2 percent of annual revenue.  AR-0055855–56.[21]  From

---

[21] EPA's analysis did not explain why it chose figures within the ranges presented.  For example, EPA chose to rely on the baseline operating cost from a 16-year-old report and an average reported by AWO, but none of the other figures (including those presented by AWO from actual vessel

this, EPA concluded that the increase of $58,038 per vessel per year—not including any retrofit or upfront costs—"would not result in an unreasonable financial burden" and was not "prohibitive" because the percentage increase in baseline operating costs represents "a small fraction of the vessel's annual revenue" and would simply "be folded into the existing 'cost of doing business' in Puget Sound." AR-0055858.

However, looking at the increased ongoing costs only as percentages of baseline costs and revenue does not address *how* that increased cost impacts the viability of the vessel or whether pumpout facilities are "reasonably available" given that cost. Indeed, the data presented to EPA as to vessels' baseline operating costs and revenue support that many vessels may be operating on thin margins (and some operating at a loss). For example, a vessel could have baseline annual operating costs of $2.9 million and revenue of $3 million (figures well within the ranges presented to EPA). A $58,000 increase in costs would make that vessel's already tight margin virtually nonexistent, and could cause the owner to cease doing business, decommission the vessel, or move it to operate outside of Puget Sound, if the market for services allows. This is not hypothetical: one vessel operator explained in AWO's submission that most of its vessels "***are already operating at or under minimum financial margins***," and the operator cannot entertain the prospect of retrofitting vessels without knowledge that the vessel will be able to recover the investment in future operating income. AR-0055775. Another operator explained that operating in the tugboat industry requires being available to customers on short notice for work, that the time needed for pump out would result in a minimum 10 percent loss of efficiency, and even a one percent loss of

---

operators). Similarly, EPA ignored the lower range of estimates for vessel revenue, which would have shown that the increased costs were nearly three percent of revenue.

overall availability would be unacceptable to customers who monitor performance.  AR-0055782. EPA did not address these comments.

EPA's approach—to calculate only what percentage $58,038 in increased ongoing costs is of average vessel baseline operating costs and revenue—sidesteps *any* analysis as to the actual impact that the NDZ will have on the viability of vessels operating in Puget Sound.  It thus does not assess if facilities are *reasonably* available to those vessels and is arbitrary and capricious.  *See U.S. Dep't of Agric.*, 2020 WL 6123104, at *27 (rejecting agency decision that was based on the conclusion that the action would result in only a "small increase" in costs and gave comments regarding adverse impacts "short shrift"); *Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 668, n.4 (1980) (Powell, J., concurring) ("The cost of complying with a standard may be 'bearable' and still not reasonably related to the benefits expected.").[22]

### B.     EPA's Cost Calculations and Conclusions Rest on Flawed Data

EPA's cost analysis data also does not include all relevant information and, in some instances, rests on clearly inaccurate data.

Consistent with EPA's failure to consider the relation between the increased costs and a vessels actual operation and viability/profitability, EPA's consideration of "baseline operating costs" does not take into consideration all of the costs associated with the vessel owner's business.

---

[22] EPA noted that "it is possible that some individual vessels may bear more significant adverse effects due to issues such as vessel design configuration," AR-0055858–59, but this does not address how the increased costs relate to viability.  Further, EPA glibly dismissed these "more significant adverse effects" by stating (without explanation) that only a "small number of vessels" would bear them and that, if the NDZ resulted in these vessels' "exclusion," that would not alter EPA's conclusion as to facilities being reasonably available for "all vessels."  *Id.*

For example, it does not include costs associated with retrofits, modifications to a vessel, or vessel replacement; nor does it take into consideration overall business costs such as taxes.[23]

EPA's analysis regarding revenue is also fundamentally flawed and rests almost entirely on information in a five-year-old report from Ecology's consultant (Herrera) that specifically cautioned about the reliability and incompleteness of its data.  *See* AR-0055855–56.  The report noted that "information on gross revenue and profit is largely unavailable," that the data presented was obtained from public records, and that indirect costs "can only be confidently evaluated with access to detailed private industry data."  AR-0000284–85.  Specifically as to tugboats, the Herrera report noted that "there is limited publicly available financial information for these industries, so it is not possible to provide a clear perspective of the impacts that NDZ regulations would have on individual businesses or industry groups."  AR-0000286–87 ("A more thorough evaluation would require access to more detailed private industry data.").  Despite these admitted limitations and warnings, EPA blindly accepted the figures and did not seek other data.  AR-0055725.  This does not comport with reasoned decisionmaking.  *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) ("If an agency fails to examine the relevant data—which examination could reveal, inter alia, that the figures being used are erroneous—it has failed to comply with the APA."); *New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("[A]n agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary." (quotation mark omitted)).

Further, the data includes basic arithmetic errors and logical fallacies.  For example, EPA cited revenue figures for the commercial fishing industry from the Herrera report (AR-0055856),

---

[23] As noted above, AWO repeatedly asked EPA to clarify and define what it meant by operating costs, and EPA twice ignored this question.  AR-0055727.

which recited Washington <u>statewide</u> revenue of approximately $160 million for commercial finfish and $44 million for shellfish.  Herrera then divided this total ($204 million) by the 347 fishing vessels <u>in Puget Sound</u> to conclude that "a gross estimate of the approximate revenue generated per vessel per year would be $575,000."  AR-0000285.  However, this falsely attributes <u>all</u> statewide revenue to vessels operating in Puget Sound, when the state has hundreds of miles of other coastline.[24]

## IV.  EPA's Response on "Safe and Sanitary" Treatment Lacked Reasoned Decisionmaking

Finally, EPA's response regarding the adequacy of treatment facilities and CSO events lacks any reasoned explanation and is logically unsound.  When an agency acts, it is required to engage in "reasoned decisionmaking" and its process must be "logical and rational."  *Michigan*, 576 U.S. at 750 (citations and internal quotation marks omitted); *see also Am. Fed'n of Gov't Emps., Local 2924 v. Fed. Labor Relations Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006) (explaining that a result that is "illogical on its own terms" is arbitrary and capricious); *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) ("[T]he process by which [the agency] reaches [its] result must be logical and rational." (citation omitted)).

Ecology noted that three of the nine communities in the NDZ area that operate combined sewer systems (to which pumped-out vessel sewage would be contributed) do not meet federal and state standards for CSO control, including the state's "largest and most complex" systems in Seattle and its surrounding King County, and some are not due to come into compliance for nearly

---

[24] Similarly, the revenue ranges for tugboats rested on the assumption that they operate 365 days a year.  AR-0055855.  However, EPA contradicts this assumption by acknowledging that tugboats are taken out of service for a few weeks per year for regular maintenance.  AR-0055843.

a decade.  AR-0055741–42, AR-0055861–62.[25]  Other evidence in the record, including a report that King County submitted to EPA, indicated that the municipality's CSOs would lead to discharge of 800 million gallons of untreated sewer water in an average year of rainfall and, in 2015, 1.47 million gallons of untreated water was subject to a CSO event.  AR-0003989.

EPA nevertheless concluded that adequate treatment facilities exist because "it is unlikely that pumped vessel sewage will be sent to a WWTP during a CSO event."  EPA reached this conclusion by reasoning that because "peak vessel sewage capacity needs . . . which are associated with recreational boating season run May-September, during the dry season," CSO events will not affect treatment.  AR-0055862.  In doing so, EPA completely ignored the year-round activity of Puget Sound's *commercial* vessels (i.e., the vessels that would need to retrofit to install tanks to comply with the NDZ and increase the volume to be treated onshore).  It is logically unsound to conclude that, because *one* group of vessels is less likely to pump out during wet months when CSO events occur, *no* vessels will pump out then.  The record evidence (unaddressed by EPA) also undermines Ecology's and EPA's conclusions about the "rarity" of CSOs or "dry months." A report from Washington's King County shows that the probability of a CSO event occurring at least one day during the week was listed as 80 percent in June; 90 percent in May, August, and September (all falling within what Ecology describes as the "dry season"); and 100 percent in April.  AR-0003890.

Otherwise, EPA does not offer any adequate explanation for why the discharge of *untreated* sewage during a CSO event, potentially contributed to by vessel sewage pumpout, is

---

[25] Ecology's statements about the anticipated improvements in CSO handling and construction of additional WWTP capacity at some point in the future (AR-0055742) is irrelevant to EPA's analysis under the statute, which requires a determination that adequate facilities for the safe and sanitary treatment of sewage from all vessels <u>are</u> reasonably available.

somehow preferable to the discharge of MSD-treated wastewater.  The only explanation cited in
EPA's Remand Findings is that CSO events occur at known locations and with notice, whereas
vessel discharges can occur at any location and time.  AR-0055862.  But this presents a false
comparison.  A CSO is a discharge of *raw* sewage, whereas a vessel utilizing a MSD is discharging
water that has been treated in compliance with federal standards.  Moreover, EPA's statement
supports that CSO events impact areas used for "swimming, fishing, and shellfish harvesting,"
whereas EPA provides no basis to support that vessels are discharging treated water in those
spaces.  Without further explanation or analysis regarding why discharge of raw sewage due to
CSOs provides safe and sanitary treatment, EPA's cursory adoption of this conclusion by Ecology
is unsound and reveals that the conclusion regarding reasonable availability of treatment facilities
is arbitrary and capricious.

**V.      The Court Should Vacate the Determination and Reaffirmed Determination**

The continued, significant deficiencies in EPA's decision on remand, particularly given the
substantial amount of capital and other upfront costs that vessels face from the NDZ, warrant
vacatur of the Determination and Reaffirmed Determination.  *See Sierra Club v. Van Antwerp*, 719
F. Supp. 2d 77, 78 (D.D.C. 2010) ("[B]oth the Supreme Court and the D.C. Circuit Court have
held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of
the APA." (citations omitted)).  This is particularly true given that EPA's action on remand
represents a reversal of its prior position and an attempt to avoid the Court's prior order.  EPA
should not be allowed to continue to draw this litigation out and keep the Determination and
Reaffirmed Determination in place during any additional remand proceedings.

Further, information provided to EPA on remand demonstrates the substantial, ongoing
harm from keeping the Determination and Reaffirmed Determination in place, notwithstanding
that the NDZ effective date for certain commercial vessels is May 2023.  Operators detailed the

various steps that are involved in retrofitting a vessel (assuming a retrofit is even possible for the vessel), including assessing the vessel; structural and stability analyses; developing design plans to install a tank and the related equipment (e.g., piping, electrical); obtaining approval from certification and regulatory bodies; scheduling dry-docking; and performing the work.  AR-0055768–83.  The time needed for this could range from a few months to over a year, depending on what steps were needed for the particular vessel.  *Id.*  Also, it is critical to align this with normal vessel maintenance schedules and scheduling it outside of normal cycle could result in substantial increase in costs and lost revenue (one operator estimated a five-fold increase).  AR-0055768, AR-0055772, AR-0055775–76.

Accordingly, vessel operators cannot wait until 2023 to start expending resources and must start working now to be in a position to comply with the NDZ.  *See also* Costanzo Decl. ¶ 6 (regarding expected upcoming vessel retrofits).  If EPA's Determination and/or Reaffirmed Determination is deemed to be arbitrary, capricious, and contrary to law, then all of these costs will be for naught.

## CONCLUSION

EPA has been gaming the legal system since AWO filed its original complaint in December 2018, trying to run out the clock on imposition of the NDZ on AWO's members.  First, EPA requested three extensions to respond to AWO's complaint, resulting in a delay of over 100 days from its original deadline.  Next, without admitting error, EPA requested a vacatur of unlimited duration, representing that it would need at least eight months to finalize draft guidance for incorporating costs into pumpout facility determinations nationwide.  *See* EPA Vol. Remand Mot., ECF No. 25; Goodin Decl., ECF No. 32-1.  When that attempt was denied, EPA agreed to a briefing schedule and waited until after AWO had already filed its motion for summary judgment

39

to admit error regarding its failure to consider costs.  On remand, EPA ignored this Court's order by claiming for the first time that costs it well knew were at issue need not be considered.  It issued a Reaffirmed Determination it knew was flawed to, once again, delay resolution of this case and force AWO's members to incur significant costs to be able to comply with the NDZ before any final decision on this challenge and then claim that the case is moot.  EPA's tactics, including intentional disregard of this Court's order, should not be tolerated.

For all of the reasons expressed above, individually and collectively, EPA's Determination and Reaffirmed Determination is arbitrary, capricious, and inconsistent with law.  AWO respectfully requests that the Court vacate it.

Date: April 19, 2021                    Respectfully submitted,

K&L GATES LLP

*/s/ Barry M. Hartman*
Barry M. Hartman (D.C. Bar No. 291617)
Theodore L. Kornobis (D.C. Bar No. 997236)
1601 K Street, N.W.
Washington, D.C. 20006-1600
T:  202.778.9000
F:  202.778.9100
barry.hartman@klgates.com
ted.kornobis@klgates.com

Laura A. Musselman (D.C. Bar No. 1029446)
134 Meeting Street, Suite 500
Charleston, SC 29401
T:  843.579.5600
F:  843.579.5601
laura.musselman@klgates.com

*Attorneys for Plaintiff*
*The American Waterways Operators*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 19, 2021, I filed the foregoing document with the Court's CM/ECF

system, which will send notice to counsel of record for all parties.

*/s/ Barry M. Hartman*
Barry M. Hartman
