## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE AMERICAN WATERWAYS OPERATORS, ) | |
| Plaintiff, ) | |
| v. ) | |
| MICHAEL REGAN,[1] Administrator of the ) U.S. Environmental Protection Agency, et al., ) | Case No. 18-cv-2933 (APM) |
| Defendants. ) | |
| and ) | |
| STATE OF WASHINGTON, ) DEPARTMENT OF ECOLOGY, et al., ) | |
| Defendant-Intervenors. ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

For the second time, this court is tasked with reviewing the Environmental Protection Agency's determination that adequate facilities for the removal and treatment of vessel sewage are reasonably available in the Puget Sound.  In 2016, the State of Washington decided to take steps toward designating the Puget Sound as a "no-discharge zone" ("NDZ").  As part of the process for a state designating an NDZ set forth in the Clean Water Act ("CWA"), Washington petitioned the Environmental Protection Agency ("EPA") to make a determination as to the reasonable availability of adequate sewage-removal and sewage-treatment facilities in the Puget Sound.  *See*

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current administrator of the Environmental Protection Agency as the defendant in this case.

33 U.S.C. § 1322(f)(3).  EPA made the requisite determination in January 2017, allowing the Puget Sound NDZ to go into force.

The American Waterways Operators ("AWO") brought a challenge to EPA's determination under the Administrative Procedure Act ("APA").  At first, EPA did not defend its determination.  Defendant-Intervenors Washington Environmental Council, Puget Soundkeeper, Friends of the Earth, and Washington State Department of Ecology (collectively, "Intervenors") instead took up the mantle.  Rather than defend its determination on the merits, EPA unsuccessfully sought a voluntary remand.  After that, AWO and Intervenors moved for summary judgment, with EPA moving only for reconsideration of the court's denial of its motion for voluntary remand.  Ultimately, the court remanded to EPA, ordering it to effectively redo its reasonable-availability determination as to certain issues, including, as relevant here, considering compliance costs and assessing the reasonable availability of adequate treatment facilities.  EPA did so, and it again determined that removal and treatment facilities were reasonably available in the Puget Sound.

AWO once more challenges the agency's determination under the APA, and now before the court is its motion for summary judgment.  EPA and Intervenors have cross-moved, defending EPA's renewed determination.  For the reasons that follow, the court denies AWO's motion for summary judgment and grants EPA and Intervenors' motions.

## II.    BACKGROUND

### A.    Factual Background

This case began with Washington's effort to prohibit commercial and recreational vessels from discharging their sewage into the Puget Sound.  The CWA allows for such state efforts:  It sets a national floor of "standards of performance for marine sanitation devices . . . designed to prevent the discharge of untreated or inadequately treated sewage into or upon the navigable

waters," 33 U.S.C. § 1322(b)(1), generally preempting state efforts to "adopt or enforce any statute or regulation" regarding marine sanitation devices. *See id.* § 1322(f)(1)(A). But states may enact regulations that are *more* protective of their waters than federal law. As relevant here, Section 1322(f)(3) allows a state to establish an NDZ if it "determines that the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection." *Id.* § 1322(f)(3). Critically, however, "no such [discharge] prohibition shall apply until the Administrator determines that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply." *Id.* The EPA must render that determination within 90 days of the state's application. *Id.*

In 2016, Washington decided to establish an NDZ in the Puget Sound after years of research demonstrated that federal marine-discharge requirements did not adequately protect the Puget Sound's water quality. *See Am. Waterways Operators v. Wheeler* (*AWO*), 507 F. Supp. 3d 47, 54 (D.D.C. 2020) (describing the dire state of pollution in the Puget Sound). Following the procedure set forth in Section 1322(f)(3), Washington sought a determination from EPA that adequate sewage-removal and sewage-treatment facilities are reasonably available in the Puget Sound. *See id.* In doing so, it submitted a petition reflecting "water-quality studies, outreach to vessel operators, and an analysis of the costs and benefits of creating an NDZ." *Id.* EPA requested more information as to the availability of "pumpout" facilities—the facilities that remove, or "pump out," sewage from vessels—and Washington provided a supplement with the requested information. *See id.*

After considering the petition, EPA published a notice seeking public comment on its preliminary determination that "adequate facilities for the safe and sanitary removal and treatment

3

of sewage from all vessels [were] reasonably available," 33 U.S.C. § 1322(f)(3).  *AWO*, 507 F. Supp. 3d at 54–55.  In January 2017, EPA published notice of its final determination, which was consistent with its preliminary determination: it found that adequate facilities were reasonably available.  *Id.* at 55; *see id.* (discussing the contents of the initial determination).  Upon receipt of EPA's affirmative determination, Washington established an NDZ in the Puget Sound.  *See* Wash. Admin. Code § 173-228-030.

### B.    Procedural Background

#### 1.    Initial Phase of Litigation

The court offers here an abridged narrative of the lead-up to the first round of summary judgment, which is recounted in greater detail in *AWO*, 507 F. Supp. 3d 47.

Almost two full years after EPA rendered its determination, and eight months after Washington finalized its NDZ, AWO, "a national trade association for the tugboat, towboat, and barge industry," brought this suit.  *AWO*, 507 F. Supp. 3d at 56 (internal quotation marks omitted); *see* EPA's Combined Cross-Mot. for Summ. J., & Opp'n to Pl.'s Mots. to Enforce & for Summ. J., ECF No. 73 [hereinafter Defs.' Cross-Mot. & Opp'n], at 3.  It alleged that EPA's determination was arbitrary and capricious under the APA, 5 U.S.C. § 706, and that, as relevant here, EPA's failure to consider compliance costs rendered its determination unlawful under *Michigan v. EPA*, 576 U.S. 743 (2015).  It also challenged, among other alleged deficiencies, EPA's failure to make an independent determination as to the availability of adequate treatment facilities.

But before any party filed a substantive motion, EPA moved for a remand without vacatur.  Contrary to its position in making an initial determination, EPA said that it agreed that, under *Michigan*, it should have considered compliance costs.  *AWO*, 507 F. Supp. 3d at 56.  The court denied that motion, in part because the agency had not actually admitted error.  After that, the

agency issued a formal memorandum in which it officially declared that it had erred in refusing to consider costs, and that the agency's new view was that *Michigan* required EPA to consider compliance costs in making a reasonable-availability determination under Section 1322(f)(3). *Id.*

The litigation proceeded. AWO filed its first motion for summary judgment early in 2020. In it, AWO challenged EPA's determination as arbitrary and capricious for four reasons: (1) EPA had failed to determine whether adequate treatment facilities existed; (2) EPA had failed to consider compliance costs as part of its reasonable-availability analysis; (3) EPA's finding that pumpout facilities were reasonably available was flawed; and (4) EPA had ignored deficiencies in Washington's petition for a determination. *Id.* at 57. EPA did not defend its determination on the merits. Instead, it sought reconsideration of the court's denial of its motion for voluntary remand. *Id.* In its motion, which it styled as a "Cross-Motion for Reconsideration," EPA reiterated its error on the *Michigan* issue and urged the court not to reach AWO's other three challenges. Intervenors mounted a merits defense of EPA's determination, seeking summary judgment and asking the court to deny EPA's remand motion. *Id.*

The court issued its opinion on the parties' motions in November 2020. As relevant here, it concluded that (1) EPA was required, under *Michigan*, to consider compliance costs in its Section 1322(f)(3) analysis and (2) EPA had not shown that it considered the reasonable availability of adequate sewage-treatment facilities in the Puget Sound. *Id.* at 79. The court remanded to EPA for 90 days to engage in the necessary consideration of those issues (as well as some other issues not relevant here), without vacating the NDZ. *Id.*

> 2.      *Remand*

With the Puget Sound reasonable-availability determination once more before the agency, EPA solicited "information relevant to EPA's action upon remand" from AWO and Intervenors,

including "average annual operating costs for [AWO] member vessels in Puget Sound," information regarding pumpout locations and state regulation of pumpout facilities, and information regarding treatment facilities' capacity.   A.R. at 55725–26.[2]   The deadline for submissions was January 8, 2021 (within a third of EPA's court-allotted remand time).   *Id.* at 55725.   AWO and Intervenors all submitted responses.   *Id.* at 55759–831; *id.* at 55735–58; *id.* at 55733–34.   Based on this new information as well as the record for the original determination and other information, EPA reaffirmed its previous reasonable-availability determination.   *Id.* at 55835.

With respect to pumpout costs, EPA concluded that it was required to consider costs that "can be attributed to pumpout facility availability and adequacy."   *Id.* at 55840.   Those costs included use costs (fees paid to use a pumpout facility), pumpout-time costs (revenue lost while pumping out sewage), travel costs (fuel costs and revenue lost while traveling to facilities), and wait-time costs (revenue lost while waiting to use facilities)—but not retrofit costs.   *Id.* at 55840, 55842.   Retrofit costs are those costs incurred by vessel operators, like AWO's members, from installing new or upgraded holding tanks that will allow vessels to store sewage until it is pumped out at removal and treatment facilities.   Prior to the NDZ, many vessels operated with on-board sanitation systems that discharged treated waste into the Puget Sound.   Retrofitting vessels to include holding tanks, AWO told EPA, would require some vessel operators to incur tens or hundreds of thousands of dollars in additional expenses, plus the loss of revenue while vessels are out of commission to be retrofitted.   *See id.* at 55300–03.   EPA nevertheless declined to consider retrofit costs.   It explained that retrofit costs are not costs associated with pumpout-facility

---

[2] Citations to the Administrative Record ("A.R.") can be found in the two-volume Joint Appendix at ECF No. 81 (second volume attached as ECF No. 81-1).

availability and adequacy.  *Id.* at 55840.  Rather, they are "attributable to a state's prohibition on discharges itself and not to factors related to the 'availability' or 'adequacy' of the pumpout facilities."  *Id.*

While many vessels already used pumpout facilities and so were already incurring pumpout costs, other vessels would newly experience these costs from the creation of the NDZ.  Those vessels included approximately 75% of tugboats, 50% of commercial fishing vessels, 5% of excursion vessels, and 9% of recreational vessels that operate in the Puget Sound.  *Id.* at 55854– 56.  EPA found that recreational vessels would face minimal costs, *see id.* at 55839, 55856, while commercial vessels faced more significant costs and required more extensive analysis due to the variations among commercial vessels, *id.* at 55839–40.

"EPA developed a technical cost tool using Microsoft Excel" to quantify the increased costs commercial vessels would face.  Defs.' Cross-Mot. & Opp'n at 6; A.R. at 55886.  Using annual baseline operating costs, vessel speed, fuel consumption, hourly revenue, and fuel price as inputs, this tool modeled demand for pumpout facilities as well as their capacity and estimated average pumpout costs for each vessel class.  A.R. at 55850–52; *id.* at 55865–78.  The results reflected a seemingly modest increase in operating costs: 2.5% for commercial fishing vessels and 6.8% for tugboats.  *Id.* at 55854–55.  According to EPA, its approach to calculating costs was conservative, often overestimating costs.  Defs.' Cross-Mot. & Opp'n at 7.  For example, even though vessels can schedule pumpouts for times between jobs and so avoid losing revenue, EPA's model assumed they would turn down paid work and lose revenue as a result.  A.R. at 55855–56; *id.* at 55844–45.

EPA compared these estimated costs to vessel revenue using revenue data from a report prepared by Herrera Environmental Consultants for Washington to use in its NDZ rulemaking.  *Id.*

at 55855–56. Using the Herrera report's estimates for tugboat revenues, for example, EPA determined that pumpout costs would be between 0.67% and 2.2% of revenue. *Id.* at 55855; *see id.* at 55856 (calculating that pumpout costs would be 1.6% of revenue for commercial fishing vessels). EPA concluded that pumpout costs constituted a "small fraction" of annual revenue for commercial vessels, *id.* at 55855–56, and that pumpout facilities are therefore reasonably available in the Puget Sound.

Per the court's order on summary judgment, EPA also considered the capacity of treatment facilities. EPA looked to the region's wastewater-treatment plants, which treat pumped-out vessel sewage and almost all other Puget Sound sewage. *Id.* at 55860, 55879–85. Both state and federal regulations govern these treatment plants: Washington administers the CWA's National Pollutant Discharge Elimination System, issuing permits to plants to treat most of the Puget Sound's sewage. *Id.* at 55860–61, 55865; 33 U.S.C. § 1342(b). The Puget Sound's wastewater treatment plants are designed to have capacity for 708.8 million gallons a day. A.R. at 55865. Before the NDZ, actual wastewater flow was 335.7 million gallons a day—less than half of total capacity. *Id.* And vessels in the Puget Sound are expected to generate "a (conservatively high) total of 36–73 million gallons of sewage per year needing pumpout facilities in order to comply with the NDZ." *Id.*

In addition to capacity, EPA also considered combined-sewage overflows that sometimes occur in sewer systems that receive both storm water and domestic sewage and send their combined flow to treatment plants. Such overflows occur when heavy rains cause surges within sewers, leading to overflows at built-in outfalls. *Id.* at 55741, 55861–62; *Nw. Env't Advocates v. City of Portland*, 56 F.3d 979, 981 (9th Cir. 1995) (describing overflows generally). In Washington, combined-sewer systems are subject to various controls; three of the nine combined-sewer jurisdictions are not fully in compliance with control requirements but will be within the

next eight years.   A.R. at 55861–62, 55741; Wash. Admin. Code § 173-245-015; 33 U.S.C.

§ 1342(q) (articulating federal requirements for combined-sewer systems).   At that point,

overflows are expected to drop by "95% to 99%."  A.R. at 55862.  Currently, overflow events

generally happen during the rainy winter months, whereas vessel sewage is at its highest during

the summer. *Id.*  As a result, EPA concluded that overflow events were not likely to coincide with

significant vessel sewage–treatment needs, and that overall, the Puget Sound has ample capacity

for treating all of its vessel sewage, such that adequate treatment facilities are reasonably available

in the Puget Sound. *Id.* at 55866–67.

### 3.     Second Round of Litigation

After EPA issued its new determination, the court entered a schedule for summary

judgment briefing.  Minute Order, Mar. 11, 2021.  AWO amended its complaint later the same

month.  Pl.'s Unopposed Mot. for Leave to File a Suppl. Compl., ECF No. 70, Suppl. Compl., ECF

No. 70-1.  The new complaint alleges that EPA's redetermination violates both the APA and

Section 1322(f)(3) because EPA ignored retrofit costs, "arbitrarily concluded . . . that the costs

associated with using pumpout facilities were reasonable," and "failed to provide any reasoned

explanation as to [its] conclusions regarding the reasonable availability" of treatment facilities. *Id.*

¶¶ 6, 47–49, 50–54.

Now before the court are AWO's motion to enforce the court's prior summary judgment

order and motion for summary judgment, EPA's cross-motion for summary judgment, and

Intervenors' cross-motion for summary judgment.   Pl.'s Mot. to Enforce & Renewed Mot. for

Summ. J., ECF No. 72 [hereinafter Pl.'s Mot]; Defs.' Cross-Mot. & Opp'n; Def.-Intervenors' Joint

Combined Mem. of P. & A. Opposing Pl.'s Mot & Cross-Mot. for Summ. J., ECF No. 76

[hereinafter Def.-Intervenors' Cross-Mot & Opp'n].

## III.     MOTION TO ENFORCE

AWO asserts that EPA violated the court's November 2020 summary judgment order ("the Order") by failing to consider retrofit costs on remand and seeks an order enforcing the court's prior judgment.  Pl.'s Mot. at 17.  The Order concluded that, under *Michigan*, Section 1322(f)(3) requires EPA to consider "all relevant factors," which include "the costs of accessing adequate facilities in determining whether such facilities [are] 'reasonably available.'"  *AWO*, 507 F. Supp. 3d at 61.  AWO reads the Order to require consideration of "*all* costs of compliance, including capital and other upfront costs."  Pl.'s Mot. at 17.  The court disagrees and declines to enforce its previous order in the manner AWO requests.

### A.     Standard of Review

"District courts have the authority to" interpret and "enforce the terms of their mandates." *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014); *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004).  "The exercise of this authority is particularly appropriate when a case returns to a court on a motion to enforce the terms of its mandate to an administrative agency." *Flaherty*, 17 F. Supp. 3d at 55 (internal quotation marks omitted).  A court should grant a motion to enforce if a "prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it." *Heartland Hosp.*, 328 F. Supp. 2d at 11.  If a plaintiff "has received all relief required by that prior judgment," however, the motion must be denied.  *Id.*

### B.     Discussion

AWO makes three arguments for why EPA violated the Order when it decided not to consider retrofit costs:  first, the omission was directly contrary to the Order; second, EPA's actions on remand violated the law-of-the-case doctrine and the rule of mandate; and third, waiver and

10

estoppel doctrines preclude EPA's post-remand argument that it need not consider retrofit costs. None of these arguments persuades the court.

<em>1.     The Terms of the Order</em>

First, EPA did not violate the terms of the Order because it did not specify which costs the agency was required to consider—it only required EPA to consider costs relevant to reasonable availability of adequate removal and treatment facilities.  The court based its summary judgment decision in large part on *Michigan*, in which the Supreme Court held that the word "appropriate" in a provision of the Clean Air Act was a "classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors," including costs.  576 U.S. at 752.  In the same way, this court concluded, Section 1322(f)(3)'s expansive "reasonably available" language provides a "textual hook" that requires EPA to consider costs.  *AWO*, 507 F. Supp. 3d at 60.  Other than providing an example that highlighted the relevance of costs of traveling to reach facilities, the court did not specify *which* compliance costs EPA must consider on remand.  And importantly, the *Michigan* opinion that was so instrumental to the court's analysis emphasized that this kind of "capacious[]" statutory language requires "consideration of all the relevant factors," leaving agencies with some "flexibility."  576 U.S. at 752.  The Order echoed this emphasis on "consideration of all *relevant* factors."  *AWO*, 507 F. Supp. 3d at 61 (emphasis added).  The court's directive that EPA consider costs in its reasonable-availability analysis therefore left it to the agency to determine which costs are relevant in the context of Section 1322(f)(3).  *See Michigan*, 576 U.S. at 752 (noting that agencies have some "flexibility" in considering "all the relevant factors").

AWO isolates snippets of the Order to inject ambiguity into this conclusion.  Specifically, AWO states that "the Court explicitly instructed EPA on remand to consider . . . the 'costs of

11

*creating an NDZ* in the Puget Sound,'" and that EPA failed to comply when it elected not to consider retrofit costs. Mem. of Law in Further Supp. of Pl.'s Mot. to Enforce & Renewed Mot. for Summ. J., in Opp'n to Defs.' Cross-Mot., & in Opp'n to Def.-Intervenors' Cross-Mot., ECF No. 77 [hereinafter Pl.'s Reply], at 4 (emphasis added). Admittedly, the court's language could have been more precise, but read in context its intended meaning is clear. In the "Conclusion and Order" section of its opinion, the court remanded the record to EPA for 90 days for further consideration of three issues: "(1) the costs of creating an NDZ in the Puget Sound; (2) the reasonable availability of adequate sewage treatment facilities . . . ; and (3) an explanation of EPA's use of a ratio of commercial vessels to pumpout facilities." *AWO*, 507 F. Supp. 3d at 79. Each of these three items corresponds to one of the issues on which the court found in AWO's favor. *See id.* at 59–63; *id.* at 63–66; *id.* at 69–71. The first of these items refers to the issue framed and discussed at length throughout the memorandum as whether EPA was required "to consider the costs of compliance as part of the 'reasonable availability' determination required under Section [1322](f)(3)." *Id.* at 59. The distinction between costs attributable to the creation of the NDZ and those attributable to the reasonable availability of treatment and disposal facilities, which underlies a significant portion of the parties' arguments on summary judgment the second time around, did not play a role in the parties' initial briefing or in the court's opinion. *See* Pl.'s Mot. at 18 (acknowledging that "[*n*]*one* of the briefing leading up to the decision distinguished between upfront (including capital) costs and ongoing costs"). The court clearly concluded that "'[r]easonable availability' . . . provides the textual hook that requires EPA to consider costs when approving an NDZ." *AWO*, 507 F. Supp. 3d at 61 (citation and internal quotation marks omitted). When properly viewed as a whole, the memorandum indicates that the court concluded *Michigan* requires EPA to consider costs relevant to the reasonable availability of disposal and treatment

12

facilities (for which there is a clear textual hook in the statute)—not the costs of creating the NDZ as a whole (for which the court never found such a textual hook).[3]

### 2.   The Law-of-the-Case Doctrine and the Rule of Mandate

Because the terms of the Order did not require EPA to consider retrofit costs, the law-of-the-case doctrine and the rule of mandate do not preclude EPA from arguing, as it has here, that it need not consider such costs.  Under the law-of-the-case doctrine, "the same issue presented a second time in the same case in the same court should lead to the same result."  *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (emphasis omitted) (internal quotation marks omitted).  The rule of mandate renders a lower court or decisionmaker, including an administrative agency, "without power to do anything . . . contrary to either the letter or spirit of" a higher court's "mandate construed in the light of the opinion of the court deciding the case."  *City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346 (D.C. Cir. 1977) (internal quotation marks and parentheses omitted).  Neither doctrine applies here.  The court did not decide the issue of whether EPA must consider retrofit costs.  Instead, the court decided whether "*Michigan v. EPA* required the agency to consider the costs of compliance as part of the 'reasonable availability' determination."  *AWO*, 507 F. Supp. 3d at 59.  Neither the briefing before the court on summary judgment nor the court's opinion purported to address the specific compliance costs EPA was required to consider.  The court ordered EPA to assess relevant costs and left it to the agency to determine which costs are relevant to the reasonable-availability analysis.  There is therefore no law of the case or mandate that required EPA to consider retrofit costs.

---

[3] Nor would an interpretation of the court's order requiring EPA to consider "all relevant costs" of creating an NDZ make much sense, as the decision whether to create such a protected zone is the province of the state, not EPA.

3.      *Waiver and Estoppel*

AWO next argues that EPA's admission of error for failing to consider any compliance costs in its initial determination precludes it from arguing now that it was not required to consider retrofit costs, under either a theory of waiver or a theory of judicial estoppel.  First, AWO says that EPA waived the argument that it need not consider retrofit costs by "admitt[ing] it failed to consider compliance costs and fail[ing] to respond to AWO's arguments regarding consideration of *all* costs of compliance with the NDZ."  Pl.'s Mot. at 21.  AWO's position distorts the history of this case and conflates two distinct questions in the litigation: "the *Michigan* question" and "the Section 1322(f)(3) question."  *See* Reply in Supp. of Defs.' Cross-Mot., ECF No. 79 [hereinafter Defs.' Reply], at 5.  During the first round of summary judgment briefing, the parties focused on whether *Michigan* required EPA to have considered costs in general (the *Michigan* question), which it had not done when it made its initial determination.  When EPA said in its response to AWO's summary judgment motion that it had "erred—just as [AWO] alleged—by failing to heed the Supreme Court's admonishment" in *Michigan*, it was admitting error on the *Michigan* question, not on the question of which costs it was required to consider (the Section 1322(f)(3) question), which had not yet been briefed.  EPA's Resp. to Pl.'s Mot. for Summ. J. & Cross-Mot. for Recons., ECF No. 48, at 1.  EPA never took a position on the Section 1322(f)(3) question.  Indeed, when requesting a remand, EPA was careful to state that it would have to make "policy choices" on remand "in developing the approach to incorporate costs into pump-out facility determination analyses," including, notably, "what types of costs should generally be considered."  EPA's Reply in Supp. of Its Remand Mot. & Resp. to Pl.'s Cross-Mot. for Vacatur, ECF No. 32, Decl. of John T. Goodin, ECF No. 32-1, ¶ 11.  In short, EPA never said that it was required to consider retrofit costs.

14

Nor did EPA waive the argument that it need not consider retrofit costs by failing to respond to AWO's arguments at summary judgment. "If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded." *Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002); *cf. Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014). But that is not what happened here. Instead, EPA sought a remand and asked the court not to reach or rule on AWO's summary judgment arguments at all. EPA's Resp. to Pl.'s Mot. for Summ. J. & Cross-Mot. for Recons., ECF No. 49, at 1. Practically, treating such conduct as a waiver would, as EPA notes, "put agencies in an impossible bind." Defs.' Reply at 6. Agencies would need to raise or otherwise risk conceding merits arguments in support of their actions when seeking remand. There may be instances in which an agency has not actually considered and taken a position on a particular issue when making its decision (as is the case here with respect to EPA's position on retrofit costs). In such instances, the agency would not be able to brief arguments on that issue and, in turn, would be deprived of any meaningful opportunity to preserve the issue. In any event, the rule of waiver is a discretionary one, and the court declines to apply it here.

For the same reasons, EPA is not judicially estopped from arguing that it need not consider retrofit costs. Courts may invoke judicial estoppel "where a party assumes a certain position in a legal proceeding, succeeds in maintaining that position, and then, simply because his interests have changed," adopts a "clearly inconsistent" position. *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010) (alterations and internal quotation marks omitted). EPA has adopted no clearly inconsistent position because its previous position was simply that it was required to consider costs relevant to the reasonable availability of treatment and processing facilities. It took no position on which precise costs were in fact relevant to that analysis.

15

In sum, nothing that occurred before or during the initial round of summary judgment proceedings precludes EPA from making its argument regarding retrofit costs during this second go around.  EPA has not violated the court's Order, so there is no need for the court to enforce it.

## IV.    SUMMARY JUDGMENT

### A.    Standard of Review

The court now turns to the parties' cross-motions for summary judgment.  "[S]ummary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016).  The district court "sits as an appellate tribunal," reviewing the entire case as a question of law.  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001) (collecting cases).  Accordingly, the court need not engage in lengthy factfinding, and usually, judicial review is limited to the administrative record.  "It is black-letter administrative law that in an [APA] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision."  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted); *see also* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party . . . .").

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "This is a 'narrow' standard of review as courts defer to the agency's expertise."  *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).  The court's review, however, is not toothless.  The court must satisfy itself that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action

16

including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). "When [an] agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)). "Moreover, an agency cannot fail to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (cleaned up). "*Post hoc* rationalizations advanced to remedy inadequacies in the agency's record or its explanation" will not suffice. *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1165 (D.C. Cir. 1987).

### B.    Discussion

AWO has moved for summary judgment and asks this court to find that (1) EPA's decision not to consider retrofit costs is based on an unreasonable interpretation of the CWA and violates the APA; (2) the cost analysis EPA did conduct is arbitrary and capricious; and (3) EPA's reasonable-availability determination as to treatment facilities lacked reasoned decisionmaking. Pl.'s Mot. at 16–17. EPA and Intervenors cross-moved for summary judgment. *See* EPA's Cross-Mot. & Opp'n at 1; Def.-Intervenors' Cross-Mot. & Opp'n at 1. Ultimately, the court finds none of AWO's arguments availing and provides its reasoning below.

### 1.    *EPA's Decision Not to Consider Retrofit Costs*

AWO argues that "EPA strayed far beyond [the] bounds of reasonable interpretation by interpreting . . . the CWA to allow it to ignore all upfront costs." Pl.'s Mot. at 24 (citation and internal quotation marks omitted). In AWO's view, the statute requires EPA to consider all significant costs associated with compliance with the NDZ in its reasonable-availability analysis.

17

That includes retrofit costs, according to AWO, because "without assessing what steps the vessels need to take to make necessary changes," treatment and disposal facilities cannot be said to be "reasonably available" to ships that do not have the physical ability to store their waste to be pumped out by those facilities. *See id.* at 24–25. EPA and Intervenors counter that Section 1322(f)(3) circumscribes the agency's role more narrowly, tasking EPA with considering only the relevant compliance costs attributable to the treatment and disposal facilities themselves—which do not include retrofit costs, as those are attributable to the creation of the NDZ. *See* EPA's Cross-Mot. & Opp'n at 11; Def.-Intervenors' Cross-Mot. & Opp'n at 13. The court agrees with EPA and Intervenors that Section 1322(f)(3) does not require the agency to consider retrofit costs.

The court starts, as it must, with the text of the statute. *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). Section 1322(f)(3) states:

> [I]f any State determines that the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection, such State may completely prohibit the discharge from all vessels of any sewage, whether treated or not, into such waters, except that no such prohibition shall apply until the Administrator determines that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply.

33 U.S.C. § 1322(f)(3). Because "available" is undefined in the statute, it takes its ordinary meaning. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). That meaning is "easy or possible to use"; "present or ready to use"; "accessible." *Available*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/available (last visited on Jan. 31, 2022); *Available*, DICTIONARY.COM, https://www.dictionary.com/browse/available (last visited on Jan. 31, 2022). Availability centers on whether the attributes *of the facilities* (e.g., their locations or their number) make them accessible or usable, not whether the user has the physical capacity to

18

use the facilities. A treatment or disposal facility may be "available" to a vessel even if it does not have a tank, just as a laundromat may be "available" whether or not one has a hamper. This understanding is consistent with the example the court included in its Order:

> Say, hypothetically, that the only pumpout facilities available to commercial vessels were all located in a remote portion of the Puget Sound. Even if those pumpout facilities were sufficient in number, no one would seriously contend that such facilities were "reasonably available" if they imposed significant costs on vessels to reach them.

*AWO*, 507 F. Supp. 3d at 61. The factors alluded to in the court's example—the number of facilities, location of facilities, distances between facilities, distances from different portions of the Puget Sound to the facilities—inform facilities' availability because they bear on the accessibility of the facilities. These are the kinds of costs that EPA must consider in its reasonable-availability determination. Retrofit costs fall outside that category.

This reading is consistent with the general regulatory framework that Congress adopted under the CWA. The Act reflects a careful balance between federal interests and state regulatory discretion. *See* 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ."). When it comes to vessel discharge, it sets a national floor for marine sanitation devices, preempting state regulation. 33 U.S.C. § 1322(b), (f)(1)(A). At the same time, the Act gives states the authority to be more protective than the national floor by prohibiting all vessel discharge in their waters—but only upon the EPA's reasonable-availability determination as to treatment and disposal facilities. *Id.* § 1322(f)(3). In making the creation of NDZs subject to the EPA's reasonable-availability finding, Section 1322(f)(3) embodies the Act's federalism policy by both recognizing the role of states in protecting their waters and allowing EPA to protect federal interests. As this court previously recognized, Section 1322(f)(3) "delineates separate roles for the

petitioning state and EPA," and the EPA's role is not plenary. *AWO*, 507 F. Supp. 3d at 74. Indeed, its role in the division of authority is narrow: determining whether adequate disposal and treatment facilities are reasonably available.

Comparing Section 1322(f)(3) to other provisions of the CWA makes Congress's intent in establishing this narrow role even more clear. While Section 1322(f)(3) allows states to regulate NDZs subject to EPA's reasonable-availability determination—and indeed leaves the decision whether to establish an NDZ to the state—Section 1322(f)(4) empowers the Administrator to establish an NDZ by regulation. "If the Administrator determines upon application by a State that the protection and enhancement of the quality of specified waters within such State requires" prohibition of vessel discharges, EPA must then regulate to establish such a prohibition. 33 U.S.C. § 1322(f)(4)(A). EPA's role under (f)(4) is broader than its role under (f)(3). Under the former, EPA takes primary responsibility for regulating; under the latter, the state does, and EPA's role is limited to making its reasonable-availability determination to safeguard federal interests. When EPA acts under (f)(4), commensurate with its broader regulatory authority, it considers a broad range of factors pertinent to the establishment of an NDZ, which can include retrofit costs. *See, e.g.*, Marine Sanitation Devices; Final Regulation to Establish Drinking Water Intake Zones in Two Sections of the Hudson River, New York State, 60 Fed. Reg. 63,941, 63,942–43 (Dec. 13, 1995) (addressing, in Section 1322(f)(4)(B) action, comment regarding retrofit costs and explaining that, using a metric set forth by Congress, retrofit costs were not "a substantial cost"); Vessel Incident Discharge National Standards of Performance, 85 Fed. Reg. 67,818, 67,874 (Oct. 26, 2020) (proposing a requirement that state applications for EPA to establish a state NDZ under Section 1322(p)(10)(D)(iii)(I) include an analysis of how vessels subject to the NDZ "may be impacted with regards to . . . need for retrofitting"). Section 1322(f)(3), by contrast, is not set up

to give EPA such an expansive regulatory role and so does not call for it to consider the same range of factors.

The foregoing leads to the conclusion that retrofit costs are not attributable to the reasonable availability of treatment and disposal facilities (and, by extension, not among the costs EPA must consider as part of this carefully drawn regulatory scheme). Instead, those costs are attributable to the establishment of an NDZ—a creature of state, not federal, regulation. *See* 33 U.S.C. § 1322(f)(3). In an NDZ, vessels may not discharge "any sewage, whether treated or not," into the water. *Id.* To comply with that prohibition, a vessel generally must be able to hold its sewage in a tank on board while transporting the waste to a disposal facility. The cost of retrofitting a vessel to meet this requirement therefore is not relevant to determining whether there are reasonably available disposal and treatment facilities to service those retrofitted vessels. States establishing NDZs may consider the costs of retrofitting vessels to have tanks to comply with an NDZ, but EPA need not do so to carry out its more limited inquiry under Section 1322(f)(3).

AWO nevertheless insists that EPA has to consider retrofit costs because pumpout facilities are not available to vessels that do not have a tank, since without a tank, a vessel cannot use a pumpout facility. Pl.'s Mot. at 25. Whether or not a vessel has a tank, however, simply does not speak to the *availability* of pumpout facilities. AWO suggests that the remote location of all facilities in the example the court included in its Order, discussed above, is similar to some vessels' lack of tanks, Pl.'s Mot. at 25–26, but simply stating these are similar does not make it so. Location, for example, is an attribute of a facility that informs travel costs and revenue loss in terms of time spent getting to the facility instead of other paid activities. Similarly, the capacity of all the Puget Sound's pumpout facilities combined might be insufficient and so render the facilities functionally unavailable to vessels. Retrofit costs cannot be grouped with costs like these

because they do not stem from the particular attributes of the Puget Sound's pumpout facilities. As EPA notes, the language of Section 1322(f)(3) is focused on the facilities themselves, not on vessel configuration. *See* EPA's Cross-Mot. & Opp'n at 14. Indeed, Section 1322(f)(3) appears to assume the presence of tanks on vessels: it refers to "removal," which implies the storage of sewage onboard. 33 U.S.C. § 1233(f)(3). AWO's argument that the statutory language "*all vessels are*," with its absolute modifier and present tense, means Congress envisioned a consideration of retrofit costs for boats that do not at present have tanks therefore falls flat. *See* Pl.'s Mot. at 28.

In an attempt to undercut EPA's interpretation of "available," AWO also draws attention to attributes of vessels (aside from whether or not they have tanks) that EPA *did* factor into its cost analysis. *See* Pl.'s Mot. at 26. "For example, EPA requires states to provide information on 'the draught requirements on vessels that may be excluded because of insufficient water depth adjacent to the facility.'" *Id.* (quoting 40 C.F.R. § 140.4(a)(5)). Properly framed, however, such factors are best viewed as aspects of facilities' locations and other attributes of the facilities themselves that inform their availability. The need to retrofit a vessel for lack of a tank cannot be viewed the same way. By definition, a pumpout facility inherently requires something to pump out of to remove and treat sewage (i.e., a tank). A pumpout facility does *not* inherently have to be located someplace with insufficient water depth adjacent to it. Whether the water surrounding a facility is compatible with large vessels' draught requirements affects that facility's availability in a way that whether a vessel has a tank does not, and so the former is a cost within the scope of EPA's reasonable-availability analysis while the latter is not.

AWO additionally accuses EPA of abdicating its duty by not performing the broader analysis it conducts when taking many direct regulatory actions, but this misunderstands what

Section 1322(f)(3) instructs EPA to do.  Pl.'s Mot. at 28–29.  For example, as already noted, EPA's consideration of costs under Section 1322(f)(4) is broader than under (f)(3), consistent with the agency's broader regulatory role.  That broader approach can be seen in EPA's other direct regulatory actions.  *See, e.g.*, *NRDC v. EPA*, 808 F.3d 556 (2d Cir. 2015) (involving a general permit for ballast-water discharge); *Riverkeeper, Inc. v. EPA*, 358 F.3d 174 (2d Cir. 2004) (involving regulation of cooling-water intake); *Nat'l Wildlife Fed. v. EPA*, 286 F.3d 554 (D.C. Cir. 2002) (per curiam) (involving regulation of discharges from pulp and paper industry).  But the fact that EPA and other agencies often consider "upfront and capital costs" in the context of other actions, *see* Pl.'s Mot. at 29–30, does not dictate that EPA must do so when its role, as here, is more circumscribed.

AWO further argues that the court previously "expressly rejected the argument that EPA cannot also consider costs considered in the state's process," Pl.'s Reply at 11–12, but that argument misses the point.  The reason EPA says it did not consider retrofit costs is not that Washington already considered them.  Rather, EPA says it did not consider retrofit costs because those costs are associated not with the reasonable availability of pumpout facilities but with the creation of the NDZ, which is within Washington's purview.  EPA's interpretation of the statute does not foreclose its consideration of costs that Washington may have also considered, so long as those costs flow from the reasonable availability of pumpout facilities.  That is the "independent obligation . . . to consider costs" that Section 1322(f)(3) imposes on EPA.  *See AWO*, 507 F. Supp. 3d at 61.

Finally, the cases AWO cites for the proposition that EPA must consider retrofit costs are inapposite given the specific requirements of Section 1322(f)(3).  AWO relies on *Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017), to argue that retrofit costs are a "condition precedent" to

reasonable availability of pumpout facilities, such that EPA must consider those costs.  The "condition precedent" in that case was payment of commissions by inmate calling–services providers to correctional facilities.  Such commissions were often required by statute or contract, and without them, providers could not do business.  *Id.* at 413.  Such costs of doing business were squarely within the scope of the Federal Communications Commission's decisionmaking when it came to setting rate caps while ensuring providers were "fairly compensated."  *See id.* at 412–13.  Here, AWO's asserted "condition precedent"—retrofit costs—is not within the bounds of EPA's narrow decisionmaking.  A more apt comparison to *Global Tel\*Link* would be vessels' payments to pumpout facilities for their services (which EPA did take into account in its cost analysis).  Nor does *Council of Parent Attorneys and Advocates, Inc. v. Devos*, 365 F. Supp. 3d 28 (D.D.C. 2019), change the court's analysis.  In that case, the court concluded that the Department of Education had acted arbitrarily and capriciously because it had not considered all relevant costs.  *Id.* at 53–54.  That case and others like it support only the proposition that EPA must consider costs relevant to its reasonable-availability determination—which it now has.  They do not somehow transform retrofit costs into such relevant costs in the context of the narrow Section 1322(f)(3) analysis.

In sum, the court agrees with EPA's interpretation of Section 1322(f)(3) that it does not require consideration of retrofit costs.  To the extent the statute is ambiguous, the agency's interpretation is reasonable for all of the above reasons and is accordingly entitled to deference.  *See Chevron, U.S.A, Inc. v. NRDC*, 467 U.S. 837 (1984).

### 2.    EPA's Cost Analysis

AWO also challenges as arbitrary and capricious EPA's analysis of the costs it did consider.  AWO contends that EPA's cost evaluation was fundamentally flawed because it (1) did not consider how pumpout costs would affect vessels and operators, (2) reached conclusions

24

contradicted by the evidence, and (3) relied on faulty evidence.  Pl.'s Mot at 32, 34–35.  EPA (with Intervenors alongside it) defends its analysis as satisfying, in light of the deference it is due, the requirements of Section 1322(f)(3) and the APA.  *See* Defs.' Cross-Mot. & Opp'n at 17; Def.-Intervenors' Joint Reply in Supp. of Cross-Mot., ECF No. 80 [hereinafter Def.-Intervenors' Reply], at 8–10.  The court agrees with EPA and Intervenors that EPA's consideration of costs and its explanation of its reasoning are adequate.

As discussed above, Section 1332(f)(3) requires EPA to consider whether adequate facilities are "reasonably available" based on "all the relevant factors"; this analysis necessarily includes a consideration of costs.  *See Michigan*, 576 U.S. at 772–73; *AWO*, 507 F. Supp. 3d at 63. The standard for such review is deferential to the agency.  Indeed, when the Supreme Court remanded to EPA after holding that it was required to consider costs in *Michigan*, it took care to note that "[i]t will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost."  576 U.S. at 759.

EPA's cost analysis proceeded, in basic strokes, as follows:  EPA began by identifying the costs relevant to determining facilities' reasonable availability.  A.R. at 55840.  It classified those costs into four categories: use costs (fees paid to use facilities), pumpout-time costs (revenue lost while pumping out sewage), travel costs (fuel costs and revenue lost while traveling to facilities), and wait-time costs (revenue lost while waiting to use facilities).  *Id.* at 55840, 55842.  EPA's analysis showed that (1) recreational vessels faced minimal pumpout costs; (2) among commercial vessels, 25% of tugboats, 50% of commercial fishing vessels, and 95% of excursion vessels already used pumpout facilities and so faced no new pumpout costs; and (3) the commercial vessels that remained would incur new pumpout costs.  *Id.* at 55854.  Focusing on this third group, EPA created a statistical tool to model factors like pumpout demand and facility capacity and used it to

estimate average pumpout costs for the different vessel types. *Id.* at 55886.  Then, EPA compared

those costs to revenue.  It concluded that the "small fraction" of vessel revenue that pumpout costs

comprise (conservatively, between 0.67% and 2.2% of annual revenue for tugboats, and 1.6% for

commercial fishing vessels) rendered pumpout facilities reasonably available. *Id.* at 55844–45,

55856, 55858.

AWO lobs two main attacks on EPA's cost analysis.  Neither is persuasive.  First, AWO

challenges EPA's alleged failure to analyze "*how* vessel operators could absorb" the allegedly

small incremental pumpout costs.  Pl.'s Reply at 16.  AWO asserts that many vessels operate on

"thin margins," with "some operating at a loss," and that EPA never considered how what it terms

a modest increase in operating costs would interact with those margins to the detriment of vessel

operators.  Pl.'s Mot. at 33.  At the outset, the court notes that, to the extent AWO calls for a vessel-

by-vessel analysis, that is simply not required under Section 1322(f)(3).[4]  *See* Pl.'s Mot. at 32–34;

Def.-Intervenors' Reply at 9.  Section 1322(f)(3) calls for an analysis of the reasonable availability

of facilities as to "*all* vessels," not each vessel.  33 U.S.C. § 1322(f)(3).  Read reasonably, this

language instructs EPA to determine whether, on the whole, facilities are reasonably available to

the vessel population.  Moreover, as EPA notes, the 90-day timeframe Congress established for

EPA to render its reasonable-availability determination suggests Congress did not envision such

an exhaustive vessel-by-vessel analysis.

AWO says its argument is not "that EPA must conduct a vessel-by-vessel analysis" but

that "[t]he record reveals no analysis by EPA determining *how* vessel operators could absorb [the]

incremental cost."  Pl.'s Reply at 16.  The argument appears to be that EPA must determine that

---

[4] In its reply, AWO rejects this characterization of its argument.  Pls.' Reply at 16.  But the court agrees with EPA and Intervenors that AWO's opening brief appears to call for a vessel-by-vessel analysis.

all vessel operators can absorb incremental pumpout costs, and since many of them operate "at or under minimum financial margins," Pl.'s Mot. at 33, any amount of pumpout costs precludes a reasonable-availability determination.    But Section 1322(f)(3) only requires reasonable availability.  33 U.S.C. § 1322(f)(3).  Given this broad statutory requirement, and the fact that Section 1322(f)(3) requires no particular methodology, it was reasonable for EPA to construct a methodology whereby it asked how facilities' availability affected the cost structure of vessels doing business in the Puget Sound overall.  In the terms of the court's hypothetical in its Order, if all of the pumpout facilities were located in the same remote portion of the Puget Sound, resulting in excessive travel costs, such that all vessel operators' margins were entirely obliterated by fuel costs and revenue losses, those facilities, while sufficient in number, might not be reasonably available. *See AWO*, 507 F. Supp. 3d at 61.  That would be a very different case from this one. Here, there is little evidence that, at the margins, pumpout cost are so burdensome that a significant portion of operators will be severely adversely affected.

AWO says that its concern that the increase in operation costs "would make [a] vessel's already tight margin virtually nonexistent[] and could cause the owner to cease doing business, decommission the vessel, or move to operate it outside the Puget Sound . . . . is not hypothetical." Pl.'s Mot. at 33.  But the record fails to actually bear that out.  AWO cites a questionnaire completed by Kirby Offshore Marine stating, in response to a question about retrofit costs, that "most of its vessels are already operating at or under minimum financial margins," and so the operator "cannot entertain the prospect of retrofitting vessels."  *Id.* (emphasis and internal quotation marks omitted).  As discussed, however, retrofit costs are not relevant to EPA's reasonable-availability analysis.  Kirby Offshore Marine's questionnaire does not provide evidence of how *pumpout* costs, which amount to a much smaller fraction of revenue than retrofit

27

costs, will affect operators' finances. The other evidence AWO points to is another operator's statement that "operating in the tugboat industry requires being available to customers on short notice for work, that the time needed for pump out would result in a minimum 10 percent loss of efficiency, and even a one percent loss of overall availability would be unacceptable to customers who monitor performance." *Id.* at 33–34. AWO accuses EPA of failing to address these comments, but EPA accounted for lost efficiency as a pumpout cost: it calculated it as lost revenue. *See* A.R. at 55842. Moreover, as EPA notes, it is not clear how these comments regarding efficiency loss bear on viability.

Contrary to AWO's underdeveloped contention, the record indicates that, on the whole, vessels can afford pumpout costs, as demonstrated by the large proportion of tugboats, fishing vessels, and excursion vessels already using pumpout facilities. *See* A.R. at 55854. Those vessels evidently can absorb pumpout costs. It is true in theory that "an incremental cost can be a 'small' percentage of overall costs" while "still caus[ing] the vessel's margins to diminish past the point of viability," Pl.'s Reply at 16, but the record does not demonstrate that to be true in practice. This case is therefore unlike *Wyoming v. U.S. Department of the Interior*, 493 F. Supp. 3d 1046 (D. Wyo. 2020), which AWO cites as an example of a case in which a court found arbitrary and capricious the agency's conclusion, "contrary to [the] record, that compliance costs would not cause" the regulated entity to close. Pl.'s Reply at 16–17. The record here is not contrary to such a finding.[5]

---

[5] AWO also says EPA's consideration of operating costs fails to account for "costs associated with retrofits, modifications to a vessel, or vessel replacement" as well as "overall business costs such as taxes." Pl.'s Mot. at 34–35. But as explained above, retrofit costs (which include modification and replacement costs) are not relevant to the reasonable availability of pumpout facilities, and so EPA need not consider them. And EPA *did* account for taxes. *See* A.R. at 55886. And, as EPA explains, if baseline operating costs are *higher* than what EPA calculated, pumpout costs (which would remain the same) would be a *lower* percentage of operating costs, which would only strengthen the conclusion that pumpout facilities are reasonably available. Defs.' Cross-Mot. & Opp'n at 20.

AWO's second main challenge to EPA's cost analysis is aimed at the revenue data on which EPA relied.  AWO charges that this data—drawn from a report prepared by Herrera Environmental Consultants for Washington's NDZ rulemaking—is flawed to such an extent that it dooms EPA's analysis as arbitrary and capricious.  *See* Pl.'s Mot. at 35.  AWO's criticisms of the Herrera report include that it was five years old when EPA relied on it; it obtained information about gross revenue and profit from public records instead of from vessel operators; and it lacked private industry data needed to best estimate indirect costs, particularly for tugboats.  *Id.*  These criticisms are without merit.  The Herrera report explained the reason for relying on public records: vessel operators do not release detailed revenue information.  A.R. at 56268.  Instead, Herrera relied on public records, published industry reports, and public financial information from vessel operators to estimate the range of annual tugboat revenue.  *Id.* at 56268–69.  AWO has provided no reason for the court to conclude that this underlying publicly available data was unreliable or inaccurate.  Nor has AWO provided a basis for concluding that it was improper for EPA to rely on estimates rather than more detailed findings.  *See* Pl.'s Mot. at 35.  EPA invited stakeholders to submit information relevant to its consideration of costs on remand, and neither AWO nor any other entity provided more detailed revenue data for tugboats.  *See* A.R. at 55725.  The APA does not require "perfect empirical or statistical data."  *FCC v. Prometheus Radio Proj.*, 141 S. Ct. 1150, 1160 (2021).  EPA noted the limitations of the report, and it treated the estimates it contained as such.  *See* A.R. at 55856.  It was not unreasonable on the basis of the data's level of specificity or reliance on public records for EPA to rely on the Herrera report for revenue estimates.[6]

---

[6] AWO attempts to distinguish *Prometheus Radio Project* on the basis that, unlike the agency in that case, EPA did not include consideration of the Herrera report's limitations in its determination after remand, nor did it ask for information on the "flaws admitted on the face of the" report.  Pl.'s Reply at 17 n.9.  But as the court has already addressed, EPA *did* acknowledge the high-level nature of the Herrera report's data, and it treated the report's estimates

AWO also asserts that the Herrera report contained "basic arithmetic errors and logical fallacies." Pl.'s Mot. at 35. First, it faults the Herrera report for calculating annual revenue of the commercial fishing industry by dividing *statewide* revenue by the number of fishing vessels in the Puget Sound. *Id.* at 35–36. This approach "falsely attributes all statewide revenue to vessels operating in Puget Sound, when the state has hundreds of miles of other coastline," says AWO. *Id.* at 36 (emphasis omitted). But to the extent this approach overestimates revenue for fishing boats, the fact that the state-level data does not encompass vessels' out-of-state revenue diminishes the overestimate. A.R. at 56269; *id.* at 55856. And while AWO suggests that the Herrera report's assumption that tugboats operate 365 days of the year is flawed because tugboats take some days off for maintenance, *see* Pl.'s Mot. at 36 n.24, EPA made the same assumption when estimating costs, removing any potential distortion of the ratio of costs to revenue, *see* A.R. at 55843, 55855. In sum, EPA considered and explained any limitations of the Herrera report's data, and its reliance on that data was not improper, as "imperfection alone" in a dataset relied on by an agency "does not amount to arbitrary decision-making." *Dist. Hosp. Partners*, 786 F.3d at 61; *see also AWO*, 507 F. Supp. 3d at 68–69 ("Moreover, minor deficiencies in an agency's data do not provide this court with a basis to conclude that the agency acted arbitrarily and capriciously.").

### 3. EPA's Analysis of Treatment Facilities

The court now moves to the other assessment EPA was required to make under Section 1322(f)(3): the reasonable availability of sewage treatment facilities. *See* 33 U.S.C. § 1322(f)(3). In the first round of summary judgment, the court concluded that EPA had failed to meet its obligation to determine that adequate sewage treatment facilities are reasonably available in the

---

as precisely that—estimates—in drawing a conclusion as to whether pumpout costs render facilities reasonably available to vessels on the whole, using both the lower and upper ends of the report's estimate ranges. A.R. at 55856.

Puget Sound.  *AWO*, 507 F. Supp. 3d at 64.  The court ordered EPA to consider that issue on remand.  *Id.* at 79.  EPA did so, but AWO argues that the agency did not engage in reasoned decisionmaking.  Pl.'s Mot. at 36.  EPA and Intervenors defend the agency's decision.

EPA concluded adequate treatment facilities were reasonably available because the overall capacity of the region's wastewater treatment plants "dwarfs the volume of vessel sewage."  Defs.' Cross-Mot. & Opp'n at 23; *see also* Def.-Intervenors' Cross-Mot. at 8.  The capacity of the region's treatment plants, collectively, is 708.8 million gallons of wastewater per day.  A.R. at 55865. Without the NDZ designation, the average wastewater flow through the Puget Sound is 335.7 million gallons per day, or less than half of the total capacity; vessels are expected to generate between 36 and 73 million gallons of sewage per year in the course of complying with the Puget Sound NDZ.  *Id.*  The Puget Sound's unused treatment capacity is, as EPA explains, "orders of magnitude" larger, even accounting for the additional vessel sewage generated by the NDZ.  Defs.' Cross-Mot. & Opp'n at 21.  Moreover, the region's treatment plants are all subject to federal and state regulation; all but three comply currently with federal statutes, and the remaining three are set to be in compliance pursuant to enforceable consent decrees by 2030.  *See* A.R. at 55741, 55861–62.  Based on the ample capacity of regulated treatment plants, EPA concluded that adequate facilities for the safe and sanitary treatment of vessel sewage are reasonably available in the Puget Sound.

AWO takes issue with EPA's analysis, first arguing that "[i]t is illogical for EPA to use the total capacity of *all* facilities in the entire Puget Sound region as the denominator for determining adequate and available treatment capacity, when vessel sewage is predominantly sent to only some facilities."  AWO's Reply at 19.  Instead, AWO says, EPA should have considered where untreated wastewater is actually delivered—here, largely to the King County or Seattle

wastewater-treatment plants—to avoid inflating capacity numbers and to appropriately account for any limitations of those particular treatment plants. *See id.* at 19. But as EPA and Intervenors note, the record demonstrates that vessel sewage is sent to treatment plants all over the Puget Sound. Defs.' Reply at 9–10; Def.-Intervenors' Reply at 6–7; A.R. at 55882–85; A.R. at 55860. Indeed, many pumpout services are mobile, so they are able to discharge at multiple treatment plants, including if a particular plant has reached capacity (although the record suggests such a scenario is unlikely, *see* A.R. at 55861). *See* A.R. at 47, 55860, 55882, 55884–85. It is therefore reasonable for EPA to have included treatment plants across the Puget Sound in its "denominator" for considering capacity.

The text of the statute also provides support for such an approach. Section 1322(f)(3) requires EPA to determine that adequate treatment facilities "are reasonably available for *such water* to which [a state's] prohibition [of all vessel-sewage discharges] would apply." 33 U.S.C. § 1322(f)(3) (emphasis added). In this case, Washington's NDZ covers all of the Puget Sound, *see* Wash. Admin. Code § 173-228-030, so it was appropriate for EPA to consider the entire Puget Sound's treatment capacity. The statute also requires EPA to find treatment facilities only "reasonably available," not perfectly available, and so does not require EPA to consider each facility one by one—nor would EPA likely be able to do so within the 90-day timeline set forth by Congress for the agency to make its determination under Section 1322(f)(3).

As its next major challenge, AWO makes much of the fact that combined-sewage overflows occur in the Puget Sound's sewage systems. *See* Pl.'s Mot. at 36–37. But the fact that such overflows occasionally occur does not render EPA's analysis unreasoned or illogical. Overflows occur in the Puget Sound's sewer systems when heavy rains cause surges in older sewer systems that receive storm water and domestic sewage and deliver them to wastewater-treatment

plants.  *See* A.R. at 55861–62, 55741.  The surges lead to overflows, which discharge at built-in outfalls of the sewage systems.  Again, as a matter of statutory language, Section 1322(f)(3) requires only *reasonable* availability, not perfect availability, and so the occurrence of overflows does not automatically preclude a reasonable-availability determination.  33 U.S.C. § 1322(f)(3).  Indeed, the CWA acknowledges and allows for the occurrence of some overflows.  *See id.* §§ 1311(a), 1342.

In any event, for numerous reasons, it was not unreasonable for EPA to conclude that overflows would have only minimal impact on treatment-facility availability in the Puget Sound.  First, they occur rarely.  *See* A.R. at 55743, 55862.  Second, to the extent they do occur, as EPA explained, they occur during off-peak months in terms of vessel-sewage volume, freeing up capacity during peak sewage season.  Defs.' Cross-Mot. & Opp'n at 21–22; Def.-Intervenor's Cross-Mot. & Opp'n at 10; A.R. at 55862.  Overflows generally occur during the rainy winter months.  A.R. at 55862*.*  But peak vessel-sewage season is summer, when recreational boating is at its highest.  *Id.*  Overflows are therefore unlikely to overwhelm sewage systems during the times of the year they are most likely to occur.  AWO counters that this explanation ignores commercial vessels' year-round need for treatment (including during winter months), *see* Pl.'s Mot. at 37, but the record demonstrates that treatment capacity vastly exceeds vessel sewage—including sewage from commercial vessels—all throughout the year.  A.R. at 55865–66; *see* Defs.' Cross-Mot. & Opp'n at 21–22; Def.-Intervenors' Cross-Mot. at 11.  AWO also disputes EPA's finding that overflows happen most frequently during the wet months, relying on a King County report from 2007 to argue that they also occur in dry months.  *See* Pl.'s Mot. at 37.  That report predicted that overflows would very likely occur at least once a week during many of the dry months.  A.R. at 3890.  But other record evidence undercuts the 2007 King County report's prediction, and so does

the 2015 King County report AWO itself cites in its motion.  Pl.'s Mot. at 36–37; Def.-Intervenors'

Cross-Mot. & Opp'n at 10; A.R. at 3989 (linking to a 2015 King County report, Defs.' Cross-Mot.

& Opp'n, Ex. A, demonstrating that, after King County made changes to its sewage system, only

a small portion of overflows occurred during the dry months).

What EPA terms the "temporal impact" of overflows is also limited by the fact that the

three jurisdictions in which overflows pose the greatest issue are subject to consent decrees with

enforceable compliance deadlines.  Defs.' Cross-Mot. & Opp'n at 22; A.R. at 55861–62.  Under

those consent decrees, each of the three jurisdictions will be in compliance with applicable

requirements by 2030 at the latest, which is expected to decrease overflows by "95% to 99%."

A.R. at 55861–62, 55741.  AWO, pointing to the language of Section 1322(f)(3), argues that EPA

must find adequate treatment facilities are *currently* available—not that they will become available

in the future.  Pl.'s Reply at 23 (noting that Section 1322(f)(3) says "*are* reasonably available").

But AWO's focus on the present tense "are" in the statutory language ignores the next two words:

"*reasonably* available."  In light of the record as to the capacity of treatment facilities and the

frequency and timing of overflows, EPA determined that their impact does not render treatment

facilities unavailable—especially since overflows are set to decrease significantly within the

decade, diminishing their minimal impact even more.  That conclusion does not reflect unreasoned

decisionmaking.

Finally, AWO argues that EPA failed to engage with arguments comparing overflows to

vessel discharges, *see* Pl.'s Mot. at 37, but this is neither true nor relevant.  First, EPA did engage

with arguments comparing the impacts of overflows to vessel discharges.  *See* A.R. at 55862

(explaining why overflows are preferable to vessel-sewage discharges).  For instance, EPA

explained that, because overflows occur at known locations and trigger immediate notification

requirements to the state, the state is better able to protect the public from overflows than discharges, which lack these attributes. *Id.*  AWO says that EPA should have compared untreated sewage discharged through overflows to treated sewage discharged by vessels. *See* Pl.'s Mot. at 37–38.  In response, EPA and Intervenors explain that overflows "receive primary treatment and are diluted by stormwater."  Def.-Intervenors Cross-Mot & Opp'n at 8; *see id.* at 9 (explaining that "King County uses satellite wet weather treatment facilities to provide primary treatment and disinfection for some of [their overflow-related] discharges").  Thus, to the extent comparing vessel discharges to overflows is a relevant consideration, based on the record, it was reasonable for EPA to reach the conclusion it did and explain it as it did.  Ultimately, though, arguments about this comparison are "a red herring."  Def's Reply at 13; *see also* Pl.'s Reply at 22 ("The issue is not whether an onshore facility that suffers from repeated [overflows] is 'better' than on board treatment. The question is whether that facility will offer safe and sanitary treatment.").  They do not speak to the reasonable availability of adequate facilities for the safe and sanitary treatment of sewage. *See* 33 U.S.C. § 1322(f)(3).

Again, Section 1322(f)(3) does not require perfect availability of adequate treatment facilities.  It requires only reasonable availability.  EPA considered the quantity of treatment facilities and their capacity, along with the frequency and impacts of overflows on treatment capacity, and explained how it analyzed those factors.  Its determination that adequate treatment facilities are reasonably available therefore did not run afoul of the APA.

\*   \*   \*

On remand, EPA properly considered compliance costs associated with using pumpout facilities and the reasonable availability of treatment facilities.  Because the court finds that EPA's actions on remand did not violate the APA, it does not reach the question of vacatur.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Enforce and Renewed Motion for Summary Judgment, ECF No. 72, is denied.  EPA's Cross-Motion for Summary Judgment, ECF No. 74, and Defendant-Intervenors' Cross-Motion for Summary Judgment, ECF No. 76, are granted.

A final, appealable order accompanies this Memorandum Opinion.


Dated:  February 14, 2022

Amit P. Mehta
United States District Court Judge